```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                          ---O0o---

 4        BEFORE THE HONORABLE KIMBERLY J. MUELLER, JUDGE

 5

 6    ANI CHOPOURIAN,

 7          Plaintiff,

 8    Vs.                            CASE NO. CIV. S-09-2972 KJM

 9    CATHOLIC HEALTHCARE WEST,
      et al.,
10

11          Defendants.

12    _____/

13

14

15                          ---o0o---

16                    REPORTER'S TRANSCRIPT

17          EXCERPT FROM JURY TRIAL PROCEEDINGS

18                    OPENING STATMENTS

19                        DAY TWO

20            TUESDAY, FEBRUARY 7TH, 2012

21                          ---o0o---

22

23

24

25    Reported By:  CATHERINE E.F.BODENE, CSR. NO. 6926
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

```
 1                         APPEARANCES

 2                          ---o0o---

 3

 4   For the Plaintiff:

 5        BOHM LAW GROUP
          4600 NORTHGATE BLVD., SUITE 210
 6        SACRAMENTO, CALIFORNIA  95834

 7        BY:  LAWRANCE BOHM, ATTORNEY AT LAW

 8

 9        LAW OFFICE OF ERIKA M. GASPAR
          2121 Natomas Corssing Drive, Suite 200-399
10        Sacramento, California  95834

11        BY:  ERIKA M. GASPAR, ATTORNEY AT LAW

12
          LAW OFFICES OF GREGORY DAVENPORT
13        3031 West March Lane, Suite 334
          Stockton, CA  95219
14
          BY:  GREGORY DAVENPORT, ATTORNEY AT LAW
15

16   For the Defendants:

17        LAFOLLETTE, JOHNSON, DEHAAS, FESLER & AMES
          655 UNIVERSITY AVENUE, SUITE 119
18        SACRAMENTO, CALIFORNIA  95825-6746

19        BY:  JULIE CLARK MARTIN, ATTORNEY AT LAW

20        BY:  DAVID DITORA, ATTORNEY AT LAW

21

22

23                          ---o0o---

24

25
```

```
1                        PROCEEDINGS INDEX
2                            ---o0o---
3
4     PROCEEDINGS:                                  PAGE
5        Opening Argument by Mr. Bohm                 2
6        Opening Argument by Ms. Martin              22
7
8                            ---o0o---
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

1              SACRAMENTO, CALIFORNIA

2           TUESDAY, FEBRUARY 7TH, 2012

3                  ---o0o---

4         (Excerpt from trial proceedings.)

5         THE COURT:  All right.  All right.  Let's call the

6    jury in.

7         Mr. Bohm, are you ready to go?

8         MR. BOHM:  Yes, Your Honor.

9         THE COURT:  All right.  Maximum 30 minutes each.

10        MR. BOHM:  Thank you, Your Honor.

11        THE COURT:  Then we will go -- You're calling

12   Miss Devitt again?

13        MR. BOHM:  Yes.  My phone is on flight mode, but I

14   have it on timer.  I'll need a cue for when I'm supposed to

15   touch it.

16        THE COURT:  All right.

17        Miss Schultz, you may bring the jury in.

18        (Jury seated at 9:15 a.m.)

19        THE COURT:  You may be seated.

20        Welcome to Day Two of trial, Ladies and Gentlemen of

21   the Jury.

22        We are ready to begin with opening statements.  Just

23   so you know what you have on your chairs, there is a binder.

24   As trial goes forward, Miss Schultz will be taking pictures

25   of witnesses and we'll put those in the binder to help you

2

```
1          just remember a name with a face.

2          We've also put the preliminary instructions in

3    there for your reference.  And ultimately, the final

4    instructions that I read to you will be added to those

5    binders.

6          (Easel moved.)

7          MR. BOHM:  Sorry.

8          THE COURT:  Then there is a notebook there if you

9    want to use it for notes.

10         I'm now going to recognize Mr. Bohm to make

11   plaintiff's opening statement, and he has up to 30 minutes to

12   do that.

13         Mr. Bohm, you may begin.

14         MR. BOHM:  I need my timer.

15         Thank you, Your Honor.

16         Ladies and Gentlemen, you just heard I have 30

17   minutes to make an opening statement about a case that

18   involves years of conduct.

19         If I speak too fast, please forgive me.

20         A business running a hospital has an affirmative

21   obligation to ensure there's a safe working environment, safe

22   for the patients, safe for the employees, safe for everybody.

23         And when that environment involves reports that

24   patient care is being jeopardized, that there's workplace

25   bullying, that there's sexual harassment, all of those
```

3

1    reports, they have to be taken very seriously.

2            If an employee is terminated, defamed or blackballed

3    for making any of these kinds of complaints, then the

4    hospital is going to be responsible for all the harm that's

5    caused.

6            Now, let me tell you the story about what happened in

7    this case.

8            This is a case about Catholic Healthcare West.  It's

9    now known as Dignity Health Systems.  Catholic Healthcare

10   West is the fifth largest health system in the nation.  They

11   are headquartered in San Francisco.  They have approximately

12   10,000 doctors.  They have 150 ancillary care sites.  They

13   have 55,000 employees across Nevada, California, Arizona.

14           According to the company, it is absolutely committed

15   to delivering compassionate, high-quality healthcare.

16           However, as you'll see from the witness stand, the

17   witnesses and the documents in this case, suggests a very

18   different mission exists in the Cardiac Surgery Department of

19   Mercy General Hospital and the Mercy San Juan Hospitals where

20   my client, Ani Chopourian, was working as a physician's

21   assistant helping and assisting during cardiac surgery

22   procedures.

23           Now, according to numerous witnesses, the environment

24   at Catholic Healthcare West has evidence of hostility towards

25   women, women who are treated like sexual objects, less

4

1   important than the male surgeons that they are assisting.

2   There's graphic sexual talk which is prevalent, pervasive and

3   constant.

4        According to several witnesses the sex talk is so

5   constant that nothing is verboten.  "Verboten" means

6   forbidden.

7        Now one surgeon, Dr. Frank Slachman, you'll hear

8   witnesses talk about how Dr. Slachman likes to talk about the

9   fact that his wife won't give him sex any more.

10        He likes to talk about the fact that he's horny.  In

11   fact if he's asked, "How you doing Frank?", his response is,

12   "I'm horny."

13        He'll give that response in front of the entire

14   staff.  He enjoys asking questions of staff members about

15   what they do in their own personal sex life.  He also enjoys

16   talking about movie stars and coworkers and how they enjoy

17   their sex life.

18        Another heart surgeon, Dr. Henry Zhu, he enjoys in

19   particular talking about women's breasts.  He talks about

20   women's breasts frequently during surgery.  He asks questions

21   about the private sex life of people who work with him.

22        Another anesthesiologist named Dr. Devoe, Dr. Devoe

23   likes to tell lots of dirty jokes, one after the other,

24   raunchier and raunchier, graphic, sexual, dirty jokes.

25        There's yet another heart surgeon named Dr. Richard

5

1    Kaplon.  For him, and we're going to hear much more about

2    Dr. Kaplon, he enjoys humiliating female subordinate staff,

3    calling them incompetent in front of the staff, using

4    passive-aggressive behavior like whispering or making people

5    pull harder than they have to.  And at least as to one women

6    he would refer to her as a "stupid chick," a "dumb chick."

7    Dr. Kaplon describes himself as an asshole.

8           The "chick" he's referring is Ani Chopourian, a

9    graduate of the Yale program of physicians assistants, and a

10   former architect before she decided to get into medicine.

11          Now, the atmosphere in the surgery, it empowers the

12   other people, the other male staff in particular, who are

13   providing the support.  If the surgeons aren't getting into

14   trouble for doing this, then neither are the male staff who

15   work under them.

16          What you'll see from the witness stand is a crew of

17   housekeepers and assistants who feel like they can do

18   anything they want to the women they work with.  Pinching.

19   Pulling them onto their lap.  Slapping them on the buttocks.

20   Continually asking them out.

21          One man named Jose Gomes asked out Miss Chopourian so

22   much.  She will tell you about how he said, "You're going to

23   get it so good from me you're never going to want it from

24   anybody else again."

25          That was one of several vulgar comments which

6

1    Miss Chopourian on a repeated basis would have to put up

2    with, many times happening in front of the supervisor, the

3    supervisor being Miss Jean Scrafton, the clinical

4    coordinator.

5           The clinical coordinator, Jean Scrafton, would laugh

6    when Miss Chopourian would talk about how Jose and the others

7    were harassing her.  She laughed because you'll hear

8    Miss Scrafton was engaged in an extramarital affair with

9    Mr. Gomes before she became the clinical coordinator.

10          You'll hear that Mr. Gomes also became involved in

11   another extramarital affair with a different female coworker.

12   According to Mr. Gomes, he asks out a lot of women at work,

13   but only the good looking ones.

14          In spite of numerous comments about the atmosphere,

15   nothing happens.  But as you'll see in this case, this is not

16   the only problem in this cardiac OR.

17          Since October 2006, members of hospital leadership at

18   Mercy General Hospital received numerous complaints, four

19   different reports about one particular surgeon in one week.

20          One of the people who submitted the report was Ani

21   Chopourian.  Three other individuals, who have not been

22   identified by the hospital, also submitted reports during the

23   same week.  According to the hospital records, the reports

24   concerned abusive, hostile and demeaning conduct by

25   Dr. Kaplon.

7

1            According to the records Dr. Kaplon made gender

2     comments that suggest he has something against women.

3     Dr. Kaplon was reported as calling Ani Chopourian a "stupid

4     chick" and saying "just like a girl."  This is in a written

5     report that was confirmed received by the hospital.

6            These complaints were not investigated.  In fact,

7     what happened was an internal letter came from the director

8     of the medical staff to Dr. Kaplon asking him to please

9     respond to these four written reports.

10           One month went by.  Another letter was sent to

11    Dr. Kaplon.  A second request.  No response.  Another month

12    went by.  Third request.  No response.

13          Finally, in January of 2007, Dr. Kaplon responded

14    that it was a bad week for him, that Miss Chopourian was a

15    new physician's assistant and he felt she was incompetent.

16    And as to the others, he really doesn't remember, but he was

17    having a bad week, and he acknowledges that such behavior was

18    unprofessional and inappropriate.

19          The reporting employees were never told about the

20    investigation or what resulted.

21          But there weren't just four reports in October of

22    2006.  The vice-president, Doris Frazier, gave a deposition

23    in this case as the person most knowledgeable about the

24    written reports of Miss Chopourian.

25          She allocated all four complaints to Miss Chopourian,

8

1    even though they're clearly from other employees, more than

2    just Miss Chopourian.  And she left out a fifth complaint,

3    also in that same week, but not just about Dr. Kaplon.

4         Ani Chopourian submitted another complaint, the day

5    after her first, talking about the hostile and abusive work

6    environment for women and talking specifically about the

7    failure to provide meal breaks as required by law.

8         This fifth complaint in October was never registered

9    in their system.  It was never investigated, and it was never

10   spoken of at all.  Miss Chopourian was never contacted in

11   follow-up to discuss this report concerning the lunch breaks.

12        Now, as you'll see, I'm working through here

13   chronologically to help you follow along in the overview of

14   the evidence.

15        We're now in spring of 2007.  And so I'm just not

16   repeating what's on the screen, I'll tell you that there were

17   three more reports in the spring of 2007 after

18   Miss Chopourian and another nurse realized that nothing was

19   being done by the hospital to address the problems with

20   Dr. Kaplon and the work environment.

21        And I want to direct your attention to the complaint

22   in April of 2007 where Miss Chopourian reported that while

23   Dr. Kaplon was out of control, in a rage in the OR, he cut

24   through a vein, something in her years of cardiac surgery

25   experience she has never seen.

9

1          She further reported that at the time that vein was

2     cut, there was no first assistant medical doctor for the

3     surgery which was a requirement of Title 22 Regulations and

4     of the hospital's own policies.

5          MS. MARTIN:  Objection, Your Honor, improper opening

6     regarding the law.

7          THE COURT:  Sustained.  The jury shall disregard the

8     last sentence.

9          MR. BOHM:  Well, the evidence in this case will show

10    the hospital's policies and the hospital's instructions with

11    regard to whether and when a first assistant surgeon is

12    required.

13         The same month a nurse named Frances Earle also

14    complained about a hostile work environment in Dr. Kaplon's

15    OR, specifically indicating that the hostile yelling,

16    screaming and humiliation was causing her to feel unsafe.

17         She was the scrub nurse responsible for counting up

18    all of the items that were going to be used in surgery.  She

19    put her complaint in writing.  She gave it to the hospital,

20    and she got a response:  She needed to take care of it on her

21    own.  She got that response from vice-president Doris

22    Frazier.  And as Miss Earle will tell you, she was very

23    dissatisfied with the hospital's response to her complaints.

24         This should now take us to the summer of 2007.  Four

25    additional reports from Miss Chopourian.  You will see these

10

1   reports and hear about these reports.  Four additional

2   reports about the conduct in the OR.

3        And in particular, the first two reports had to do

4   with the fact that Miss Chopourian was being required to

5   harvest a vein from a part of the leg that has a certain

6   distinctive staining called hemosiderin staining.

7        It means the vascular integrity of the vein has been

8   corrupted and it is leaking, and it suggests that it is not

9   going to be good for use during bypass surgery.

10       Dr. Kaplon had a game he liked to play with

11  Miss Chopourian where although she intended to harvest from

12  the thigh endoscopically, he would make her take these veins.

13  Then once she handed him the vein, he would unleash a verbal

14  assault criticizing her for being incompetent, even though

15  Miss Chopourian told him that the vein was going to be

16  compromised.

17       This was one of his passive-aggressive games that he

18  liked to play with Miss Chopourian.  And in her written

19  report she specifically noted he was playing these games at

20  the expense of the patient.

21       Another witness you'll hear from in this case is

22  named Betty Devitt.  She'll tell you she observed this, and

23  that she also reported these problems to management.  And

24  she's not aware of any follow-up having been taken.

25       But what did happen after the various reports in

11

1    August, again mentioning she's being called a stupid chick

2    and the hostile environment, is in September of 2007 a

3    curious meeting, from Miss Chopourian's standpoint, happened.

4          She was called into a meeting with the vice-president

5    of Human Resources, Cynthia Kirch, and the clinical

6    coordinator, Jean Scrafton.  And they told her that she had

7    had another employee swipe her card for her when she was

8    circling the parking lot because there wasn't enough parking.

9          She said:  Yes, I did that because you do that.  I

10   thought that was our process, since there's construction in

11   the garage, to have somebody swipe in, go park off parking,

12   we're not going to hold that against you.

13         They said:  No, that's not our policy.  You need to

14   go park off-site and walk to work.

15         Fine.  Never happened again.  She wasn't written up

16   for this either.

17         But she did feel like this very curious meeting had

18   something to do with the fact that she was reporting.  And

19   she immediately took it upon herself to stop reporting, at

20   least for a little while, because she was worried she was

21   going to get in trouble if she kept doing it.

22         But then in 2008 the Cardiovascular Surgery

23   Department got a new director, Renee Dodge.  And

24   Miss Chopourian thought:  New director.  I will go to this

25   director.  I can tell her about the problems we've been

12

1    having in the cardiac OR.  This new director will do

2    something about it.

3            Before the new director, Jean Scrafton, the clinical

4    coordinator, was wearing both hats.

5            Well, when Miss Chopourian brought up the very first

6    issue, that there was no M.D. assist, and that there been a

7    radial artery dropped on the floor during surgery, the

8    response was a corrective action meeting.

9            The same month as this information was communicated,

10   management met with Miss Chopourian to indicate she was going

11   to receive a written corrective action based upon the meeting

12   they had in September 2007 about the timecard swiping.

13           Miss Chopourian was given a write-up that referenced

14   a meeting in September of 2007 and she was given her first

15   written warning in lieu of suspension.  And that was dated in

16   February of 2008.

17           Miss Chopourian immediately indicated:  Why am I

18   being written up for something that happened in September

19   2007.  Miss Dodge said that we need to make an example of

20   you.

21           Miss Chopourian was deeply concerned after that

22   meeting, and in March of 2008 she began again making formal,

23   written complaints to the hospital about the working

24   conditions, the environment.

25           Frances Earle also submitted her second complaint in

13

1   writing, this time telling a harrowing story of how she was

2   forced to look through garbage pails looking for a sponge

3   which she couldn't find.  Every bit of tools and product used

4   in that surgery has to be accounted for.

5       They couldn't find the RO sponge.  They looked

6   everywhere.  And right before they called in radiology,

7   Dr. Kaplon reached behind the heart, pulled out the sponge

8   and flipped it at her with a smirk indicating, "Is this what

9   are you looking for?"

10      Everybody in the room told Miss Earle to write that

11  up.  Everybody in the room believed that she had been

12  subjected to, from the beginning of that procedure to the

13  very end, a hostile work environment intended to drive her

14  out of Dr. Kaplon's room.

15      In fact, Miss Earle will tell you she specifically

16  requested after that incident that she no longer have to

17  scrub for Dr. Kaplon, a request which was granted by the

18  hospital.  And you'll find out also later revoked by the

19  hospital because of the appearance it created with

20  Miss Chopourian when she wanted the same thing.

21      MS. MARTIN:  Objection, Your Honor.  Argument.  Also

22  beyond the scope.

23      THE COURT:  Overruled.

24      MR. BOHM:  Coming through this spring, in addition to

25  the "stupid chick" remarks and the constant verbal assault,

14

1  something even more egregious happened from Miss Chopourian's

2  point of view.

3       She was stuck by a needle when Dr. Kaplon was in a

4  rage pulling suture.  He tore through her glove, through her

5  finger.  She'll tell you at that moment Dr. Kaplon realized,

6  or at least it appeared, that he knew he had gone too far.

7       She went out and reported that to management.  No

8  response.  No paperwork.  Nothing happened.

9       What did happen was a meeting between Renee Dodge and

10  Ani Chopourian to discuss the situation.  And at the meeting

11  between Renee Dodge and Ani Chopourian there was discussion

12  of this work environment that I've described for you.  There

13  was discussion about Jose Gomes pinching her, pulling her and

14  sexual harassment.

15       The sexual harassment got put by Renee Dodge in an

16  email to management with only one line, "dirty laundry."

17  That's what Miss Dodge characterized the complaints from

18  Miss Chopourian about sexuality in the workplace, "dirty

19  laundry."

20       She also mentioned to management that Ani was

21  complaining she got so upset she drove her car into the

22  parking garage -- part of the parking garage and damaged it.

23  And when she is telling this to the HR manager, she puts in

24  parenthesis, "I know Jim.  I know."

25       She can't remember what she meant by that.

15

1    And Mr. Anderson, the HR manager, he can't remember
2    what he thought it meant.

3    But you'll hear from Miss Chopourian that what she
4    was experiencing was disregard, belittling and being accused
5    of being dramatic because she was conveying these reports to
6    management.

7    After these complaints in June, in the summer of
8    2008, there was finally a meeting in July with the HR
9    manager.

10    Miss Chopourian showed up to this meeting ready to
11    talk about all of her reports.  She indicated that she had
12    written up Dr. Kaplon.  After a very brief discussion about
13    her complaints about Dr. Kaplon, the meeting turned from
14    Dr. Kaplon to information they had received that
15    Miss Chopourian was sleeping in the break room and that
16    Miss Chopourian was not being a team player.

17    Miss Chopourian was never told that these kinds of
18    concerns were going on in the workplace and that this was
19    going to be discussed during the meeting.

20    Right after that meeting on July 3rd, July 11th she
21    had another meeting with Miss Dodge, this time more about
22    sleeping in the break room and not being a team player.
23    And then following that up she received a write-up which is
24    reflected on the screen.

25    It was after all of this that the email comes out

16

1    concerning Ani's dirty laundry about the department,

2    specifically that Ani has a problem that she's not getting

3    her meal breaks as required by law, indicating that Ani has

4    some kind of consultant.

5         And they began investigating who she might be talking

6    about to get her time records, time records, Ladies and

7    Gentlemen, which were never produced by the defendant in this

8    case in terms of the handwritten time records.

9         Miss Chopourian has about 80 percent of her

10   handwritten time records because she kept them herself, but

11   the time records that the hospital kept were never produced.

12   You will never see them in this case.

13        By using Miss Chopourian's time records we're able to

14   tell that there was a failure to provide a meal break as

15   required by law for at least 25 consecutive weeks and

16   hundreds and hundreds of missed meal breaks in terms of when

17   they should have been provided.

18        Feeling no administrative response, feeling

19   disregarded, Miss Chopourian takes one more step.  She

20   delivers via certified mail a letter to the director -- the

21   manager of human resources which was stamped "Received" where

22   she repeated the concerns that she discussed at the July 3rd

23   meeting, where she brought to their attention specifically an

24   unsafe environment for workers and an unsafe environment for

25   patients.  She brought up the needle stick.

17

1    They don't recall receiving this letter.  They can't

2    remember if they received it.  They can't remember their

3    response to this letter.

4    You will see no information corroborating that the

5    hospital registered this complaint internally.  You will hear

6    from Dr. Kaplon, if he is called by the defense, he will tell

7    you he was never spoken to about his behavior in the

8    workplace since that time in October 2006.

9    After this report that was stamped "Received," two

10   days later Miss Chopourian is called in to another meeting.

11   Miss Dodge, although she testified she can't remember

12   the letter, Miss Chopourian will tell you she told her she

13   received the letter.  She told Miss Chopourian that we're

14   going to have a meeting about this on August 4th, we'll go

15   over all of it.

16   And between August 1st and August 4th Miss Chopourian

17   allegedly failed to show up for floor coverage based on an

18   "X" that wasn't put on her schedule but was put on the main

19   schedule says Miss Scrafton, and now the meeting of August

20   4th will not be about your concerns about Dr. Kaplon, but we

21   need to address our concerns with you and you will probably

22   be terminated.

23   And true to form, three days later Miss Chopourian

24   was officially notified that she was to be terminated.

25   THE COURT:  You have six minutes left.

18

1          MR. BOHM:  Yes.  Thank you.

2          Again, you'll see these reports.  There's not in a

3    half hour's time possible for me to tell you all of the

4    evidence.  This is an overview.

5          I need to shift gears from the termination to what

6    happened after the termination.

7          After Miss Chopourian was terminated, because she was

8    a privileged physician's assistant, they had to follow

9    procedures to have her removed from the hospital.

10         But after the dust settled Miss Chopourian was

11   approached with an offer:  You resign, you'll still be

12   eligible for rehire, and we don't have to go through this

13   process.

14         Miss Chopourian agreed and decided to resign rather

15   than go through that process.

16         What you'll hear is Miss Martin claiming that as

17   Miss Chopourian sent out applications for employment, that

18   she was lying to the prospective employers when she said that

19   she had not been terminated, even though she had engaged in

20   this deal with Catholic Healthcare West to be resigned.

21         You'll see Catholic Healthcare West documents which

22   confirm to themselves that she was resigned and that she had

23   no problems in her performance.

24         And the reason you'll see communication to themselves

25   is because Miss Chopourian landed on her feet about a year

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

19

1    later working for another medical group who put her back into

2    the same hospitals.

3         And when that process happened, the privileging had

4    to be done.  And the privileging reports came back from

5    themselves saying that there were no problems and that she

6    had not been terminated.

7         And then Miss Chopourian gave her deposition in this

8    case in March of 2010.  She had already been working back in

9    those hospitals for a period of months, but she couldn't get

10   her privileges renewed.  She couldn't understand why.

11        After she gave her deposition -- She showed up at her

12   deposition.  She had her journals, all the evidence she had

13   been preserving because she knew the hospital wasn't keeping

14   the evidence.  And she gave all of this evidence over to the

15   attorney.  There was a representative for the hospital

16   present.  She communicated it all.

17        Within a month she received a statement from the

18   hospital that her privileges could not be renewed because she

19   lied on her application saying that she was not terminated

20   and because she had stolen or taken unauthorized patient

21   information and put it into this journal for the use of this

22   case.

23        Miss Chopourian's employer immediately -- employment

24   with the new medical group immediately ended since she

25   couldn't get her privileges, and now she had been labeled as

20

1  somebody who unauthorized takes patient information.

2        Miss Chopourian has not had a legitimate job offer or

3  interview since the time that this occurred.  And she is now

4  compelled to disclose this information every time she talks

5  about her employment history.

6        At the time of her termination Miss Chopourian made

7  $174,000 a year, plus benefits, as a physician's assistant.

8        To help us calculate the economic loss, When somebody

9  loses that, we hired an economist named Dr. Chares Mahla.

10 Dr. Mahla will help you understand her lost wages to date,

11 which is approximately 500,000, and Dr. Charles Mahla will

12 help you understand, if you believe that Miss Chopourian's

13 not going to ever be able to come back from this, the loss of

14 her career.  Her earnings in present value are approximately

15 $3,000,000.

16        But the lost money, Miss Chopourian will tell you, is

17 nothing compared to the defamation, the humiliation and the

18 sense of injustice and outrage that she has as a

19 highly-educated woman that has had to go through this process

20 and be embarrassed and attacked and accused falsely.

21        She'll tell you about how she struggled to keep her

22 home.  She will tell you about how she has special recipes so

23 she spends no more than 20 to 30 dollars a week on food.

24 She'll tell you about how she goes to the food bank to get

25 food sometimes in order to keep money for her mortgage.

21

1      She tell you about her peace of mind and how she

2  can't sleep, how this case and her experience affects every

3  facet of her life.

4      And you'll hear from her mentor, a man who she met

5  shortly after she was terminated, who has watched her go

6  through this process.

7      I'm nearly at the end, Your Honor.

8      THE COURT:  One more minute.

9      MR. BOHM:  Thank you.

10      Of course establishing the liability in this case is

11  one of the things that we need to do in this case, but there

12  is another thing that we're trying to do.  We're trying to

13  show you the evidence of the harm that was caused to

14  Miss Chopourian at the same time as we'll be trying to show

15  you the evidence of what caused the harm.

16      And in terms of why bring this lawsuit, when an

17  educated physician's assistant stands up and challenges the

18  hospital --

19      MS. MARTIN:  Objection, Your Honor.  Argument.

20      MR. BOHM:  I didn't finish.

21      THE COURT:  Overruled.

22      MR. BOHM:  Thank you.

23      THE COURT:  You do need to wrap up in the next 30

24  seconds.

25      MR. BOHM:  Thank you.

22

1          When the hospital fails to respond and fails to do

2     anything, this case becomes important.  And I thank you very

3     much for your time and opportunity to hear me.

4          Thank you.

5          THE COURT:  All right.

6          Miss Martin, do you need the easel?

7          MS. MARTIN:  No, I do not.

8          THE COURT:  All right.  Mr. Bohm, if you can move the

9     easel out of the way.

10          MR. BOHM:  I will, Your Honor.

11          (Phone goes off.)

12          That's my timer.  That's not a phone call.  It

13     doesn't apparently let you mute the timer.  My apologies.

14          THE COURT:  All right.

15          MS. MARTIN:  I'm on?

16          Good morning.

17          Thank you for being our jury.

18          We're all here to find the truth, aren't we?

19          Because there's one thing that is as clear as the

20     noses on our faces, and that is there is a straight line

21     between the truth and justice.  And that's what this

22     courtroom is all about.

23          We're going to be producing evidence for you to make

24     these very important decisions in this case.  I will tell

25     you, there is a reason why Mercy is here, and you're going to

23

1    learn that what plaintiff claims happened didn't.

2            Moreover, you're going to learn that evidence can be

3    produced in a couple of different ways, in a straightforward,

4    legitimate manner, and you're going to learn that it can also

5    be produced in a way that somehow shades the real issues.

6            And I encourage all of you to be wary of evidence

7    that doesn't sound like it should appear because your eyes

8    and brains are telling you one thing.

9            Our job in this trial is to make sure, my job, that

10   you get the truth.  You get the truth as best as we can

11   produce it.  We have rules of evidence here that we all have

12   to live by.  So please, be mindful of that.

13           Also, what I'm doing, what I'm about to talk about

14   here is a road map for what you can expect our evidence to

15   show.

16           Hold me to it.

17           Make sure that what you see and hear over the next

18   couple of weeks is actually what you get.  Be wary of

19   evidence that is promised or that you're going to see that

20   never quite materializes the way it is represented.

21           My pledge to you is I will be true.

22           So let's talk about what this case is all about.

23   This case is all about a termination, and Miss Chopourian was

24   terminated.

25           She was terminated from Mercy General Hospital, but

24

1    she wasn't terminated because she complained about anything

2    or because she complained about sexual harassment because

3    that wasn't happening.  That's what the evidence is going to

4    show.

5            What you're going to find is that Miss Chopourian was

6    really a bad fit for this CVOR, the cardiovascular operating

7    room where she worked, and she just wasn't good enough to

8    make it in that environment.

9            Now, I guess we start with what's a physician's

10   assistant?

11           What do they do?

12           The physician's assistant is actually an individual

13   who has an education that allows that person to practice

14   medicine under the supervision of a doctor -- of a medical

15   doctor.

16           And this is significant.  These guys can do all kinds

17   of cool things.  They can examine and diagnose patients.

18   They can work in an outpatient clinic.  They can work for all

19   kinds of doctors.  And they can actually see patients on

20   their own.

21           They can prescribe medicines.  And the doctor, the

22   supervising physician, doesn't have to be there to prescribe

23   medicines, but they get to do that.

24           More importantly, for this case, is these PAs get to

25   perform surgery.  And that is where this case takes place.

25

1    This case takes place in a cardiovascular operating room, the

2    CVOR.

3            And you're going to find Miss Chopourian was a

4    professional.  Indeed, this was her second profession as a

5    PA.  Her first profession was as an architect.  She worked

6    being an architect, I think, for about 90 days, and then she

7    went back to school to become a PA.

8            What's the CVOR all about?

9            Well, Mercy's cardiac department is not just any

10   ordinary cardiac department.  Mercy's CVOR is the number one

11   CVOR in the State of California at the time Miss Chopourian

12   worked there.

13           It was number one in volume and number one in patient

14   outcomes.  And that is really significant.

15           Volume?  What does that mean?  Are they too busy

16   there?

17           No.  Because you'll learn through this trial that in

18   a high-volume area they take care of the sickest and the most

19   critical patients.  They're the best.

20           They become the best because they get more practice.

21   The doctors get more practice, and the staff gets more

22   practice.

23           You're going to learn Mercy's CVOR had mortality

24   rates that were a fraction of the mortality rates in the

25   State of California during the time Miss Chopourian worked

26

1   there.  One-third to be precise or thereabouts.

2          And it was rated in the top 100 cardiovascular

3   hospitals in the country, the top five percent.  We're very

4   proud of that fact.

5          How do you get there?

6          How do you get to be the best?

7          Well, it's really easy.  You hire the best who care

8   the most.

9          And so you're going to learn that Mercy hired

10  doctors -- I'm sorry.  Withdraw that.  They did not hire

11  doctors.  Doctors are not employees of the hospital.

12         They hired staff, nurses, PAs, technicians.  And

13  you're going to meet a lot of them here.  And they worked

14  together in an environment, shoulder-to-shoulder,

15  elbow-to-elbow for hours at a time to fix patients' broken

16  hearts.

17         Cardiovascular surgery.  Bypass surgery.  What's the

18  PA's role in all of this?

19         Well, PAs were used -- If you're familiar with bypass

20  surgery you will learn that people's hearts, sometimes the

21  arteries going to the heart become blocked because of

22  disease.

23         One thing that the surgeons can do to help fix that,

24  to make sure the heart gets plenty of blood, is to take veins

25  out of either the leg or the artery in the arm, the radial

27

1   artery, and essentially rewire or replumb the area so that

2   the blood goes around the area that is occluded or clogged to

3   profuse or provide blood to the heart.

4           Very important work.

5           And these surgeries, they put patients on a

6   heart-lung bypass machine.  They stop the patient's heart.

7   Surgeons can't really stitch on moving hearts that are

8   beating you will learn, and they put them on a heart-lung

9   bypass machine so all the rest of the organs are profused by

10  a machine.

11          And taking and putting the patient on bypass, taking

12  the patient off bypass, all these times there is some very

13  critical times during these surgeries.

14          You're going to learn that while doing these

15  surgeries they can take hours at a time, sometimes four up to

16  12, 13 hours.  Bad things happen during these surgeries so

17  all hands on deck.

18          And sometimes in all of this these people learn to

19  work with each other, and they work with each other and know

20  each other more than their own families because they spend so

21  much time together.

22          You are going to learn there are between nine and ten

23  people, bodies, in a surgery, all dedicated to making sure

24  that the patients in that operating room come out alive and

25  get to go home and see their families again.  And sometimes

28

1   that's not an easy task.

2          You're going to meet surgeons.  You heard about some

3   in plaintiff's opening statement.  We've got Dr. Dein.  We

4   haven't heard much about him.

5          Dr. Slachman.  You're going to hear Dr. Slachman.  I

6   don't think that -- You're going to find that Dr. Slachman is

7   one of the top surgeons in the country, and you're going to

8   find out that he did not harass people in that OR.

9          We're going to bring in witness after witness after

10  witness -- and I go second so please be patient -- who are

11  going to come in here, women, former employees, men, PAs, an

12  assistant surgeon who are going to say that they never heard

13  anything that was inappropriate from Dr. Slachman.

14         He did say:  How are you today?  Horny.  He did say

15  that.  And Doris Frazier, you're going to learn, the

16  vice-president of the cardiac OR, is going to tell you she

17  heard that and she came unglued.  She said:  Don't you ever

18  say that again.

19         And by golly, he stopped.  That's what's supposed to

20  happen.

21         You're also going to learn that he didn't mean it.

22  Horny?  Just thought he was being cute.  Very bad judgment.

23  But it doesn't -- You're going to learn that's not the basis

24  upon which to award somebody money.

25         You're going to meet Dr. Zhu right here, live, in

29

1    person, this man who comments on breasts.  You're going to

2    learn that he never comments on breasts.  He's a soft-spoken

3    gentleman.

4         Dr. Kaplon.  You'll meet him.  I'm going to call him

5    in my case.  Dr. Morris, who is the head of these guys.  He's

6    the lead surgeon.  And you're going to meet Dr. Taylor who is

7    an assistant surgeon.

8         Now, plaintiff wasn't terminated because of any

9    wrongful conduct.  Plaintiff was not fulfilling her duties.

10   Plaintiff was not a good PA in this environment.

11        You're going to learn that her Yale education served

12   her well.  Her Yale education served her so -- She's very

13   bright.  There's no doubt about that.

14        You're going to learn that while her skills were

15   okay, when she came to Mercy, she only had about two years

16   experience in the cardiovascular OR doing this vein

17   harvesting stuff.

18        And she had the potential to be quite good, but there

19   were other issues with her performance that made her a very

20   bad employee.  And it started when she first came, and

21   instead of getting better with verbal counseling, it became

22   worse.

23        You're going to learn that plaintiff lacked judgment.

24        Nobody would swipe their timecard in for somebody

25   else when they're not there.  You're going to learn that

30

1   doesn't happen.

2         And you're going to learn that Miss Chopourian, in

3   February of 2008, was running late.  And instead of calling

4   the CVOR to say, "I'm running late," she contacted the newest

5   employee on the unit, who had just been promoted from an aide

6   position in another unit, I believe surgery, her name is Keri

7   Hunter, you'll meet her, she not only called the unit, she

8   called and asked for Keri, newest employee.

9         Somebody else answered the phone, and she asked Keri

10  to meet her in the parking lot, which was against the rules

11  for Keri to leave the CVOR, and then she asked for her to

12  swipe her timecard showing her to be present at work when she

13  wasn't while she looked for a parking place.

14        You're going to learn that Miss Chopourian

15  misappropriated 132 patient names in her journal and in other

16  documents.  Not just her journal.  She kept a logbook you're

17  going to find out.  In that logbook she kept patient names.

18        That is against hospital policy.  You're going to

19  learn that taking patient information is verboten.  From the

20  top of the line to the housekeepers, that's just not done.

21        And she was taking these books back and forth to her

22  home.  They had patient diagnoses.  They had notes.  They had

23  patient birth dates.  They had patient names and medical

24  numbers -- medical record numbers.

25        That's not okay.

31

1          You're going to learn that there was a concern that

2    Miss Chopourian was not a team player.  You're going to hear

3    several witnesses come up here and tell you of their

4    experiences with Miss Chopourian that made it problematic in

5    this environment.

6          You will learn that being a team player in this CVOR,

7    where lives are saved, where patients' chests are broken open

8    every day, is really important.  You need to rely on one

9    another.

10         And you're going to learn there was an emergency one

11   day.  This was the cue'de gra.  You will learn that plaintiff

12   was called in because she was on call.  They all take a bit

13   of call.  And she first of all said:  No, I can't come right

14   now.  I'm going to be off call in a little while.

15         And the person who was calling her said that's not

16   okay because the rules around here say you come in when

17   you're on call.

18         And she begrudgingly came in.  Then did she go

19   straight to the OR?

20         Nope.  She went into the lounge and instructed an

21   aide to wake her up when the patient arrived.

22         This is a patient who is crashing, a patient who

23   needs emergency surgery.

24         You're also going to learn when there is an

25   emergency, it is all hands on deck.  Everybody does

32

1   everything.  Nobody is too good to open up a package because

2   time is of the essence in getting that patient to surgery.

3          She joined the healthcare team because she wanted to

4   take care of patients, and that's what they do in this unit.

5          You're going to learn Miss Chopourian had a

6   resistance to opportunities given to her by her colleagues to

7   upgrade or improve on her skills.

8          Miss Chopourian, you will learn, knew it all.  And

9   she didn't want anybody to know that she didn't know

10  something.

11         Well, that's not good, you'll learn from the folks

12  who worked at Mercy, that's not good to have somebody like

13  that in your hospital, especially in your CVOR, because you

14  need to upgrade your skills.  You want somebody who wants to

15  upgrade their skills because you don't know sometimes what

16  you don't know.

17         Finally you're going to learn there were concerns

18  with respect to Miss Chopourian's trustworthiness.

19         Accountability.  Really important.

20         Accountability and being able to say, "Oops, my bad."

21  Accountability.  Being able to realize, "I'm sorry I swiped

22  somebody's timecard -- somebody swiped my timecard in when I

23  wasn't here.  That will not happen again."

24         That's not what Miss Chopourian said.  She said that

25  everybody is doing it.

33

1        She was asked, you will learn, "Who else is doing

2   this?"  "Just everybody," she said.  She never identified a

3   single person.

4        You will learn that that was not the practice on this

5   CVOR.  And that's just one example of a time when

6   Miss Chopourian failed to take responsibility for her own

7   choices and her own actions.

8        There was a concern also with respect to her veracity

9   or ability to tell the truth.  Sometimes Miss Chopourian's

10  truth was different than other people's truth.

11       And in every organization there is some latitude for

12  difference in perspectives.  They recognize they are human

13  beings.  Everybody has a belly button.  But sometimes those

14  differences cross the line.

15       And in this case you will learn that those

16  differences do cross the line.  And you're going to

17  understand, as irritating as working with somebody like that

18  might be in a normal job, it's dangerous in a healthcare

19  environment.  Because in a healthcare environment each one of

20  the members of the team, everyone, needs to be able to say,

21  "Oops, I mixed something up," or "Oops, I made a mistake" so

22  it can be fixed.

23       But if somebody doesn't tell the truth or if somebody

24  doesn't disclose what's happening, it can be absolutely

25  devastating to the patient.

34

1          You're going to learn there was no sexual or

2     gender-based harassment in this environment.

3          You're going to learn sometimes, yes, people made an

4     off-color joke.  But in this environment, when people are

5     working crazy hours, sleep deprived, that was a welcomed

6     change.

7          When we talk about a little off-color joke, we're not

8     talking about graphic jokes.  We're talking about a double

9     entendre.  We're talking about people talking in the OR,

10    crowded around each other.

11         You'll learn all about this environment.  Hours

12    together talking about everything, their kids, their bunions,

13    whatever.  When these off-color jokes did come, they weren't

14    graphic and they weren't gross.

15         You're going to meet Betty Devitt.  She's plaintiff's

16    first witness.  She's a nice lady.  She's a lady who is

17    particularly offended by swearing and anything, having any

18    type of contact.

19         She will tell you, I think, that she's very

20    religious, and that people in the OR were so respectful of

21    that.  She told them that she didn't like swearing.  And I

22    bet she's going to tell you that they really tried not to

23    swear in front of her, the doctors, even when things turned

24    bad.

25         And they would say, "Oops, sorry Betty" when they let

35

1    one out, when somebody was crashing or dealing with a patient
2    that was critical.
3            You're going to learn that this idea that there was
4    pervasive sexual talk, conduct, motions, bottom swapping --
5    swiping, I can't remember the litany of things that counsel
6    suggested, but it is not supported by the plaintiff's
7    coworkers.
8            You're going to learn that plaintiff did not report
9    any sexual harassment.  She did talk about a lot of things,
10   and she had -- she was absolutely not shy about reporting any
11   concern she had, but she never reported sexual harassment,
12   never, not once, despite the fact you will learn that Mercy
13   General Hospital, where she worked, had a anti-harassment
14   policy in full force and effect.
15           And she was aware of it.  She knew what to do.  But
16   she didn't use it because it wasn't happening you will learn.
17           What did she complain about?
18           You've heard counsel give you a little snippet about
19   Dr. Kaplon.  Dr. Kaplon, you're going to learn, wasn't
20   abusive.  Dr. Kaplon is a surgeon.  You're going to meet him.
21   Again, he is one of my first witnesses.
22           Plaintiff was complaining about veins, that he made
23   me take the wrong vein.  Well, you're going to learn that's
24   clinical judgment.  And the doctor, who has, you know,
25   multiple years of doctoring surgical experience, with

36

1    fellowships in cardiovascular surgery, and 20 years of

2    experience harvesting veins, which is what the PA does, that

3    he's fully qualified to disagree with plaintiff's assessment,

4    with her two years or three years of experience doing this

5    stuff, and that does not constitute abusive behavior.

6              It is his operating room.  He gets to call the shots.

7              Now, can she contribute?  Of course.  You're going to

8    learn that too, that's encouraged.  But is that abuse?

9              You're going to find out that plaintiff was offended

10   when Dr. Kaplon, when he -- when his wishes were not being

11   respected, that he would step in and do plaintiff's job, he

12   would step over and harvest the vein himself.

13             What else is he supposed to do?  You got a patient

14   there, open chest, on bypass, and he wants something done.

15   He has every right and responsibility to do just that, get it

16   done the way he wants.

17             You will learn he was not trying to offend anybody.

18   He was not trying to embarrass plaintiff.  But he does have

19   an obligation.  And his first obligation, quite frankly, is

20   to the patient.

21             You're going to learn that plaintiff, despite the

22   fact that, you know, you will learn that these little issues

23   come up in the OR.

24             Again, they're working together all the time in these

25   weird, standing close conditions for hours.  There's no

37

1    cubicles where they can get away from each other in the OR.

2         You're going to learn that -- that when these

3    personality conflicts would develop, that folks behaved like

4    professionals and adults, and they would confront the

5    physician after the surgery was over.

6         And Dr. Kaplon is not the only one who had

7    personality conflicts with a staff member.  That happened

8    with virtually every one of the physicians because, again,

9    people are people.  And they're going to have disputes, and

10   they're not going to get along all the time.  That's life.

11   It doesn't mean it is abusive.  It wasn't abusive in this

12   case.

13        Plaintiff didn't feel that Dr. Kaplon gave her the

14   respect to which she deserved as a Yale graduate from the PA

15   program.

16        You're going to learn from Dr. Kaplon that he does

17   give respect, but you give the respect you ask for.

18        You're going to hear a lot about plaintiff's meal and

19   break periods.  Plaintiff was a professional.  You're going

20   to hear that plaintiff got her meal periods.  You're going to

21   learn that she wanted lunch breaks at a specific time each

22   day claiming blood sugar issues.

23        I took her deposition.  She said she never was

24   diagnosed with blood sugar issues or hypoglycaemia, but she

25   wanted them at a specific time.

38

1          Well, that's not the way it works in the OR.  You

2   can't check out at any time when you're the PA and you got a

3   patient open.

4          Nobody can.

5          You're going to hear, again, witness after witness

6   after witness come up here, and nobody got their lunches at a

7   specific time.  That's what they signed up for.

8          But you're going to learn plaintiff did take her

9   lunches.  You're going to learn that in this OR there are

10  three operating rooms, and typically there were two cases

11  assigned per day.  And between those two cases, more often

12  than not, there was at least an hour to an hour and a half

13  period between those cases where the PA didn't have to do

14  anything.

15         So you're going to learn that in addition to being

16  spelled or given breaks during these procedures, when it was

17  proper for the patient and the department, because there are

18  other people working in other rooms as well, that she got

19  these breaks of an hour to an hour and a half period of time.

20         By the way, she was getting paid for that time,

21  fifty-some dollars an hour.

22         When I asked her at deposition whether she considered

23  those breaks between cases her lunch, could she take that as

24  her lunch period, "Oh, no, I don't consider that my lunch

25  period."

39

1          Again, the goal in the OR is to make sure patients

2     are safe, make sure patients get cared for.

3          You are going to learn plaintiff felt her lunch times

4     trumped patient safety.

5          Well, lunch and break times are important for the

6     people you will learn, to the folks at Mercy.  It wasn't like

7     being ignored, not recognized.  But again, it is about being

8     a professional, about being an adult.  Take your breaks and

9     your lunches when you can.

10          And she was paid for them by the way.

11          So basically you're going to learn that plaintiff got

12     her meal periods, break periods, and then some.

13          You heard counsel talk about plaintiff's difficulty

14     finding work after her termination.  And you heard counsel --

15     Essentially, I believe what you're going to hear from

16     plaintiff's side of the story is that it is Mercy's fault.

17          Well, it is not you will learn.

18          You will learn that plaintiff's difficulties finding

19     work after her termination had absolutely nothing to do with

20     any representations or lack thereof of folks from Mercy.

21          You're going to learn that plaintiff's difficulty

22     finding work in actuality lies squarely with plaintiff.

23     Because you're going to learn that in 2008, after her

24     termination, she started making some really critical

25     mistakes.

1          She made some misrepresentations on applications.

2    And you're going to see those in this trial.  You're going to

3    learn that actually she received two conditional job offers

4    after her termination.

5          You will also learn that PAs are in short supply and

6    high demand.  And PAs who have surgical skills are really in

7    demand.  And that she received these conditional job offers

8    conditioned upon her passing credentialing.

9          The one thing you will learn, something that a lot of

10   people don't know, is that a hospital -- if somebody is a

11   hospital employee as a PA, they also have to obtain

12   privileging or credentialing to the hospital.

13         They are two completely separate processes,

14   separation of church and state.  They never -- they never

15   meet.  And the reason for that is because doctors -- you

16   know, there is, you will learn, that doctors can't work for

17   hospitals.

18         And the purpose is there is a law that says that.

19   And the reason for that is because the Legislature, and it's

20   good public policy, to make sure our doctors and

21   practitioners exercise independent judgment when caring for

22   patients.

23         And they are not even -- There can't be even a

24   suggestion there is any control over those physicians by the

25   hospitals, where they work, where they bring their patients.

41

1          And in this case, as a physician's assistant, as a

2    professional, and as a licensed individual who gets to

3    practice medicine, Miss Chopourian also had to go through

4    that credentialing process, with us, with Mercy, so she was

5    an employee on one end and had privileges on the other.

6          You'll learn that Miss Chopourian had an obligation

7    to report any type of disciplinary action because, again, the

8    two don't meet.  Employee, HR, Human Resources, privileging,

9    they don't talk to each other, very rarely, at least in the

10   course of things.

11         And Miss Chopourian had an obligation to report that

12   she had been terminated to the credentialing office, of all

13   places, where she had credentials, and she didn't.

14         You're going to learn that she had a -- that because

15   of that, the folks at the credentialing offices didn't know

16   for a long period of time that she had been terminated.

17         So that wasn't the reason why Miss Chopourian wasn't

18   able to find a job.  It was because Miss Chopourian, when she

19   would apply for privileges at these two places, these two

20   hospitals where she was given conditional offers, she omitted

21   her experience at UC Davis from her application.

22         She had six months where she worked in the

23   cardiovascular OR at UC Davis before she came to us, to

24   Mercy.

25         THE COURT:  Miss Martin, you have four minutes

42

1   left.

2         MS. MARTIN:  Okay.  Thank you, Your Honor.

3         And you will learn that when physicians and PAs are

4   becoming credentialed, you're going to learn they do primary

5   verification, which means they check with each and every

6   place where you work and make sure that everything checks out

7   because it is very important to a hospital that the people

8   who are practicing there are honest and they have good

9   judgment and they are good practitioners.  All three.

10        And Miss Chopourian's failure to list the UC Davis

11   experience and her experiences on her applications resulted

12   in them not following through with the hiring because she was

13   unable to get credentialed.

14        Not Mercy's fault.

15        You're going to learn that ultimately she was

16   discovered that she did take this patient information.  And

17   Miss Chopourian had privileges at Mercy San Juan Hospital.

18        Again, Miss Chopourian, you will learn, she never

19   told the folks at Mercy San Juan, a sister hospital to Mercy

20   General where she usually worked, she didn't tell them there

21   was any issue with respect to her employment at Mercy

22   General.

23        As a matter of fact, she didn't tell them anything.

24   And when they called and said:  Hey, we see your -- your --

25   When the Mercy San Juan person called and said:  Are you

43

1    still covered by insurance?  She said:  Oh, no.  I no longer

2    work at Mercy General.  She still don't disclose that she had

3    been terminated.

4         And furthermore, when Mercy San Juan found that out,

5    down the road, and when they discovered that Miss Chopourian

6    had taken these 132 patient names and information home in

7    violation of policy -- huge no-no, could expose Mercy to

8    hundreds of thousands of dollars by the way in fines and

9    penalties with the state and to these very nice folks who had

10   their names taken -- that showed such a grievous lack of

11   judgment under any circumstance --

12        MR. BOHM:  Objection, Your Honor.  Argument.

13        THE COURT:  Sustained.

14        You have one more minute.

15        MS. MARTIN:  Thank you, Your Honor.

16        Miss Chopourian's references were also spotty.  She

17   didn't have good references.  And those were the reasons why

18   she was unable to find work.

19        Ladies and Gentlemen, you will learn that Mercy

20   General Hospital and CHW did the right thing in this case for

21   their patients.

22        There was no discrimination, no harassment.

23        I encourage you to please listen to the evidence

24   carefully.  Please listen discriminatorily.  Listen to see

25   does it sound true, does it sound like somebody is trying to

44

1    pull the wool over my eyes, are the questions asked of these

2    witnesses, do they make sense, are the questions fair.

3            And at the end of this case, after all of the

4    evidence is in, I'm going to come back here and I'm going to

5    talk about what the evidence showed.  And I betcha that what

6    the evidence shows is what I'm telling you.  Then I'm going

7    to ask you for a defense verdict.

8            I can't thank you enough for your attention.

9            (Excerpt concluded.  Further proceedings held.)

10                          ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2                          ---o0o---

3
     STATE OF CALIFORNIA  )
4    COUNTY OF SACRAMENTO )

5

6
           I certify that the foregoing is a correct transcript
7
     from the record of proceedings in the above-entitled matter.
8

9

10                  IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California.
11

12

13      /S/_Catherine E.F. Bodene_____
             CATHERINE E.F. BODENE, CSR NO. 6926
14           Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25