1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF CALIFORNIA

3                    ---O0O---

4     BEFORE THE HONORABLE KIMBERLY J. MUELLER, JUDGE

5

6  ANI CHOPOURIAN,

7         Plaintiff,

8  Vs.                          CASE NO. CIV. S-09-2972 KJM

9  CATHOLIC HEALTHCARE WEST,
   et al.,
10

11        Defendants.

12  _____/

13

14

15                    ---o0o---

16

17              REPORTER'S TRANSCRIPT

18        EXCERPT FROM JURY TRIAL PROCEEDINGS

19             RE:  CLOSING ARGUMENTS

20                   DAY ELEVEN

21           THURSDAY, FEBRUARY 23RD, 2012

22

23                    ---o0o---

24

25  Reported By:  CATHERINE E.F.BODENE, CSR. NO. 6926

```
1                        APPEARANCES

2                          ---o0o---

3

4    For the Plaintiff:

5         BOHM LAW GROUP
          4600 NORTHGATE BLVD., SUITE 210
6         SACRAMENTO, CALIFORNIA  95834

7         BY:  LAWRANCE BOHM, ATTORNEY AT LAW

8

9         LAW OFFICE OF ERIKA M. GASPAR
          2121 Natomas Corssing Drive, Suite 200-399
10        Sacramento, California  95834

11        BY:  ERIKA M. GASPAR, ATTORNEY AT LAW

12
          LAW OFFICES OF GREGORY DAVENPORT
13        3031 West March Lane, Suite 334
          Stockton, CA  95219
14
          BY:  GREGORY DAVENPORT, ATTORNEY AT LAW
15

16   For the Defendants:

17        LAFOLLETTE, JOHNSON, DEHAAS, FESLER & AMES
          655 UNIVERSITY AVENUE, SUITE 119
18        SACRAMENTO, CALIFORNIA  95825-6746

19        BY:  JULIE CLARK MARTIN, ATTORNEY AT LAW

20        BY:  DAVID DITORA, ATTORNEY AT LAW

21

22

23                         ---o0o---

24

25
```

```
1                      PROCEEDINGS INDEX

2                         ---oOo---

3

4      PROCEEDINGS:                              PAGE

5

6          Closing Argument by Mr. Bohm           1

7          Closing Argument by Ms. Martin         29

8          Final Closing Arg. by Mr. Bohm         68

9

10

11

12                        ---oOo---

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

1        SACRAMENTO, CALIFORNIA

2        THURSDAY, FEBRUARY 23Rd 2012 – 2:40 P.M.

3                    ---o0o---

4        THE COURT:  We are bringing the jury in.

5        (Jury seated at 2:40 p.m.)

6        THE COURT:  All turned around?  I know.  I got a new

7    sheet.  Are you clear on where you are sitting?

8        Welcome back, Ladies and Gentlemen of the Jury.

9    Thank you for your patience.  We are all human, and all of us

10   needed a little longer break.

11       We also understand that you have conferred on the

12   schedule.  Thank you for sharing with the court your

13   schedule.  That is very helpful.  And so we understand you're

14   willing to stay until 5:00.  I think we can hit that pretty

15   closely today.  You'll be here from 8:30 to 3:30 tomorrow,

16   then next week a normal schedule as needed.

17       All right.  Thank you for that help.

18       I'm going to acknowledge Mr. Bohm now -- you may all

19   be seated -- to begin with his closing.  He's going to

20   reserve some time so we'll hear from Mr. Bohm, then defense

21   counsel, and then Mr. Bohm again.

22       Mr. Bohm.

23       MR. BOHM:  Thank you, Your Honor.

24       Good afternoon, Ladies and Gentlemen.  It's been a

25   long trial.  And I have been avoiding eye contact with each

2

1    and every one of you because I didn't want to sway you.  I

2    didn't want to communicate with you until this time, until

3    all of the evidence was in.

4         And I want to remind you all where we are.  Take a

5    look around.  Look at all the seats here, the people here,

6    the majesty of this court, the flag.  This means something.

7         This isn't state court.  This is federal court.  This

8    is a national case.  This isn't just about our own backyard.

9    This isn't just about a Sacramento surgery center.

10        What we do in this case matters.  This is the most

11   important right as Americans that we have.  In fact, our

12   Founding Fathers talked about a jury, the heart and lungs of

13   our justice system, a jury -- sitting on this jury, sitting

14   in those seats, as uncomfortable as they are, is the most

15   important, fundamental right that you have.  Abraham Lincoln

16   talked about it as the most precious right we have as

17   Americans.

18        It has been recognized through ages in terms of our

19   country and our country's existence that our men and women

20   died for this right that you're exercising right now.

21        In fact, if you think about it, that's why a lot of

22   countries, they don't have juries.  They don't like to give

23   power to the people.  They don't like to level the playing

24   field.  That's what we're doing here today.  And we're

25   leveling it for the benefit of our community.  That's why

3

1   we're here every day, public service, public safety.

2          Now trying to keep up with this closing argument in

3   terms of how much evidence has been coming in in this case is

4   a challenge.  And if it is a challenge for the lawyer living

5   this case, it's got to be a challenge for you all.  And so it

6   is my job right now to tell you about your two jobs.

7          A lot of people get surprised by that:  Two jobs?  I

8   thought I only had one job.  I've got another job?

9          Yeah, you do.  You have two jobs.

10          You're not going to just decide on a verdict.  By the

11   way, verdict means truth, right?  Speak, truth, verdict.

12   Okay.  That's what you're going to do.  As the public, you're

13   going to speak some truth about this case, some truth about

14   that surgery center, some truth to help the public become

15   aware of what's going on.

16          You got a glimpse that nobody else gets to see.  You

17   got to see the inside, the real insides of this cardiac

18   surgery center, the real insides of Dignity Health, Catholic

19   Healthcare West.

20          You got to know.  You got to see beyond all their

21   gold medals and their recognition to what is really

22   happening.  And that's a privilege for all of us to be able

23   to see them.  Absolutely.

24          So here's your two jobs.  Besides doing the verdict

25   form -- and this is regardless of whose side you are on --

4

1    you want to hear this because you're going to want to know

2    what you're doing in the room.

3         And I know this isn't your jury room.  We're not

4    allowed to take pictures of actual courtrooms.  But this is a

5    conference room.  And the first job you're going to have,

6    that very first one, is selecting your presiding juror.

7         Why am I taking our precious time to talk about that

8    presiding juror?

9         Because people don't know how to pick a presiding

10   juror.  Most people have never deliberated before.  So let me

11   share with you some thoughts about what a good presiding

12   juror is.

13        Okay.  First of all, a good presiding juror is a

14   listener.  If I were going to compare a presiding juror to

15   any kind of a person, it would be a talk show host.  It would

16   be the person who just facilitates the dialogue, making sure

17   everybody gets heard, not allowing anybody to railroad their

18   opinions or dominate the conversation.

19        Usually the best presiding juror is the person who

20   doesn't like to speak.  Maybe they're not a good public

21   speaker.  Maybe they're shy about it.  That's the person who

22   should be your presiding juror because that person is not --

23   has no chance of dominating the conversation.  Because both

24   sides will agree, we want fairness.

25        That's all we ask.  Fairness.  Following the

5

1     instructions, looking at the evidence, and please be fair.

2     Both sides.  Follow the law.  Because the verdict that

3     doesn't follow the law isn't worth the paper it's written on.

4          Nobody wants that.

5          Now what I'm showing you on here -- you don't have to

6     worry about trying to read every little detail.  I'm going to

7     paraphrase this for you because the judge, she's going to

8     read this to you.  And it's a little long, and it goes on,

9     but you will also see you'll get a copy of these in your

10    deliberations.

11         Look at them.  We're not just giving you paperwork to

12    snow you over with paperwork.  It means something, just like

13    jury service means something.  There are families that have

14    loved ones on these operating tables.  They want you to look

15    at this information.  Everybody wants you to look at the

16    information.

17         So this thing, knock on the door, what does that

18    mean?

19         It means sometimes juries have questions.  Sometimes

20    people aren't clear about what something means.  Sometimes

21    people want to do the right thing but they don't know how to

22    do it.

23         So if you ever reach a point during your

24    deliberations where you're confused, you're uncertain, or

25    somebody is not following the rules, they want to talk about

6

1    things that they're not supposed to be talking about, knock

2    on the door.  Please, pass a note to the court and get your

3    clarification.

4         And on that note, this is not supposed to be a prison

5    in that jury deliberation room.  Don't rush to justice

6    because you want to go see your loved ones.  You're to

7    deliberate on your own schedule.  Don't rush it.  It is

8    Thursday.  If you want the weekend to think about it, please

9    take the weekend to think about it.  Don't rush this because

10   it matters to our community.  It really, truly matters.

11        Now there is another instruction that talks about you

12   as the jury evaluating the evidence.  All of it.  And I

13   watched some of you during the trial.  Some of you checking

14   out those monitors so close, seeing all the little words.

15   You'll have all the evidence admitted in this case.  That's

16   going to back there in the jury room with you.

17        Unfortunately, it is not always in chronological

18   order, but it is all there.  And you can take it apart, you

19   can put your hands on it, you can look at that Exhibit 5

20   that's in the plastic case, hold it up to the light and see

21   the pinhole where it was really there, that official

22   schedule.  Okay.  You can see all of that.

23        The case wants to be seen.  That's our job.  See the

24   case.

25        Regardless of what side you are on too, remember this

7

1   is -- we're going to get into the witnesses, but you'll see

2   an instruction that says it is okay to change your belief.

3   Don't come out of the box so hard saying:  Oh, this side or

4   that side, I'm never going to change my mind.  That's not the

5   process.  That's not deliberation.  That's just a

6   dictatorship.

7        We don't want that.  We want a deliberation.  Express

8   your point of view.  Be open to the experiences and the

9   wisdom of your fellow jurors.  Pay attention.

10        Everybody sees things a little bit differently than

11   others.  That's why we have a jury system.  That's why so few

12   people get to determine the fate of our enormous community.

13   That's what we are talking about.

14        Now, when we talk about evaluating the witnesses --

15   and I've sketched out a lot of things, but frankly that's

16   just in case I get so tired I forget what I'm suppose to talk

17   about.  I've been in this case with you every single day

18   watching all of this, watching these witnesses, and I'll tell

19   you we really basically have two kinds of witnesses in this

20   case.  Their team and our community, our team.

21        And the theme of the defense case, you may have

22   caught on, was two-fold.  Miss Chopourian was not a team

23   player.

24        I'm going to clarify what that means.  It means she

25   didn't want to play with that team, the team that disrespects

1    patients as "pieces of shit," the team that makes sexual

2    jokes when our loved ones are on the table, the team that

3    covers up patient safety concerns, the team that doesn't

4    report arteries on the floor, unlawful vein harvest, not

5    having an M.D. assist.

6            In terms of the phrase "train wreck," this case is a

7    train wreck.  This is not a bifurcated case.  That means

8    you're going to decide Miss Chopourian's damages, and you're

9    also going to be deciding punitive damages.

10           And if you feel about this case in terms of what that

11   witness stand showed you and those witnesses, what you saw is

12   a lot of the folks that play for that team, they're

13   terrified.  Their so scared they're willing to get up here

14   and tell you the sky is blue when it is white, to tell you it

15   is black when it is white, to tell you it is red when it is

16   whatever.  They'll say whatever they got to say to keep their

17   job.  And we saw it, and they're afraid.

18           THE COURT:  Mr. Bohm no notes on the jury box.

19           MR. BOHM:  I'm sorry.  Thank you.

20           THE COURT:  No touching the jury box.

21           MR. BOHM:  I will not do that.  That is how sacred

22   this box is.  Don't touch.  I don't want to touch it.  I want

23   you guys to be unbiased.  Unprejudiced.  Don't give us your

24   sympathy.  Give us your justice.  That's all we want.

25           And I got to tell you about a dangerous thing.  It's

9

1    called an incomplete verdict.  It's when you kind of go:

2    Well, you know, maybe she should get X million, but, you

3    know, let's take it down a notch.  Let's give them a little

4    bit of a pass.

5            That's an incomplete verdict, and that's terrifying.

6    An incomplete verdict is terrifying because you know what it

7    tells people:  Come on into Sacramento.  Don't worry if you

8    hurt our loved ones or risk or safety.  We'll give you a

9    pass.

10           What happens when we do that?

11           We become a place where bad actors want to be.  We

12   don't want to be that place.  Not at all.  Not one bit.

13           So let me finish talking about their team.  We've got

14   photos of the witnesses, and I want to use my time the best I

15   can because I've been waiting to talk to you all.  Let's

16   review some of their teammates.

17           First of all, we've got philanderers, home wreckers

18   and liars.  That was pretty much the foundation of the

19   defendants' case and what we can call their "dysfunctional"

20   family.

21           I don't know what you-all's family is like, but for

22   some people family is sacred.  And for Miss Scrafton to look

23   you all in the eye and tell you that a five-year long

24   extramarital affair with a subordinate coworker was not

25   immoral, was absolutely outrageous.

1          You'll see in this witness instruction it says you

2     can believe a little bit, or you can just toss the baby out

3     with the bathwater because you know it is wrong.

4          You can do that.  Absolutely.  And you should do that

5     with Miss Scrafton.  At least she can own that it is immoral.

6     But there is a reason they don't want to own that because

7     that's the exact Rules of Conduct that they used on

8     Miss Chopourian.  And so they don't want to acknowledge any

9     differential treatment because it looks bad.

10          What about Keri Hunter?  Oh, my goodness.  You

11     couldn't find a better witness to come in and talk about this

12     case than Miss Keri Hunter.  Really.

13          I want to remind you guys, when Terese Merlo was

14     testifying, worked there over 20 years.  She gave that

15     company her life.  She gave those patients her life.  And

16     what happened?

17          You know, Dr. Slachman is going to be here.

18          Where is Dr. Slachman?

19          Where is he?

20          If anybody tries to answer "no" to that sexual

21     harassment case, anybody who wants to think about that should

22     say right off the bat:  Where is Dr. Slachman?

23          He didn't want to come because you saw what happened

24     to Dr. Kaplon and Dr. Zhu.

25          You remember Dr. Zhu.  First he made a gesture in the

11

1  workplace then he realized how bad it looked, then he didn't

2  make the gesture in the workplace.

3        A Harvard educated undergrad, med doctor, can't

4  understand what the word "trust" means.  Then after he lays

5  out some lies about Ani Chopourian's performance, he's

6  confronted immediately by his own quality evaluations just

7  months before her termination.

8        That's their team.

9        That's the dirty laundry they're hiding.  The dirty

10  laundry they're hiding, you actually heard a little bit about

11  it from Joe Marquez.  Joe told you.  Surgeons are running

12  that show over there.  You also heard the surgeons now work

13  for Dignity.  They are no longer independent.  They're

14  affiliated.  That came out in testimony, too, for those of

15  you who caught it.

16        So what is going on here?

17        Money.

18        That's what's always going on here.

19        Compromise patients' safety for money.

20        You heard Miss Dodge talk about how sleeplessness for

21  medical professionals is dangerous, causing medical errors.

22  And then think about it.  Does that make any sense, how

23  defense was pointing out Ani Chopourian was complaining that

24  she had to work with too little sleep and she gets written up

25  for that.

12

1        Written up because I'm too tired to work.  For acting

2  responsibly.  That gets a write-up.

3        And what about these write-ups?  The first write-up

4  has a typo.  The second write-up they are sure absolutely it

5  is correct until it isn't.  Oops.  How reliable are these

6  documents?

7        Well, you heard from Ms. Chopourian:  Not reliable at

8  all.  That last demonstrative exhibit, we put that in so you

9  could see all of the highlighting of all the lies that they

10  spilled out against this awesome, awesome person.

11        Let me tell you, it is not easy to be the lawyer for

12  an Ivy league grad, who you all heard described by credible

13  people as extremely meticulous and bright.

14        Even now I'm sure she's watching me and keeping track

15  of what I'm saying and making sure I'm doing my job right.

16        It is fun?

17        No.

18        But it is awesome.  I'll tell you what.  It's a darn

19  shame she's not going to be holding somebody else's heart,

20  making sure that person is treated with dignity and respect.

21        That's not going to happen.  Let's face it folks.

22  You heard her testimony.  You Google -- Unfortunately, if her

23  name was Smith, maybe she would have a shot.  But Chopourian?

24  First Google page is Chopourian versus Catholic Healthcare

25  West.

13

1          You heard it.  This is standard HR, folks.  If you're

2    not googling somebody who applies, then you're just not doing

3    your job as a HR professional.  People want to know about

4    this.

5          And you'll see -- I want to point out the most

6    important document in this case, and I've covered this, we're

7    here because we're not safe.  And we're here because she

8    wasn't treated with dignity.

9          And I'm trying to get to my exhibit because I know it

10   is coming up next, and I've already talked about the toxic

11   and hostile environment, but this, oh, please, the very first

12   document that the plaintiff asked that you look at, please,

13   Exhibit 239.

14         It will open your eyes, truly open your eyes to the

15   2000 pound gorilla in the room.  This is not unique.  Not at

16   all.  This is a problem that has been plaguing our healthcare

17   system nationally.

18         That's scary.

19         When you read Exhibit 239 you'll see why I look so

20   tired.  You'll see why I had laser focus getting these

21   exhibits in, sparing no time, all those depositions on video.

22   It's because of that exhibit.  Because I know what's at

23   stake, and now you know what's at stake.

24         And when you read that, you'll see that this culture

25   of intimidation and ridicule, passive-aggressive behavior,

14

1   hiding a sponge behind the heart, having somebody take radial

2   harvest and then seeing the quality person -- Jean Scrafton?

3   She's now quality.

4       We should be scared.  We really should because you

5   saw the video where after she acknowledged that

6   Miss Chopourian was pointing out that hemosiderin staining

7   had compromised vascularity, that she had a disagreement with

8   the surgeon, that that was the reason, remember what

9   Miss Scrafton said:  I did nothing.

10      That was right after I showed her the Injury and

11  Illness Prevention Plan which apparently she's never seen.

12  And she's their quality person.  That is scary.

13      This case, folks, is a wake-up call.  You know,

14  there's a famous expression, "Ask not for whom the bell

15  tolls."  It tolls for dignity.  Both the company and

16  Miss Chopourian's dignity.  That's what we're talking about,

17  our loved ones' dignity.  That's whom the bell tolls for.

18  Our dignity.

19      I put some clips from this.  You'll never be able to

20  read it on the screens.  I've already told you if there was

21  one exhibit to look at, please look at 239 so I'm going to

22  move past that.

23      I want talk about Dignity Health's legal violations

24  for a moment.  And you're going to get the full list in here,

25  and you'll get the verdict form so I'm not going to belabor

15

1    this, but there is sexual harassment.

2            I barely had to talk about sexual harassment by the

3    time Ani Chopourian took the stand because it was just so

4    obvious by that point.  Even the defense witnesses said it.

5    Even on cross-examination they couldn't keep out the graphic

6    nature.

7            And then there's the video of Mr. Harper:  Nothing is

8    verboten.  Nothing is forbidden.  Graphic sex talk.

9    Innuendo.  Gestures.  Tongue gesture.

10           Here's the rest of them.

11           I want to talk about some of these.  I'll leave it on

12   the screen because you can see it.  I want you to soak this

13   in for just a moment.  Just look at the list.  This list took

14   me about two minutes to make.  Two minutes only.

15           There is so much more information than even this in

16   the various complaints that Ms. Chopourian went through.  So

17   when you get to that hospital whistleblower case, that

18   verdict form, if anybody feels like they're slowing down, "Is

19   this this," if anybody has a question about the legitimacy of

20   our case, stop and look at the evidence.  Please, look at the

21   evidence.

22           Here I am representing this fine woman, in this fine

23   case, in this fine court, and I'm begging for justice in the

24   form of looking at that evidence.

25           Read it.

1          This case basically boils down to -- This is all the

2     sexual harassment stuff.  I tried to summarize as best I

3     could all the various things you heard.  And it is not fun to

4     put on vulgarity, especially in front of a bunch of women and

5     men.  It is not fun, but it is necessary.

6          It is necessary because you got to understand this

7     environment.  If they're going to tolerate this in the form

8     of sexual harassment -- and you heard Mr. Harper say it on

9     the video, they don't do anything, and you heard Frances

10    Earle talk about it.  She said that they the talk the talk

11    but they don't walk the walk.

12         You want proof of that?

13         I'll give it to you in a couple of one-liners right

14    here.  First of all, I don't know if you all appreciated it

15    when it happened, but not only did Doris Frazier admit to

16    violating the sexual harassment policy as the vice-president

17    of this place, but actually something worse than that

18    happened.

19         You on the jury learned about John Jerome, his sexual

20    harassment complaint, before the vice-president.  She didn't

21    know about it.  You heard it first.

22         How sad is that?

23         That's how out of touch they are with their own

24    department, that juries hear about their sexual harassment

25    complaints and reports before the vice-president does; who,

17

1   by the way I made sure to ask, is she supposed to know.  She

2   said yeah.

3          That brings us to that witness Jim Anderson.

4          I did my best to show you with as much focus as you

5   could see.  He's out to protect the company from liability.

6   Plain and simple.

7          Dr. Wood let the cat out of the bag that it was Jim

8   Anderson who sent over those confidential patient health

9   information records to Mercy San Juan causing the denial of

10  Ani Chopourian's privileges.

11         Exhibit 104.  Another must-read.  104.  That's RAS

12  Surgeons, Dr. Kevin Elliott pleading, pleading with Dignity

13  to say:  I have women with cancer surgery needs who will

14  benefit from this amazing person, please approve her

15  privileges.

16         Nope.

17         Why?

18         Because Jim Anderson sent something over there after

19  Miss Chopourian gave her depo.

20         In fact, if Miss Chopourian didn't give those four

21  days of depositions in this case, she would still be working.

22  She would still be at RAS.  If she didn't file this case, she

23  would still be at RAS.

24         That's terrifying.

25         In fact, you heard that.  You heard that theme.

18

1    Intimidation.  Threaten.  That didn't even go rebutted.

2         Let's keep of track of the evidence.  If evidence

3    doesn't have an answer, its unrebutted.  Right?

4         You heard from Frances Earle.  Twice.  Hospital

5    representatives intimidated and threatened her.

6         No response.

7         You heard Terese Merlo say that she had been

8    intimidated and threatened.  And you watched her being

9    intimidated and threatened as they used her own confidential

10   patient health information and employment records against her

11   to try and discredit her.

12        The exact thing they're doing here.

13        This is the protocol.  Write up a bunch of lies, try

14   to make the person look bad.

15        What was this thing about the sex and the

16   cleanliness?

17        That was just absolutely abhorrent and despicable.

18   This woman brings this important case, and the best they have

19   is a philanderer who says one time that she mentioned her

20   sexual hygiene.

21        That's the price this poor woman has had to pay for

22   our safety.  Our safety.

23        But she never wavered.  You heard every real witness,

24   Betty Devitt, Frances Earle -- gosh, let me find my list.

25        Betty Devitt.  Frances Earle.  John Jerome.  What was

19

1    the deal in terms of trying to impeach Mr. Jerome?

2         It's not enough that we serve our country and get

3    honorable discharged?

4         You got to take the witness stand and have somebody

5    try to impugn your integrity?

6         John Jerome is an enlisted man, honorably discharged.

7    The idea that somebody -- that Michelle McDaniel, without

8    even knowing what he said, is going to accuse a veteran of

9    lying in a federal court that he fought for, you should be

10   outraged by that.  That's absolutely ridiculous.

11        And yes, John Jerome has his own case.  God bless him

12   that he does.  God bless our safety.  That's what we need,

13   more people, more brave people who will have the courage to

14   stand up and fight for what's right.  That's what we're

15   talking about.

16        And I'll tell you what's really important, if

17   Miss Chopourian loses this case, have this dialogue:  Who is

18   going to ever come forward?  If this case can't win, who is

19   ever coming forward?

20        Nobody.

21        This case will get run up the flag pole at Dignity

22   and everybody is going to know:  Shut your mouth.  Remember

23   what happened to Ani Chopourian.

24        If that sits well with you, then go ahead and give

25   the defense their verdict.  But for the sake of our

20

1   community, think that through carefully, look at that

2   evidence.

3         I have to give you some numbers.  This is a small

4   claim.  This isn't really a case about meals and rest breaks,

5   although it is interesting how it gets woven through

6   everything.

7         It is true.  She wanted her rest break.  You heard

8   Joe Marquez say she was a vegetarian.  She would run out of

9   steam.  You heard Renee Dodge confirm the JCAHO standard,

10  fatigue, tiredness.  I don't know about you, folks, but if

11  I'm on the table, and my loved one's on the table, I want my

12  staff well-fed and well-rested.  Period.

13        They all acknowledge that they never gave her her

14  breaks.  Miss Chopourian went through all those documents.

15  She summarized it all for you.  She opened the door so that

16  they could cross-examine her all they wanted.

17        She came up with the exact number of days that she

18  worked over 368 hours.  You heard not a word.

19  Uncontradicted.  Absolutely uncontradicted.

20        She told you she got her meals 54 times.  So why are

21  we wasting time?

22        Ma'am, you worked with her a little bit.  Did you

23  ever see her in the break room?

24        Sure.

25        You know what?  Justice delayed is justice denied.

21

1   That's what you saw.  For folks who like football,

2   basketball, it is called killing the clock.  Just get up and

3   ask a whole bunch of whatever.  And maybe this jury will get

4   fed up because they're stuck in those uncomfortable chairs

5   wanting to go home.  Maybe they'll just get tired of this.

6          And I'm so proud that this jury dug in and hung in

7   because that tells us that you see something important going

8   on in this case, and you're not going to be starved out of

9   it.  No way.

10         Here's the numbers.

11         This is the total number of times, 314 times, that

12  Miss Chopourian didn't get her meal break as required by law.

13  And this number, 368, this is just talking about the fact

14  they don't give regular rest breaks.  They can hire somebody.

15  It's Mercy, it's Dignity for crying out loud.  They can hire

16  one more physician's assistant.  Instead they're running them

17  out of there.

18         We lost a Yale graduate.  That's what we lost.

19         By the way, Dr. Morris.  What an amazing heart

20  surgeon and brave man.  With all the pressure of this

21  hospital coming to bear, he still had not a nary negative

22  word as director of that medical department about Ani

23  Chopourian.

24         He actually -- Oh, maybe he forgot a little bit some

25  of the things he said.  Maybe I had to refresh his

22

1    recollection with some documents that reminded him of the

2    things that he said glowing about Ani Chopourian, and that

3    should be an example of how much pressure there came to bear.

4    But did you catch it when he said:  She's better than

5    surgeons.  Some surgeons.  Not all, but some.  Better than

6    some.

7            He described her as meticulous, a team player,

8    absolutely conscientious and an advocate for patient safety.

9    You heard it over and over again from reputable nurses.

10           What about that we lost Frances Earle too?

11           I hope you caught that her application for her visa

12   was not renewed after these two meetings.  She's been exiled

13   to Canada.  We lost another one.  How many more people do we

14   have to lose from our OR suites before we wake up?

15           All right.  Now, folks, I want you to recognize I'm

16   giving short shrift to liability because frankly to the

17   plaintiff this is an obvious case of liability.  It is not

18   whether they're liable, the main question you folks are going

19   to be deliberating about, in our opinion, is how much money

20   is it going to take to make up for this harm?

21           That's really what we're talking about.

22           Then this jury instruction, you're going to catch

23   this word "compensate," right here, "fairly compensate."

24   This paragraph -- that second paragraph.

25           "Fairly compensate," that means balance.  Here's the

23

1   definition of the word, but I know this because I've seen

2   this before.  "Compensate" means balance.

3          So we've seen the harm.  And I'm going to summarize

4   it briefly for you.  But you have watched it.  You've seen

5   the horrible, horrible, horrible treatment of Ani Chopourian.

6   Devastating a women with two postgraduate degrees, ruining

7   her career and careening her on a three-year long course of

8   horribleness.  That's what's on the scale.

9          And you know what?  When I go to work, I want to get

10  paid for my job.  That's what they call compensation.  For

11  every hour I work, they put money on the side for the other

12  side of the scale, and it balances out.  And we repeat this

13  process every two weeks.  We go, we put our arm, put our time

14  on the scale, and they balance it.

15         So what are we going to put on the scale here?

16         This is 269.  I like to give juries options.  I don't

17  tell you what to do.  You're a jury, one of the most powerful

18  forces in our country.  I don't tell you what to do.  You do

19  what you want to do within the law that's provided by the

20  court.

21         But this past wage loss figure of 549,360, that is

22  every shekel that she has lost until today offset by all the

23  income.  We had an expert, Dr. Charles Mahla.  Very

24  reputable.  Very polite.  Very knowledgeable.

25         Where was their expert?

24

1          They don't want to talk about that, folks.  Believe

2     it or not, when they get up, they're going to say this isn't

3     real.  They're going to say this is all made up.  They're not

4     going to give you a number to work off of.  It is going to be

5     a zero.  Okay.

6          So there was some mention:  Oh, well, maybe she could

7     have worked harder, maybe she could have found another job.

8     That is called mitigation.

9          That's their burden.  They don't even have an expert

10    to talk about that.  They didn't have a vocational expert.

11    They tried to make it seem like our economist is supposed to

12    do their job.

13          That's their job.

14          We gave you a number.  The value of her career.  And

15    most people who learn this figure are sort of surprised.

16    That's it?  That's it for a whole career?  Three million?

17    Here it is, the career value is $3,737,488.

18          For most people who think about a cardiac surgical

19    assistant's career the first question that comes up is:

20    That's all?

21          But I tell you what, folks, the money we take from

22    our work, that's not the most valuable thing to us, not if

23    you really love your job.  For those of us who really love

24    our work, who find meaning in our work, the money isn't the

25    important part.

1          It's the feeling you get, the pride you get, the

2    lives you save, the benefit you do.  That's what has value.

3          When you go to work is your paycheck the sum total of

4    your value as a human being?

5          I hope not.  I really do.  I really hope not.  I know

6    it isn't for Ani Chopourian.  She is a spectacular human

7    being, absolutely spectacular.

8          And let's talk about the emotional harms.

9          I like art.  I find art to be one of the ways to put

10   a jury in touch with their feelings.  Not for sympathy, but

11   for understanding.

12         Ani Chopourian told you about her recurring nightmare

13   over this -- over the termination, the attack on her

14   character, the loss of her defamation, all those years in

15   school she worked to be in that position gone.

16         It's upsetting.  It's harrowing.

17         These words are in a jury instruction about

18   non-economic damages, every single one of these words.  So

19   one of the things I like to do when you are trying to think

20   of how many millions to give Miss Chopourian for her

21   emotional suffering is take one of them at a time.

22         If anybody is having a problem saying, "Gosh, you

23   know, that many millions, that's just that's a lot of money,"

24   slow it down.

25         Remember Richard Press?  I know he was just a drop in

26

1    the bucket, that mentor of Ani Chopourian's.  I actually like

2    to impersonate him because he has a great voice.  "Ani," he

3    says, "I'm a doctor of anthropology."  And he knows.  He saw

4    her.  He worked with her.  He tried to keep her off the

5    depression.  He tried to help her stay in touch, keep in

6    tune, "Focus on your case."  "They ruined her, this woman who

7    went to the most elite universities in the world."

8            He maybe gets a little carried away, but he loves

9    this woman.  And he loves her as a member of our community,

10   running that book store.  For 30 years he's been here.  He's

11   proud of her.  He wants her to pursue this case.

12           Frances Earle wanted her to pursue this case.  Betty

13   Devitt said this she wants her to pursue this case.

14           And then think of the regret.  Oh, my goodness, the

15   potent and poignant regret of all these people who wish they

16   had spoken out because they know that our precious Ani

17   Chopourian was ruined when all she ever wanted to do was save

18   our lives.

19           So look at these words and talk about how much it is

20   worth, your enjoyment of life, your loss of sleep, early

21   menopause, hot flashes, migraines, incessant crying.

22           I'm not trying to build up sympathy, I'm trying to

23   put in evidence so that you can see that this affected this

24   woman.

25           And I'm wrapping up in just a moment because I think

27

1   people who take too long in closing, they start shooting

2   themselves in the foot so here we go.

3        I think you recognize this.  It's the woodshed.  When

4   you want somebody to learn a lesson, you take them to the

5   woodshed.  So we're now past emotional damages.  I'm going to

6   suggest a range to you just for now because I know you're

7   going to hear nothing anyway.  I'm going to suggest a range

8   for Miss Chopourian's emotional suffering.

9        You guys decide, but somewhere -- it has got to be

10  somewhere between seven to fifteen million dollars just in

11  terms of how horrible this poor woman has been treated.  It

12  has got to be more than the loss of her career.  It has got

13  to be, and I'll tell you why.

14       Because if somebody only lost a dollar, you can't

15  give punitive damages of a million because that would be a

16  million to one.  That's ridiculous.  You don't give somebody

17  a million dollars in punitive damages because they have a $1

18  loss.

19       So this is what I was talking about with incomplete

20  verdicts.  You have to do the first part of your job so that

21  you can do the second part of your job correctly.

22       What I mean by that, if you give her the value -- the

23  true and actual value of her suffering, of her economic loss,

24  then you relate that to the reprehensibility of this company

25  and what they've done.  That's when you take them to the

28

1   woodshed.

2          So let's keep it simple.  Let's just say between the

3   3.5 and wherever you are between five and 15 you land at a

4   total of ten, keeping math easy as the lawyer likes to do.

5          All right.  Now I want to imagine you're in a car.

6   We all got gas needles in our car.  Reprehensibility is like

7   a needle.  If you're okay with this case, you have no problem

8   with the way she was treated, then zero would be appropriate.

9          If you think it is only medium in terms of how

10  reprehensible and disastrous, maybe it is a five.

11         But if you think that this case is the most

12  ridiculous and reprehensible case and you never want to see a

13  train wreck like this again in a federal court on a witness

14  stand, if you want to help Ani Chopourian and address the

15  harm that is done to her and punish this company, then take

16  that needle to nine.  But I beg of you, don't go more than

17  that.  We run into problems if you go over nine times.

18         Please, keep your calm, keep your reason about you.

19  Look at the instructions, but then think to yourself in terms

20  of multiplying that damage where are you between zero and

21  nine, and then come to an understanding as a group that this

22  number -- with this number your children, your children's

23  children, everybody will see justice was finally done for Ani

24  Chopourian, and we will actually take a step, where JCAHO

25  wants us, protecting our community, protecting our medical

29

1  workers, protecting our right to breaks, protecting the women

2  in the workplace.  That's what we want.

3       You saw John Jerome.  He's military.  He cried when

4  he talked of the environment in that workplace.  That should

5  say something to you in terms of how bad it was.

6       These are the -- You will see this on the

7  instructions.  I'm ending because I've got to save some of my

8  time so you'll see me here at rebuttal.

9       Now, folks, I'm going to get a chance to see you

10  again.  I'll address some of the amazing things that you're

11  about to hear.  So with that, I thank you so much for sitting

12  through all of this and for your time and your attention.

13       Thank you, Ladies and Gentlemen.

14       THE COURT:  All right.  You do have 20 minutes left,

15  Mr. Bohm.

16       MR. BOHM:  Thank you, Your Honor.

17       THE COURT:  Miss Martin.

18       MS. MARTIN:  Thank you, Your Honor.  I need just a

19  moment to get my stuff up there.

20       The trouble with going backward is you have to shift

21  from one gear to the other.

22            (Brief pause.  Mic adjusted.)

23       Okay.

24       Well, you just heard a lot of information from

25  counsel, but none of it addresses the real issues in this

1    case.

2          We've been sitting here for the last basically, what,

3    two-and-a-half, three weeks, and you've been listening

4    attentively, but in closing argument nothing was really

5    talked about with respect to the facts in this case.

6          Now, when I came before you just a few weeks ago, I

7    promised a solemn oath to you.  My oath to you was that I

8    would give you, to the best of my ability – we are in a

9    courtroom, we do have rules to follow, as you know – the

10   truth.  I would share with you the good, the bad and the

11   ugly.  And I think you'll find I have.

12         I have not tried to obfuscate.  Look at the

13   cross-examination I did.  I have shared through our witnesses

14   what was really happening in that CVOR when Miss Chopourian

15   was there.

16         I don't think that that really came across in

17   plaintiff's case.  We heard a lot of –– we saw a lot of

18   drama, facial expressions, and a lot of noise, but we really

19   didn't learn anything about what was really happening.

20         Let's take an example.

21         Do you remember when Miss Chopourian was testifying

22   in this case?  When she first got up on the witness stand, it

23   was a pretty brief time for a case of this magnitude.  She

24   was up there for, I believe, a couple hours, hour and a half,

25   give or take on direct examination.  And she was very sweet.

31

1          When I got up to do my cross-examination, she became

2     angry, her voice was raised, and she became combative you'll

3     recall.  That's the Ani Chopourian that worked as Mercy

4     General Hospital.

5          So let's talk, without a lot of arm waving and

6     fanfare, let's talk about what the evidence shows.

7          I'm going to try to help you because when you go back

8     in the jury room, you will be seeing -- you will have the

9     jury instructions, which you need to work with, as well as

10    the verdict form.  It can be a bit much sometimes.

11         What are we dealing with here?  What are the claims?

12         Plaintiff has several claims.  This is an actual copy

13    of the jury instruction you will receive when you go back

14    into the deliberation room.

15         So plaintiff claims a sexually hostile work

16    environment, Title 7 retaliation, we will talk more about

17    that, retaliation for complaints about patient safety, and

18    she's claiming there was intentional inference with her

19    prospective economic advantage, that was when she didn't get

20    privileges as Mercy San Juan Hospital with the 132 patients

21    records that were disclosed improperly, and defamation, and

22    the failure to provide meal breaks.

23         I'm going take care of a couple of them first of all

24    because they're easy.

25         Defamation.

1          There needs to be a false negative statement made

2     about somebody, and you will get the jury instruction.  There

3     needs to be a false negative statement made about somebody,

4     and that's an important first part of this analysis.

5          If it is true, it doesn't count.  And if you publish

6     to a third person, meaning somebody else needs to hear it,

7     and that didn't happen here you'll learn, and we'll talk

8     about that in a minute.

9          And more importantly, there is what we call immunity,

10    that if you publish something for purposes of responding to a

11    healthcare organization, like a hospital or like a medical

12    staff office, that's like a bi card, a waiver.

13         And so then even if it turns out that the statement

14    made wasn't perfectly true, then it is still not defamation

15    because it is for policy reasons.

16         In this case you're going to find out that the

17    statement was true nonetheless.

18         What was the statement?

19         Have you heard anything about that?

20         Nope.

21         What defamation was there?

22         Counsel wants you to believe that when plaintiff went

23    through -- I don't know, I want you to remember this part --

24    she went through with a highlighter, she said, and

25    highlighted all the false statements.

33

1          And Her Honor told you that highlighting the false

2     statements is a summary.  This is demonstrative evidence, she

3     told, you just today.  And she told you you need -- if you

4     get demonstrative evidence, that's only supposed to be the

5     sum total or summary of actual evidence that came in.

6          Well, I triple dog dare you to find actual evidence.

7          This is just so loud.  (Indicating mic.)

8          There is no actual evidence of defamation.  Where did

9     she testify of any false statement on the stand?

10          You were given -- you were shown, flashed up on the

11     screen, a bunch of pages with yellow marks.  That doesn't

12     tell you.  That is untrustworthy evidence because it didn't

13     happen.  There was no false statement.

14          And while we are on the subject of false statements,

15     who do you trust?

16          Do you remember when I did my cross-examination of

17     Miss Chopourian, and I spent a great deal of time talking to

18     her about her job search.  And that was because she made

19     false statements, you'll recall, to the people she was

20     applying for jobs with.

21          Do you remember when I was asking Ms. Chopourian

22     about what she was representing when she was with Rae, the

23     nurse, at Saint Joseph's Hospital?

24          There was a whole series of questions asked of her

25     because she had not disclosed to Saint Joseph's Hospital that

34

1    she was no longer working and had not been working.

2         Remember she ultimately admitted that she interviewed

3    with them in November of 2008, and we know when she was

4    terminated, which was August.

5         And remember we showed -- it's in evidence in this

6    case -- that email where Miss Chopourian was confirming with

7    Rae, who whom she was interviewing, that her current salary

8    was $170,000 a year.

9         And she had already told you that she was sure she

10   disclosed to Rae, complete disclosure, before this email at

11   the initial interview that she was no longer working at

12   Mercy.

13        And without a glimmer of any recognition that what

14   she told you wasn't accurate – and we talked about this for

15   awhile – she changed her testimony to say:  Oh, I told her on

16   December 3rd, which was a week or so after.  She insisted,

17   swore up and down that she had provided this information in

18   the interview.

19        She was hired on the condition that she could pass

20   credentialing.  And she couldn't pass because she wasn't

21   truthful on her resume either.  The same thing happened to

22   her at Kaiser.  You heard that testimony too.

23        She couldn't pass credentialing.

24        Why couldn't she pass credentialing?

25        Remember Dr. Wood?

1    He was here yesterday, and he was the credentialing

2    guy that testified yesterday.  And remember when he was

3    talking about that verification, that there's actual

4    verification of every piece of information in the file in

5    order to provide staff privileges to an applicant.  That's

6    what happened to her before.

7    Now, there's no defamation in this case, Ladies and

8    Gentlemen.  Miss Chopourian can't prove it.  And indeed, we

9    do know that she has lied to you, and she's not been truthful

10   with others.

11   And so I would present to you that the defamation in

12   this case and the untruthful statements in this case, many of

13   them have been made in this courtroom.

14   Now, Miss Chopourian cannot receive a verdict for

15   defamation because she hasn't proven it.

16   She's also claiming that we interfered with

17   prospective economic advantage was because she lost her job

18   with Dr. Elliott's office, RAS.

19   And truthfully, nobody wants anybody to lose a job,

20   for sure.  It looks like she was happy there.  But

21   unfortunately something came to light that was very troubling

22   to the credentialing people at the medical staff office and

23   understandably so.

24   It was 132 patients' names were taken away by

25   Miss Chopourian.  And we know that those patient names, it

36

1  was wrong.  It was against hospital policy.  You heard

2  Dr. Wood testify that that is a huge -- almost every witness,

3  even plaintiff's witnesses said that is a no-no in the

4  medical community.

5       And Dr. Wood talked about how important it was for

6  everybody on the medical staff to have integrity and have

7  good judgment.  And that was such a huge lapse of judgment,

8  in his mind, that they had a unanimous decision, they voted

9  that they couldn't give her privileges.

10      Now, that's notwithstanding the fact that the medical

11  staff office is not CHW.  It's not the same.  He told you

12  that.

13      So the people who made the decision to not provide

14  Miss Chopourian with privileges was somebody that wasn't

15  Mercy Hospital or CHW.

16      So there absolutely can be no nexus between the two

17  if the people making the decision to deny privileges weren't

18  the people that are here today, CHW and Mercy Hospital.

19      Is it on?  (Indicating monitor.)

20      All right.  This slide may look familiar to you

21  because this is what I talked about a couple of weeks ago

22  with you.

23      I want to pause discussing the claims in this case to

24  the reason -- the true reason why Miss Chopourian was

25  terminated and why she wasn't a good fit.

37

1        She wasn't a good fit because of these traits, and
2   they've all played out in this case.   She lacked judgment.
3   We learned that from the patients' information issue.   More
4   importantly, we learned that with her write-ups and her
5   conduct in this case.

6        Now, you have seen this before.   This is Exhibit A --
7   part of Exhibit A in this case.   And this is the write-up for
8   Miss Chopourian for the timecard violation.

9        And with respect to that, remember she acknowledged
10  in this timecard violation that her behavior was against
11  policy, that is the behavior of having somebody or asking
12  somebody else to clock in for her was against policy, and she
13  knew it was wrong.

14        That's a big deal, having somebody clock in for you
15  when you aren't there.

16        But she wasn't the only one who thought that was a
17  bad idea, and the folks at Mercy weren't the only ones who
18  thought that was a bad idea and really could have resulted in
19  immediate termination.   Because we saw that Terese Merlo,
20  plaintiff's witness.   Remember her, the stocky gal who came
21  and testified.   And she -- I provided for you a copy of a
22  little bit of her testimony.

23        (Reading:)

24        And during that time what was the environment at the
25        hospital like in relation to employees swiping cards

38

1           for other employees?

2           It was absolutely not allowed.

3           (Reading concluded.)

4       Now, we also heard the same thing from John Jerome:

5   That it would be, yes, definitely verboten to allow somebody

6   to swipe a card for you.

7       But then Miss Chopourian came in and talked to you.

8   Miss Chopourian, in this courtroom – the courtroom next

9   door – denied it was not right to swipe a card.  And this is

10  an excerpt from her testimony right in the next door

11  courtroom.

12          (Reading:)

13          You know that you were written up for timecard --

14          having somebody else punch your timecard; do you

15          recall that?

16          Yes.

17          And you understood at that time that that was the

18          wrong thing to do, correct?

19          Incorrect.

20          (Reading concluded.)

21      Very different from what was reflected on the

22  original write-up.

23      And you see at the bottom of the write-up

24  Miss Chopourian signed that reprimand.  And you're going to

25  find out later on, when she disagreed with something, she

39

1    would write in an objection that she didn't agree with it,

2    which she has every right to do.

3          Now, again, Miss Chopourian was not a good fit for

4    this environment.  You heard from Mr. Anderson, who is the HR

5    manager, and he talked about what they have at Mercy, a

6    progressive discipline system.

7          But I want to give a nod here to something else that

8    is really important.  This is something that we all know

9    intuitively, that no matter who you work for, if you work for

10   the state, if you're a teacher, no matter who you work for,

11   or CHW, that regardless of the progressive discipline, that a

12   particular company or entity subscribes to, that your conduct

13   is always being looked at.  It is not always getting written

14   up.

15         So typically, if you think about your own experience,

16   you go to work for somebody new, you got a clean slate, and

17   people cut you some slack.  It is kind of like depositing

18   money in a bank.

19         So if you are doing a good job and showing you're

20   enthusiastic, really trying, all those kings of things, the

21   intangibles, that makes for a great employee.  In the case of

22   Ani caring for the patients, showing up to work, showing up

23   for the emergencies, it is putting money in a bank account.

24   Gives you a bit of wiggle room in case you mess up.  Kind of.

25         And when you are not that great an employee, that

40

1    there are issues with respect to the conduct, it is like

2    taking money out of that bank account.  And sometimes you

3    just hover around the edge.  And I think that's exactly where

4    Ani Chopourian lies.  That was where she was.

5          So when you get written up with these serious

6    infractions, serious violations of the rules that could have

7    seriously affected patient care, that's a problem.  That is

8    good reason for termination.

9          You heard Dr. Zhu yesterday, I believe.  Dr. Zhu

10   talked about exactly that kind of a situation.  Now, Ani

11   didn't get written up for this when they worked late into the

12   night.  Remember that?

13         They worked late into the night, and Ani didn't want

14   to report the next day for work early to treat the patient to

15   do her job as the PA.  And he said:  No, you have to show up.

16   We have a patient who needs our care.

17         And so Miss Chopourian didn't show up until several

18   hours later.  That's a problem.  Dr. Zhu told you that he was

19   lucky that he had a physician to assist him and to take the

20   vein that he needed.

21         She didn't get written up for that.  He doesn't like

22   to write people up.  You met him, a mild-mannered man.  But

23   that is still resonating in the collective wisdom, the

24   collective understanding of this person, of Miss Chopourian.

25         Now, next she got a written warning for being called

41

1   in for the emergency that we've talked about in this case.

2   And that emergency was instead of going into the room like

3   she was supposed to, she decided to go into the break room

4   instead of checking into the OR.

5          That's a problem.  Think of yourself if you're there

6   being moved from the cath lab to the OR.  Every minute

7   counts, every set of hands, every belly button in that room

8   needs to be all dedicated to one thing.

9          Now, you heard counsel talk about she was tired, she

10  was -- she was upset because she had been at a party that

11  weekend that she wanted off.

12         We can all relate to that, but it's still no excuse

13  for not helping people in the OR.  And she did have an

14  obligation.  You heard Patti DiPinto talk about this, that

15  she had an obligation if she didn't want to work that night,

16  she should have made arrangements for somebody to cover for

17  her.  But she did not do that.  She chose not to do that.

18         It's not that -- Furthermore, how about this?  When

19  we all work, I have to go to bed, as I'm sure everybody has a

20  bedtime where you know that you need a certain amount of

21  sleep to function the next day.

22         Well, Miss Chopourian knew she had to go to work the

23  next day.  As a matter of fact, remember Renee told you that

24  they even gave her -- let her come in later to try to

25  accommodate her so that she wouldn't have to get up so early

42

1    after the party.

2          And that was after the party that she did not give to

3    Patti DiPinto the request for time off in writing, like was

4    the policy.  She needed to do that.

5          Who can remember a whole department's worth of

6    people's personal schedules?  That's an onerous burden.  I

7    can't remember what I had for lunch today.

8          So Patti told you that she didn't get the request in

9    writing, and she didn't plan to give it to Ani off.  But she

10   did.  Everybody tried to accommodate Ani.

11         Oh, yeah.  What about the lunch periods?

12         Witness after witness, and I would have liked to have

13   brought more, but we were limited on time, witness after

14   witness came in here and said Ani got her breaks.

15         Then we brought Joe in here, and he told you that I

16   let her out because she wanted it, everybody tried to let her

17   out when she wanted to.  And we'll talk more about that later

18   too, but there is nobody being mean to Miss Chopourian.

19   People are just bending over backwards to accommodate her

20   special needs.

21         You also heard, by the way, that she told most

22   everybody in the department, at least that came here, except

23   Joe didn't.  He remembered that she was a vegetarian.  The

24   others told you she told them that she was hypoglycemic.

25         Remember that?

43

1        Remember she told me, when I asked her questions, she

2   is not really hypoglycemic.  She's never been diagnosed as

3   hypoglycemic.

4        Well, that is fine.  We can all ask for our lunches

5   when we want, we can all want to eat when we want, but we

6   cannot pick a job where we can't leave at a moment's notice,

7   we can't plan for a lunch, we can't plan for a rest period.

8        You'll learn she got her lunches and got rest

9   periods.  And even Miss Chopourian told you with respect to

10  those lunch periods, when I asked her, I said:  What about

11  that hour?  She admitted, an hour to an hour and a half

12  between most cases.  But she didn't count that as a rest

13  period or lunch period, and she is getting paid for that.

14       Now, back to the emergency case that we were talking

15  about.  Plaintiff's witnesses agree that you got to get to

16  the room as quickly as possible.  Terese Merlo recognized

17  that.  So when there is an emergency case, it is all hands on

18  deck, everybody gets in there to get the room ready as

19  quickly as possible, right?  Correct?  Yes?

20       Well, that's a problem.

21       So next we move again to the second half of the

22  write-up here, which is a failure, Miss Chopourian, you

23  learned, that she -- that she didn't show up for work, even

24  though she worked there for almost two years.  She forgot to

25  call in.

44

1          And then she left without asking permission, without

2     going through the chain of command.  And she left, and so

3     that was, again, a big deal because it takes a whole team to

4     make the OR run.  And we had lots of people come in and tell

5     you that.  So she's not reporting to work, and she's not

6     interacting positively to the team.

7          And then we have denial of accountability, here --

8     right here at the bottom Ani writes:

9          (Reading:)

10          My signature is merely an acknowledgment of receiving

11          this letter.  Content false and not an acceptance of

12          its contents.

13          (Reading concluded.)

14          Really?

15          She was seen by Barb Moore in the break room when she

16     should have been in the OR, and she's really saying it is

17     false?

18          And then remember Anil Prasad, nice little

19     mild-mannered fellow the plaintiff calls in his case in

20     chief.  Anil Prasad says she told me to wake her up when the

21     patient got there.

22          You also heard there is a lot of work you need to do

23     in order to get the room ready.  The case doesn't start when

24     the patient gets there.

25          So with this backdrop let's talk a little bit more

1   about plaintiff's contentions in this case and why they don't

2   fit with Mercy.

3         By the way, we had an opportunity.  As happens in all

4   cases, why did we get here?

5         Plaintiff got very emotional with this, but really it

6   is very simple, is that this is a stickup.  And Mercy, CHW,

7   said:  No, we treat our people well.  We have processes to

8   make sure that people don't feel harassed.  If they don't

9   report things to us, we can't know.  We have processes by

10  which we investigate problems, not just problems of sexual

11  harassment, which, of course, is the legal claim before you,

12  but we are also concerned about our people, that they don't

13  feel like they are being harassed by physicians.

14        We've all seen the shows.  We've all seen House.

15  We've all seen Nash.  We've all seen that.  But just like

16  some of the conduct in this courtroom, it is not real, it is

17  TV.

18        You know, that idea of the doctor, you know, being

19  just oppressive and barking orders, that's not what is

20  happening here.  But still when the complaints were made,

21  they were investigated.  They were -- the people involved

22  were spoken with.

23        And you met Dr. Kaplon.  Dr. Kaplon was horrified

24  that there are people who feel like he's being mean to them.

25  And again, let's all remember, nobody is perfect, not one of

1   us in this room is.  And so all of us get to behave a little

2   bit badly sometimes, but that's not the basis for a lawsuit.

3          I'm having a bad day, and I yell at my dog.  I feel

4   terrible about it afterwards.  Can my dog sue me?  No.

5          I'm in a bad mood, and I go in my office and I shut

6   the door in my office.  And my secretary is upset because I

7   didn't stop by like I do every morning and wish her hello,

8   find out how her day is going, find out what her goofy

9   grandkid is up to.

10          Does that constitute a lawsuit because I insulted

11   her?

12          I'm just a lawyer.  I'm not saving lives.  I'm not

13   dealing with patients' hearts.  I'm not dealing with bloody

14   fields.  I'm not holding patients' hearts in my hands.

15          You heard all these nurses came up here and basically

16   say that he's human and I have had an experience or two over

17   the years, but he's not abusive, Dr. Kaplon, at all.

18          Women and men.

19          And you've heard all of them say:  When we have an

20   issue, we talk like adults.  It is reasonable.  That's not a

21   basis to bring a lawsuit.  By the way, that is not sexual

22   harassment.

23          And that conduct that Miss Chopourian is describing,

24   which is not this case, it is not true, it's through her

25   filter, is not a basis for a lawsuit because sexual

47

1   harassment, you will learn, requires that there be some kind

2   of sexual- or gender-based animus to create an environment.

3           So let's talk about that for a second.

4           You will learn that for plaintiff to prevail in a

5   sexual harassment case -- And again, she has the burden of

6   proof by a preponderance of the evidence.  Think about it.

7   Makes sense when you really think about it.

8           Let's see if I can make this a little bit bigger.

9           (Monitor adjusted.)

10          Okay.

11          (Reading:)

12          Plaintiff was subjected to sexual advances, requests

13          for sexual contact, or other verbal or physical

14          conduct of a sexual nature because of her gender.

15          (Reading concluded.)

16          What evidence do we have of that?

17          Very little.

18          Witness after witness came up and said that they

19  never saw Ani have any issue with sexual harassment, that

20  they never saw anything that she was subjected to sexual

21  advances or requests for sexual contact.

22          Miss Chopourian told you that Jose Gomes approached

23  her and, I think, on one or two occasions and made a comment.

24          Well, as satisfying as it may to be place the blame

25  on Jose Gomes -- we know.  We've learned all about Jose.

48

1   He's a cad.  He's a scoundrel.  But his conduct with respect

2   to Miss Scrafton and Keri Hunter have nothing, again,

3   whatsoever to do with any of the issue you are to decide in

4   this case.

5        You're not going to see one single jury instruction

6   there that says:  By the way, what are the personal morals of

7   people who aren't even directly involved in this case,

8   tangentially involved?  It is irrelevant.

9        Remember how many times that issue was brought up by

10  counsel?

11       Each witness, over and over again, pejorative, loud,

12  pounding the lectern, kind of dramatic a flare, would remind

13  all of us that we have three -- the hospital has three people

14  on their staff that live probably by a different code of

15  ethics than all of us.  But it doesn't belong in this

16  courtroom.  That is irrelevant.

17       What is relevant is what happened to Miss Chopourian,

18  and she said very little because what you're going to also

19  learn - and we're going to move to the third step here - is

20  that the conduct needs to be sufficiently severe or pervasive

21  so as to alter the conditions of the plaintiff's employment

22  and create a sexually abusive or hostile environment.

23       Well, the environment, again, using Miss Chopourian's

24  filter, just for the moment, had really, when you read her

25  journals, when you heard her testimony, the quandary wasn't

49

1  with sexual issues, the quandary was because she didn't like

2  Dr. Kaplon.

3          That doesn't cut it.  You're done right there.  It's

4  not enough.

5          You will also learn that you evaluate the conduct in

6  the context of the environment.  Now, somebody who comes out

7  and makes a sexual joke, if I walk out of my office three

8  times out of four during the day, if any of us walk out of

9  our offices three times out of four and make a joke that has

10  a double entendre, well, that would be inappropriate.  I

11  think we can all agree with that because everything coming

12  out of the mouth would kind of seem that it is kind of

13  prurient or wrong.

14          But when you're in an operating room, for hours and

15  hours and hours, 12, 14, 16 hours sometimes, with the same

16  people, and you might -- and there might be a million words

17  that come flying around that table.  And if somebody says

18  something that has a double entendre during the course of

19  that day, well, that is not pervasive, folks.  That is not

20  pervasive.  That is a fraction of a percentage of the

21  conversation going around that table.

22          You saw the table.  You saw how closely people work

23  together.  That does tend to create some familiarity.  You

24  also heard that these folks, they work together.

25          Anybody who's ever worked with a hospital knows

50

1    that – we had testimony here – that in most of the

2    departments at the hospital for staffing reasons, to make

3    sure the patients' interests get cared for, people call in

4    sick, sometimes people leave, all kinds of things happen,

5    they bring in what they call per diem or daytime nurses or

6    floaters.  They come in and take the place of those who are

7    not present at work.

8           Well, we don't have that.  So we have this very small

9    environment, very elite environment, doing some of the most

10   risky surgeries in the hospital, the most demanding, some of

11   the best surgeons in the hospital.  And they develop a pretty

12   close relationship.

13          And remember -- Do you remember Betty Devitt?  This

14   is kind of cool.  Betty Devitt, she is plaintiff's first

15   witness.  And Betty Devitt was the lady who was offended by

16   swearing.  That's not really sexual, but she was offended.

17   And remember she testified that everybody tried not to swear

18   in front of her because she made her needs known.

19          And I think she also told you they did a pretty good

20   job trying not to.  Every once in a while in the heat of the

21   moment somebody would say something and then say "Sorry,

22   Betty."  She said that kind of with a good-natured smile.

23          And even though she came back here and testified on

24   behalf of the plaintiff, she told us how much she loved

25   working there.

51

1              Hostile environment?  Really?

2              I don't think so.

3              She's the most sensitive of them all.

4              And Ani Chopourian, we know she was capable of

5      standing up for her rights.  Again, you saw her conduct here

6      in the courtroom.  She's no shrinking violet.  She is

7      capable, Yale graduate, of advocating for her own rights.

8      And she didn't advocate for her own rights about sexual

9      harassment or any of her rights.

10             Actually, we'll talk about that more.  Remember this

11     journal, her journal, the handwritten journal, it has been

12     referenced many times throughout the trial.  And she

13     admitted, when I asked her, did you document these issues.

14             Because in her journal -- And I encourage you to read

15     it, really, because it is very illuminating.  We couldn't

16     read it here, do too much with it in questioning.  It's just

17     full of handwritten notes.  These are the ones that she was

18     taking to her home and collecting -- well, part of the ones

19     she was collecting patient stickers for.

20             And you'll find, as she admitted to all of us here in

21     the courtroom when I asked her the question, there's not

22     really a reference to sexual harassment in that journal,

23     there's a lot of reference to everything else.

24             She will -- You learn she talks about people being

25     mean to her.  She talks about her frustrations.  She talks

52

1   about the staining.  She talks about the difference of

2   opinion with Dr. Kaplon.  And she talks about -- spends a lot

3   of time talking about the abuse she's received in

4   Dr. Kaplon's room.

5          Again, that has nothing to do with sexual harassment.

6   It is not gender based.  It is not sexual harassment.

7          If that is to be believed, and I would submit to you

8   that it is not, because she's the only one who interprets

9   these behaviors to be, you know, abusive in any respect, or

10  harassing, that it's still doesn't support the harassment

11  claim.

12         By the way, I just want to -- I just mention this

13  staining.  Do you remember Miss Chopourian - you'll read this

14  in her journal if you take a look at it - that the staining

15  that she talks about, do you remember when Dr. Morris came

16  and counsel was questioning him, and he asked him some

17  question that said:  And hemosiderin staining would

18  contraindicate the taking of a vein for conduit during

19  surgery? Dr. Morris said:  No, it doesn't.  It has nothing

20  to do with it.

21         Because veins -- there are areas of the body that

22  have this staining can be good conduit.  It can be bad

23  conduit, but it is really not factored into the equation.  So

24  Dr. Morris, remember he was called by plaintiff, he doesn't

25  have a horse in this race, and he was -- I think he was

53

1      trying to tell it like it was.

2            And then Dr. Kaplon came and he was asked again about

3      the same thing, and Dr. Kaplon said the same thing.

4            Now, again let's talk about the difference in

5      education and experience between Miss Chopourian and these

6      cardiac surgeons.  Nine years of education, training --

7      actually, when you count it all up it is 13 because four

8      years medical school plus the education they get in practice,

9      the residency and fellowships versus -- I don't want to

10     malign Miss Chopourian's Yale PA experience at all, but the

11     two are not the same.  Completely different.

12           Miss Chopourian, we also learned, had spent about two

13     years, all told, doing this kind of work in the

14     cardiovascular surgery suite, harvesting veins.  Again,

15     that's great, but really is she qualified to make the final

16     call on what is a better vein than the cardiovascular

17     surgeons.

18           The surgeons also told you they encouraged people to

19     talk to them and the people on staff to provide their input.

20     Not one person in this courtroom has told you anybody resents

21     or doesn't want any input.  Except maybe Dr. Morris a little

22     bit.  He was the one who said that nobody has ever challenged

23     him with respect to what vein to take.

24           Moving back to our harassment claim, we don't have

25     severe and pervasive.

54

1          Then we go to the subjective part:  Did plaintiff

2     perceive the working environment to be abusive or hostile on

3     the basis of sex?

4          Well, gosh, if she didn't write it in her journal,

5     and she was writing everything else down, I don't think so.

6     By the way, you'll see in her journal she makes a lot of

7     comments about race, things that aren't even an issue in this

8     case.  And we'll talk about that a little bit later.  But she

9     makes comments about race, frustrations about what people

10    say, even a nun, Sister Claire.  She talked about

11    Sister Claire on direct examination with counsel.

12         And in her journal she goes to Sister Claire, then

13    she writes down, oddly enough, that Sister Claire, out of the

14    blue, asked her what her race was, and then when she told her

15    she was Armenian, that Sister Claire's face changed.

16         Does that even make sense?

17         The prism through which these events are being

18    viewed, the perspective is skewed, clearly.  And there is

19    ample evidence, when you go back in that room, to where you

20    can see that.

21         Did management at the hospital know?

22         Not one bit of evidence that management knew about

23    any sexual harassment complaint by Miss Chopourian.

24    Management don't know because Miss Chopourian didn't report

25    it, and she's now claiming it.

1          And Mr. Jerome did report it, and it was fully

2     investigated.  He really did report it, and it was

3     investigated.

4          That's when he met Miss McDaniel and the Jose Gomes

5     thing, and that Miss McDaniel was mad because she got called

6     to HR, and particularly for a claim that had absolutely no

7     basis in fact.

8          So we know there's a system in place.  We know that

9     CHW is not trying to trample over anybody's rights.  They

10    aren't trying to have people working in these hostile

11    environments as counsel and the other side would have you

12    believe.

13         They've got systems where they learn about things,

14    they take care of them.  And remember Mr. Anderson had

15    actually investigated one previous claim before that.  He's

16    been there for twelve years.  Two claims, twelve years, for

17    actual sexual harassment.  And they fired the guy because

18    they came to a different conclusion in that one.

19         So the system works.  They take this stuff very

20    seriously.

21         This just wasn't sexual harassment on any one of

22    these elements.  You knock out any one of these elements,

23    there is no liability.  There is no case.  They lose on that

24    claim because it's also the right thing to do because it is

25    the truth, without fanfare.

56

1        Title VII and retaliation.  I'm going to lump these

2    two together because they are similar and talk about the same

3    issues.

4        And basically, as you've heard, and will probably

5    hear a lot more about this in rebuttal, that plaintiff claims

6    that she was -- that she reported these issues, and she was

7    retaliated against in the Title VII claim for reporting

8    sexual harassment.

9        Well, we know that she didn't report it.  She never

10   reported sexual harassment.

11       I want to make one more note there.  She did testify

12   that she verbally reported it to Doris Frazier.  Remember

13   Doris?  She was the vice-president of the larger department,

14   the cardiac services.

15       And remember Doris when she testified and she told

16   you that when she found out that Ani Chopourian -- that Ani

17   approached her and called her and -- I think it was called

18   her.  And she said:  I'm not getting paid enough.  I was

19   promised a higher rate of pay.  And who took care of it?

20   Doris.

21       Ani Chopourian approached Doris again because she

22   thought that Dr. Kaplon, when he didn't heed her concerns

23   about the hemosiderin staining issue, Doris said:  This is

24   what you need to do.  I'm not qualified to address that.  I

25   don't know what that means.  I'm a nurse, and I'm in

57

1   administration now.  And I can't help you because I can't

2   ferret the right answer.  I can't explain it to you.  It

3   would be a shot in the dark.

4        It would be like, you know, asking somebody what

5   size -- how big their dinning room table is at their house

6   and you have never been there.

7        So she told her to do what is reasonable under the

8   circumstances, which is A) talk to Dr. Kaplon.  If you've got

9   a concern, talk to Dr. Kaplon.

10       She didn't do that, did she?

11       There is no evidence she did that.

12       And then she said Doris told Miss Chopourian:  If

13  that doesn't work for you, talk to Dr. Morris.

14       Now, remember Ms. Chopourian and Dr. Morris, they had

15  a great relationship.  They really liked each other.  But

16  Miss Chopourian never complained of any of this stuff to

17  Dr. Morris.

18       Does that make sense?

19       If you're truly upset about something, even

20  Dr. Kaplon, why didn't she take any concerns about Dr. Kaplon

21  to Dr. Morris.  Dr. Morris was the only one who wrote her

22  letters of recommendation.  And I think that is terrific.  I

23  think we all think it is terrific because there is nothing

24  wrong that different people tend to resonate with different

25  people.  We don't all resonate to everybody.

58

1        But Dr. Morris never knew about these concerns.  And

2   in fact, he didn't even know about the concerns about the

3   claims in this case, the safety issues and the sexual

4   harassment stuff.  He didn't learn about it because she never

5   even told him about it.

6        Think about it.  If you're upset about something, the

7   first thing you do is you go to your friends and you go to

8   your friends in power.  She didn't do it.

9        And while I'm there, remember I asked Dr. Morris a

10  little bit about whether or not he tried to hire Ani.  He

11  said, no, absolutely not.

12       Remember she wrote down and told other people that he

13  tried to hire her.  And remember when Ani wrote down on that

14  exhibit that her boss, who is her problem person,

15  Miss Scrafton, had been fired.

16       She was here.  You met her.  She hadn't been fired.

17  Just a skewed perspective.

18       So she's claiming that she -- So we know that she

19  can't receive any -- she can't win and it is an absolute

20  verdict for the defendant on the Title VII allegation when

21  she claims that she was retaliated against because she didn't

22  report sexual harassment.

23       The next thing she wants you to believe is that she

24  was fired or retaliated against because she was reporting the

25  safety issues.

59

1      Let's talk about that for a minute.  This is really

2    important.  Now, these safety issues, what safety issues were

3    there?

4      The safety issues pertain to her frustration with

5    Dr. Kaplon.  And the safety issues -- And that was brought to

6    the attention because it sounded like a little bit of touchy,

7    a little grumpy, didn't like him, they didn't get along.

8    That happens in this environment.

9      It is a reality.  People bump into one another in

10   this world, and when you are crunched in a small space, it

11   does happen.  And part of that being a good, functional

12   environment is being able to talk with one another.

13     So when she did bring a concern to her boss, who was

14   Jean, Jean took it immediately to Renee Dodge who was also

15   here just a few hours ago.  And what happened?

16     Again, did they retaliate against her?

17     Did they say we're not going to listen to you because

18   we like the doctor?

19     Did they do something that indicated there was not

20   going to be a true investigation here?

21     They took it to human resources.  By the way, Ani did

22   indicate she wanted to go to human resources, which they made

23   happen.

24     Then they asked for another investigation where they

25   asked another guy in HR to talk to the other PAs.  What is it

60

1    really like?  Is there something we're not getting?

2            No.  They said no.  Remember that?

3            And also let's remember this environment where we've

4    got nine or ten people around a patient, all doing their

5    thing for hours at a time.

6            Don't you think that if Ani was being abused in that

7    environment, that there would have been somebody else who

8    stepped up to the plate, kind of like Barb Moore did in that

9    Frances Earle incident in 2007?

10           The law doesn't require perfection, Ladies and

11   Gentlemen.  The law requires reasonableness.  Take it down a

12   notch.  Let's look at this.  What's really happening here?

13           So that -- the report to Dr. Kaplon -- about

14   Dr. Kaplon, is that really a safety issue?

15           No.  Because a safety issue needs to be something

16   that is tangible, otherwise anybody could really run and

17   report something:  I don't like this doctor.  I think this

18   person is unsafe, which is essentially what's happening here;

19   she is accusing the number one cardiac surgeon in the state,

20   with the best outcomes in the state, of being unsafe.

21           And she has every right to do that, but we have to

22   say no sometime because it was investigated and it wasn't

23   unsafe.

24           So you don't get to complain about somebody, label it

25   "unsafe," and then be immune from the consequences of your

61

1    own behavior.

2         Essentially so what would happen if we would allow

3    that as a society?

4         "I think I'm going to get fired from my job" or "I'm

5    concerned about something" or "I've been misbehaving," fill

6    in the blank.  "Okay.  I'm going to go to my boss and

7    complain about a safety issue."  "I'm calling it a safety

8    issue so therefore they can't touch me."

9         How dysfunctional is that?

10        Remember the other points that they're claiming that

11   she was retaliated against was because of the M.D. assist or

12   the physician assist.

13        Doris Frazier talked about that a little bit, and we

14   ran out of time so we didn't get to bring in our doctor,

15   Dr. Taylor.  But you don't have to have an M.D. assist

16   because it is safer.  The M.D. assist, that's not a safety

17   issue.  That really is routine.

18        Remember Doris told you that you're not always able

19   to have your physician there, for it to be the first

20   assistant in these emergency cases, that it's the PA.  And

21   Dr. Morris said that Ani was a better assist than the

22   doctors.

23        That is what happens.  That is what PAs do.  They do

24   first assistant work when the PA is out of the room.  You

25   also heard the first assistant physician, by Title 22, only

62

1    has to scrub in.

2            How weird is that?

3            They only have to scrub in and stay.  They don't have

4    to stay for the whole case.  They don't have to stay for half

5    the case.  We heard it here on the stand.  Dr. Morris also

6    talked about it.  There's nothing that says how long you have

7    to stay.

8            And you also heard from Doris that every time they

9    have to use two PAs instead of a M.D. assist, as a matter of

10   course they report that information because they want to

11   track that information and make sure they have adequate

12   staffing.  Again, that is not a safety issue.  That doesn't

13   count.

14           Besides that, we really don't have much evidence that

15   she actually reported that stuff.  I don't think there is one

16   scintilla of evidence that she reported no M.D. assist.  We

17   have a couple of event reports because that's the procedure,

18   but we don't know who drafted them.

19           So you can't have retaliation for that because you

20   have to have something protected to retaliate you will learn.

21           Okay.  Let's talk about the meal breaks for a while.

22           Ms. Chopourian -- And that's what counsel focused on

23   in his -- the first part of his closing.  So that's what this

24   case is really all about?  Remember that?  Really?

25           We spent a lot of time talking about other things if

63

1   the case is about meal waivers and meal breaks.

2           We know that Ani Chopourian got plenty of meal

3   breaks.  We have ample evidence that she had plenty of meal

4   breaks.  The evidence is in that she signed the meal waiver.

5   She admitted that.

6           The evidence is in that she didn't have to clock out

7   for her meals and she was paid for every second she was at

8   work.

9           The evidence is in that she got her lunch, she just

10  didn't get it when she wanted.

11          The law is sometimes a wonderful thing --

12          THE COURT:  Miss Martin, you have five minutes left.

13          MS. MARTIN:  Okay.

14          Miss Chopourian was under a meal exemption.  She

15  didn't even get it to begin with.  Because remember, I asked

16  questions, and this was kind of hard to track.  But I asked

17  some questions about what Miss Chopourian did in her role as

18  a PA.  And what her -- and we talked about the fact, and we

19  learned this from the doctor, that she really practices

20  medicine, and she rounds on patients, and as such she has to

21  be able to exercise independent judgment.

22          So an employee is exempt from the requirement of

23  giving timed meal breaks, in other words the meal break

24  within five hours, and for good reason, if they are primarily

25  engaged in the practice of one of the following recognized

64

1    professions and it lists medicine.

2           Then it requires, for her to be exempt, that she

3    exercise discretion and independent judgment in the

4    performance of her duties.

5           And then it talks about this monthly salary.  This is

6    the part that might be a little hard, it is hard for me to

7    wrap my brain around, which is the salary -- the salary isn't

8    like we think about it in the usual world as we bump around

9    in it.

10          The salary really has a very precise definition.  And

11   it is a predetermined amount constituting all or part of the

12   employee's compensation.  We know that Ani was going to get

13   paid for her 80-hour workweek.  We heard that from

14   Mr. Anderson, and her offer letter is also in evidence.

15          And so that we know she got paid for that.  She was

16   paid hourly, and she got overtime.  But that has nothing to

17   do with the analysis.  And that is what your jury instruction

18   says.

19          So when you find she was a professional, engaged in

20   the practice of medicine, and when you find she got that

21   salary, and that she exercised independent judgment in the

22   performance of her duties, she doesn't get -- she doesn't

23   have the right to demand a lunch time within five hours.

24          If you think about it in the grand context of where

25   she is working, it makes sense.  You heard from every

65

1   witness, every single witness - I think I might be off by one

2   or two because I think I asked it with everyone -- is it

3   possible to guarantee a lunch break within the first five

4   hours of starting your work?

5         No.  All no.  That is a silly question.  That is the

6   kind of response I would get because it is a silly question.

7         What's more important, taking care of those patients

8   or tummy rumbling?

9         Nor did Miss Chopourian, because Miss Dodge told her

10  so, if you need an accommodation, you need to bring in a

11  doctor's note.  We will see if we can work with this.  It

12  might be tough, but let's see what we need to do so we can

13  start the interactive process.

14        But Miss Chopourian didn't do that either.  In fact,

15  Miss Chopourian didn't do a lot of things that she could have

16  done to help herself.

17        And so despite the fact that she was given the

18  information on who to speak with and how to accomplish things

19  with the complaint about Dr. Kaplon, and despite the fact

20  that we told her how to get her meal breaks or how to

21  possibly start the discussion to get meal breaks when you

22  want them, it never happened.  And there are lots of other

23  examples.

24        Now, the other issue in this case is these incident

25  reports.  I just want to say a couple of things because I

66

1    know my time is almost out.  I don't get to come up here and

2    talk to you again, and plaintiff's counsel gets to take a

3    crack at what I just said.  So please take that in mind when

4    you do -- when you listen to his presentation because I don't

5    get a chance to rebut.

6         That is just kind of part of what we do in our every

7    day world because he has the burden of proof.  Plaintiff has

8    to prove his case, every element of it.  If he doesn't prove

9    one element of each cause of action, the determination is for

10   the defense.

11        There's one other claim that you'll learn about where

12   it is flip-flopped, where I have the burden of proof, but he

13   still gets to go last.

14        I want talk to you about these incident reports that

15   were -- that we didn't receive, the hospital never received.

16        Remember the October 12 incident report that was

17   received?

18        That went through the system.  Those are the group of

19   four that came out.  It was submitted.  It went through the

20   system.  It was addressed.  Dr. Kaplon responded.  That was

21   the first letter from Dr. Kaplon where he responded actually

22   pretty favorably.  He said:  Mea culpa.  I've had a bad week

23   so let's take care of this.  So he did.

24        THE COURT:  You have one minute.

25        MS. MARTIN:  But the other ones, oddly enough, never

67

1   went anywhere.  That's because they weren't submitted.  They

2   were -- Remember, Doris Frazier told you it was the IVOS

3   system.  We know it was the IVOS system from 2006 on.

4          It doesn't mean they wouldn't accept a handwritten

5   one because you never want to keep somebody from not turning

6   in a problem.  And we learned that we did accept them -- the

7   hospital did accept them because Frances Earle's handwritten

8   one was accepted in 2007.

9          But oddly enough, Miss Chopourian's, even though

10  those others got to where they were going, even though the

11  system wasn't broke when she was complaining orally in June

12  2008, complaining of Dr. Kaplon, the other ones just never

13  went anywhere because they were never received.

14         THE COURT:  That's your time, Miss Martin.

15         MS. MARTIN:  Can I give a final sentence?

16         THE COURT:  A final sentence.

17         MS. MARTIN:  Thank you.

18         I'm doing just what I told I was going to do when I

19  got here, when I was here in that courtroom awhile ago, and

20  that is none of plaintiff's claims, and we just talked about

21  them a bit, make any sense at all.  They're not justified.

22  There is no basis for them.

23         This case does not belong here, and I'm asking you to

24  please use your logic, use your eyes, everything you learned

25  while you were watching these witnesses.  Figure out who was

68

1    telling the truth, who was forthcoming, who has voracity on

2    the issues.

3            THE COURT:  Miss Martin, you need to wrap up.

4            MS. MARTIN:  Thank you, Your Honor.

5            And I ask you for a defense verdict for the hospital.

6            Thank you very much.

7            THE COURT:  Mr. Bohm, you have up to 20 minutes.

8            MR. BOHM:  Yes, Your Honor.

9            It is true, we get the last word, but it is not true

10   we have the burden of proof for everything.  The defense has

11   the burden of proof for their defenses.  I don't want to get

12   caught on that.

13           I want to point out to you this is what is called a

14   polarized case.  Right?  Meaning either it is, or it isn't.

15   There is no middle ground.

16           You just saw it.  Either everything you heard and saw

17   during this trial is utter fantasy, or it's dreadfully real

18   and horrifyingly frightening and scary.

19           And this is not about the mouthpieces for the

20   hospital.  If somebody wants to talk about that in the

21   deliberations, ask yourselves why is the hospital hiring

22   someone who says they can't remember what they had for lunch

23   today?

24           Why is that what we're relying on?

25           We're not, because it is not about them.  This is

69

1    about Dignity Health.  It is not about whatever this lawyer

2    says because I'm sure you all just heard me say that this is

3    not about meal breaks.  Okay.

4          The hospital takes liberty with the truth, but really

5    liberty lives with you all because you decide the truth.  You

6    do.

7          And you heard apparently yelling at the dog is

8    comparable to Miss Chopourian.  Apparently the hospital's

9    lawyer's dog is suing people and that's supposed to be

10   relatable to Miss Chopourian.  Now she's a dog?

11         That's below me.  It's an offense to justice is it

12   what it is.

13         I want to point out something you're going to see in

14   the jury instructions because I don't have time for the Elmo

15   and all that.  I trust that you smart Ladies and Gentlemen,

16   that you can read and understand, and you'll take your time.

17         The number 120 is a special number for everybody who

18   works in hospitals because this is the safe harbor, 120 days

19   says the law.  If you make a complaint within 120 days of

20   something bad happening to you in a hospital, then it is

21   presumed retaliatory.

22         That's what they're up against.  They don't want to

23   acknowledge it, but they have to because you just heard it.

24   June 11th.  At least they'll cop to that.

25         Presumption.  They have to rebut that, and you

1    already know they can't.  Because Renee Dodge, she staked the

2    validity of that termination until she realized she was

3    wrong.

4          That's what we're talking about, a presumption and

5    protection.

6          Now, I want to draw your attention, this exemption is

7    hogwash.  It's confusion.  In fact, Mr. Torres, I don't have

8    my clicker.  Please bring up the first slide for rebuttal.

9          Confusion is the enemy to justice.  Anybody who wants

10   justice doesn't ever want you to be confused.  They want that

11   path lit up bright and easy, easy to follow.

12         That's what we tried to do.  That's right.  There is

13   a lot of evidence.  Oh, my goodness.  I put in a lot of

14   evidence.  That journal, please have a cup of coffee, sit

15   down and read it.  And yeah, I think what we just heard is

16   they're upset we're not seeing over more illegal issues like

17   race.

18         That's true.  We focused our case on to what was

19   essentially important.  And somebody accusing an Armenian of

20   being a member of Al-Qaeda, one doctor doing that, that is

21   not important enough for this federal court.  But that sexual

22   harassment, and all the evidence involved -- Where are my

23   notes?

24         This trial started so long ago that I had to make

25   notes of everything that we heard from that first week.

1          I'm not going to go through all of it, but Betty
2    Devitt:  Coyote ugly.  Inappropriate comments about implants.
3    Sexual conversations between Taylor and Slachman.  Physical
4    contact.  Pressing the breasts.  Rubbing the neck.  The
5    lingering hug.  Peggy Coppin shaking and juggling her
6    breasts.  No effort to prevent sexual harassment.
7          That's just day one.  They just vouched for the lady
8    who told you everything I just said.
9          Shania Twain.  Ashley Judd.
10         Even Patty DiPinto is laughing about how she's got
11   small boobs and a big butt.  Everybody is enabling this
12   behavior.
13         They believe -- they want you to believe Betty
14   Devitt, but they don't want you to believe what she said
15   about broken ribs inappropriately happening or veins being
16   dropped.
17         I don't want to get caught up rehashing all of this,
18   but I did -- I triple starred something right here.
19         Oh, my goodness.  Renee Dodge, uncontroverted, that
20   she is talking to Keri Hunter about their panties with the
21   door open in the workplace, about how their husbands like it
22   or whatever.
23         And you remember the testimony about Jean Scrafton,
24   every time she would see her ex-lover hitting on Ani
25   Chopourian, hee-hee, giggling.  You heard that from three

72

1   different witnesses, Betty, Frances and Ani -- and John.

2   That's actually four witnesses.

3       They want you to believe that John -- Why are they

4   quoting John Jerome and Terese Merlo?

5       Okay.  These are absolutely wonderful people who were

6   very believable, not "stocky gal."  That's not how we refer

7   to people in a court of law.  With respect is how we treat

8   people.  With respect is how we take care of each other.

9   That's what it means to be in a community.  We take care of

10  ourselves, of each other.

11      False statements.  This is funny.  The brief little

12  stuff you saw on the screen with the highlighting from the

13  hospital, compare that to that Exhibit 261 with the

14  highlighting done by Ani Chopourian and it's frightening how

15  everything that she is highlighting matches what they say is

16  true because it is not.

17      And in defamation, they have the burden of proof.

18  They have to prove it is true.

19      How far are they from that?

20      It's true, the law has a more likely than not

21  standard, but we don't aim for just getting the tip of the

22  ball over the end zone.  We want that thing caught in our

23  grasp, locked tight, touchdown, clear and convincing.

24      That's what it is.  Highly probable.  In fact, it is

25  so highly probable that's why the law establishes a 120-day

73

1    safe harbor because it is highly probable.

2           That's what it means.

3           All right.  So in terms of being misled, on this

4    exemption issue, which is totally bogus because you were just

5    told there is this waiver, which they don't have, even though

6    this is the only time they needed the waiver to help them out

7    in this case, right, but then there is the offer letter which

8    clearly says "nonexempt hourly employee."

9           All of you are sophisticated enough to know what this

10   means.  It means their exemption is absolutely hogwash.  You

11   heard Joe Marquez, Patti DiPinto, Miss Chopourian, all the

12   surgeons, the surgeon calls the shots.

13          They can't even decide what vein to take.  It's

14   coming out so fast of both sides of the mouth it is hard to

15   keep track.  It is confusion.  Just trying to bog you down in

16   confusion.

17          It is my job to light the path, to make your jobs a

18   little easier so that when you're in that deliberation, you

19   don't have to get caught up in their confusion.

20          Go ahead and click for me, Mr. Torres.

21          Just so you know, Exhibit 16 is the offer letter in

22   case anybody gets caught up in the exemption issue.

23          Exhibit 174 also mentions the half hour lunch break.

24   Then, of course, all the testimony.

25          Okay.  Oh, okay.

74

1          The surprise was, when I show this graphic, most

2     people think I'm going to talk about David and Goliath,

3     right?  The little one going up against the big boys.  But in

4     reality -- now I'll click it now that the surprise is

5     ruined -- it is not what the slide is about.  It is about the

6     unmovable nature of truth.

7          It will not yield to flimsy allegations and shoddy

8     documentation.  The truth won't be pushed from that circle

9     because Ani Chopourian, supported by these wonderful people,

10    who told the truth.  She's a giant sumo, and they cannot do

11    anything to move her out of this circle, Ladies and

12    Gentlemen.  That's never going to happen.

13         Now, when the hospital representative starts spinning

14    testimony, and they're relying on Barb Moore to make the

15    sleeping in the break room thing, that's just absolutely

16    ridiculous because I read one line from Miss Moore's

17    deposition testimony that absolutely contradicted.

18         It she can't remember when it happened, how it

19    happened, what happened.  She is contradicting herself, she's

20    changing her testimony just like Miss Dodge did, just like

21    Mr. Anderson did, just like Miss Scrafton did, just like

22    Miss Frazier did.

23         What's the point of taking a deposition, testimony

24    under oath, if everybody is going to change their minds when

25    they get on the witness stand?

1          But you did hear from Betty Devitt who remembered

2     exactly the month, the surgeon, that she was either a scrub

3     or circulating, and she said there was not even close to an

4     issue with Ani Chopourian.  Nothing happened.  Nobody spoke

5     to her.  Nobody asked her to right a statement.

6          Where are the statements of this?

7          All we see are these hogwash write-ups, which frankly

8     makes our case, because if they weren't defaming her and

9     causing her termination and causing her to be in this

10    position that she's in, well, I suppose we wouldn't be able

11    to save all the good folks that are going to go through that

12    heart surgery center who are entitled to the best treatment.

13         It may be that the law doesn't require perfection,

14    and I don't recall ever asking for perfection.  JCAHO doesn't

15    look for perfection.  They look for reasonable conduct.

16         Now, calling this case a "stickup" is absolutely

17    absurd.  You want to know who is being stuck up?

18         It is us.

19         We're the ones that go in there.  We're asleep.  We

20    don't know what's going on.  We're getting a stickup.

21    Absolutely.  With these healthcare costs skyrocketing as they

22    are and they can't hire a few more people to spell others?

23         It is ludicrous.

24         And what is it about the defendants' position just

25    now that made you all feel like something was going to be

76

1  done?

2      I'm going to say it again.  Think about it.  With

3  what you just heard, who among you feels like they're going

4  to do anything?

5      They're not.

6      Where is Sister Claire Dalton?

7      I'll tell you why you didn't see her on the stand

8  because she's a sister of the faith.  We believe that a

9  sister of the faith is not going to take that sacred stand

10 and lie.  That's why she's not here.

11     Just the same way they promised you Dr. Dein, and

12 he's not here.  Lots of promises by the hospital.  Not their

13 lawyers.  Don't you dare blame this on the lawyers.

14     This isn't the lawyers' fault.  The lawyers work with

15 the information that they're given.  Don't let the company

16 skate because they hired these folks.

17     This isn't about them.  This isn't about me.  They

18 say that Ani Chopourian's denying accountability.  Folks,

19 we're sitting in the middle of her accountability.

20     Right?

21     She could have just shut her face, kept her job at

22 RAS, never filed a lawsuit and been done with this.  But that

23 is not accountability.

24     Accountability is putting yourself out there and

25 pursuing what's right, come hell or high water, whatever

1    nonsense they want to throw back at you and insults.  You sit

2    there and you take it because you're accountable as an

3    ethical healthcare provider, a master of science who can't

4    tell whether or not she's nourished enough -- a master of

5    medical science.  My apologies.

6         She doesn't know when she needs to eat now.  She has

7    independent judgment, but she can't take a break.

8         Come on?

9         So I want to tell you folks -- you can clear the

10   screen, Mr. Torres.

11        You have been hearing about how important this work

12   is.

13        Your Honor, how much time do I have left?

14        THE COURT:  You have seven minutes.

15        MR. BOHM:  I won't use all of that.

16        There's this theme they keep raising.  It is an

17   effort to scare you, and I agree, be scared.

18        There are lives in people's hands.  They are

19   literally reaching and pulling a heart, holding it so these

20   grafts can be done.  Those of you with any kind of experience

21   like that know exactly what I am talking about.  And they

22   keep saying holding the heart in their hands, holding the

23   life in their hands.

24        I want to remind you, you're holding that lady's life

25   in your hands.  You absolutely are.  Her heart is in your

78

1    hands.  The community's safety is in your hands.

2          That's what's really going on.  And we trust and we

3    thank and we applaud you and we are proud of you that you

4    will do this service, and that you obviously get it, that you

5    obviously know what you have to do.

6          You have heard two figures.  Zero, give us a defense

7    and let us off the hook, versus full accountability.

8          They didn't even suggest a number.  I told you that

9    would happen.  They told you it wasn't real.  This is not a

10   surprise.  That's the way they've acted the entire case.

11         So what are your choices now?

12         Zero by 3.5 million, plus emotional distress, let's

13   call it ten, with a multiplier.  We hope it will be something

14   significant, something that we'll read about, something

15   people will remember so that they change.  So I suppose a

16   number somewhere between zero and including punitive damages,

17   90 million dollars.

18         Hopefully that will wake them up.  Hopefully they'll

19   never do this again.  And hopefully we'll never see this

20   train wreck in the witness stand again throughout not just

21   California, through not just this Eastern District, the Ninth

22   Circuit, but throughout the whole country so that surgeons in

23   Guam won't take a step without making sure that they're

24   really taking our interests, our lives with an understanding

25   of the importance when you guys decide with this woman's

79

1  heart in your hands.

2          And on that note I submit it to you.  I thank you so

3  much for your time and attention, and I just want to make it

4  known on the record for all time that representing this women

5  is the proudest thing I have ever done.

6          Thank you.

7          THE COURT:  All right.  Ladies and Gentlemen of the

8  Jury, that concludes the parties' closing argument.  I do

9  still need to read the instructions to you but my sense is

10  that we should at least take a short break.  So here are the

11  options unless you want to power through.

12          We can take a short break and come back.  I think it

13  would take me at least a half hour to read through the

14  instructions quickly.  Or we can break for the evening and

15  the last thing I would do tomorrow morning, when you come in

16  at 8:30, is read the instructions and then excuse you to

17  deliberate on the schedule you shared earlier, 8:30 to 3:30.

18          Is there any strong objection to breaking now and

19  reading the instructions first thing in the morning?

20          You have heard so many words, and I would sound like

21  the fine print in auto ad if I read to you tonight yet I

22  think.

23          So I'm just trying to gauge your reactions.

24  Ultimately this is going to be your case very soon.

25          I think based on what I'm seeing we'll go ahead and

80

1    break for the evening, but we'll meet here at 8:30 in the

2    morning for the reading of the final instructions.

3         You'll have a copy in front of you so you'll be able

4    to follow along, and then immediately after that I'll excuse

5    you to deliberate.

6         So at this point it is more important than ever that

7    you remember my admonitions not to discuss the case with

8    anyone, family member or friends, not to do any research of

9    any kind, not to begin thinking about the ultimate conclusion

10   of the case, that should depend on your discussion with each

11   other as I'll instruct you in more detail tomorrow, and if

12   anyone approaches you in anyway about the case, let me know

13   first thing.

14        With that you are excused for the evening, Ladies and

15   Gentlemen.  We'll see you at 8:30 for that last step, reading

16   of instructions to you.

17        Thank you so much for your service so far and the

18   service you'll provide tomorrow and thereafter.

19        Have a good evening.

20        (Jury excused at 4:40 p.m.)

21        THE COURT:  All right.  You may be seated.

22        So that's the plan, 8:30 for instructions and then to

23   the jury.  You can go ahead and work on making certain the

24   exhibits are ready.

25        MR. BOHM:  Yes, we will.

81

1        THE COURT:  Any issues with exhibits you can let me

2    know in the morning.

3        MR. BOHM:  Your Honor, the basis of our renewed Rule

4    50 Motion is not the salary alone, it's that there is truly

5    no evidence to establish a primary independent discretionary

6    function of the PAs.

7        THE COURT:  If you want to argue any motions after we

8    excuse the jury tomorrow, I'll allow you to do that.

9        MR. BOHM:  Thank you, Your Honor.

10       All right.  See you tomorrow morning.

11       THE CLERK:  Court is in recess.

12       (Off the record at 4:41 p.m.)

13                           ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     REPORTER'S CERTIFICATE

 2                         ---o0o---

 3
     STATE OF CALIFORNIA  )
 4   COUNTY OF SACRAMENTO )

 5

 6
            I certify that the foregoing is a correct transcript
 7
     from the record of proceedings in the above-entitled matter.
 8

 9

10              IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California.
11

12

13      /S/_Catherine E.F. Bodene_____
            CATHERINE E.F. BODENE, CSR NO. 6926
14          Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```