1             IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---oOo---

4       BEFORE THE HONORABLE KIMBERLY J. MUELLER, JUDGE

5

6    ANI CHOPOURIAN,

7          Plaintiff,

8    Vs.                              CASE NO. CIV. S-09-2972 KJM

9    CATHOLIC HEALTHCARE WEST,
     et al.,
10

11         Defendants.

12    _____/

13

14

15

16                        ---oOo---

17

18                  REPORTER'S TRANSCRIPT

19                 JURY TRIAL PROCEEDINGS

20                       DAY ONE

21              MONDAY, FEBRUARY 6TH, 2012

22

23                        ---oOo---

24

25    Reported By:  CATHERINE E.F.BODENE, CSR. NO. 6926

```
 1                          APPEARANCES

 2                            ---o0o---

 3

 4   For the Plaintiff:

 5         BOHM LAW GROUP
           4600 NORTHGATE BLVD., SUITE 210
 6         SACRAMENTO, CALIFORNIA  95834

 7         BY:  LAWRANCE BOHM, ATTORNEY AT LAW

 8

 9         LAW OFFICE OF ERIKA M. GASPAR
           2121 Natomas Corssing Drive, Suite 200-399
10         Sacramento, California  95834

11         BY:  ERIKA M. GASPAR, ATTORNEY AT LAW

12
           LAW OFFICES OF GREGORY DAVENPORT
13         3031 West March Lane, Suite 334
           Stockton, CA  95219
14
           BY:  GREGORY DAVENPORT, ATTORNEY AT LAW
15

16   For the Defendants:

17         LAFOLLETTE, JOHNSON, DEHAAS, FESLER & AMES
           655 UNIVERSITY AVENUE, SUITE 119
18         SACRAMENTO, CALIFORNIA  95825-6746

19         BY:  JULIE CLARK MARTIN, ATTORNEY AT LAW

20         BY:  DAVID DITORA, ATTORNEY AT LAW

21

22

23                            ---o0o---

24

25
```

```
 1                          PROCEEDINGS INDEX

 2                              ---o0o---

 3

 4      PROCEEDINGS:                                    PAGE

 5

 6         Jury Selection                                 1

 7

 8

 9

10                              ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

1          SACRAMENTO, CALIFORNIA

2        MONDAY, FEBRUARY 6TH, 2012 – 1:30 p.m.

3                  ---o0o---

4        THE CLERK:  All rise.

5        Court is now in session.

6        The Honorable Kimberly J. Mueller, United States

7   District Court Judge, presiding.

8        Calling Civil Case 09-2972, Chopourian versus

9   Catholic Healthcare West, et al.  This is on for jury trial.

10  Today is Day One.

11       THE COURT:  Appearances, please.

12       MR. BOHM:  Yes.  Good afternoon, Your Honor.

13  Lawrance Bohm appearing for plaintiff Ani Chopourian.

14       MS. GASPAR:  Good afternoon, Your Honor.  Erika

15  Gaspar appearing for Ani Chopourian.

16       MR. DAVENPORT:  Good afternoon, Your Honor.  Gregory

17  Davenport on behalf of plaintiff.

18       THE COURT:  Good afternoon all.

19       Defense.

20       MS. MARTIN:  Good afternoon, Your Honor.  Judith

21  Clark Martin appearing on behalf of defendant.  I have Erin

22  Abbott with me.

23       MR. DITORA:  Good afternoon, Your Honor.  David

24  Ditora appearing on behalf of defendant.  I noted from one of

25  the daily trial transcripts that I'm being listed as employed

2

1   by or appearing for Clement and Associates, but I am and

2   always have been an associate with Lafollette, Johnson,

3   DeHass, Fesler and Ames.

4           THE COURT:  That correction is noted.

5           (Reporter and Court confer.)

6           MR. DITORA:  That's my fault, Your Honor.

7           THE COURT:  All right.  Take two.  I'm going to

8   propose that we go to voir dire and try to finish that, then

9   start with opening statements this afternoon.

10          Have a housekeeping session, if we don't have

11  sufficient time this afternoon, yet tomorrow morning between

12  8:30 and 9:00.  I know there are some things just filed, and

13  I gather there is something that is going to be filed under

14  seal this afternoon by the plaintiffs.

15          MS. GASPAR:  Yes, Your Honor.

16          MR. BOHM:  Yes.

17          THE COURT:  So that I can read everything that has

18  been filed and take it into account, that's the schedule

19  we'll follow.  You have sufficient guidance to give your

20  openings again.

21          And all I would ask is that we make certain only one

22  person is talking at a time for the court's sake, for the

23  court reporter's sake.  That you make certain I'm done

24  talking before you start talking, and we will move through

25  this as quickly as we possibly can.

3

1          I do note the new schedule presented by plaintiffs so

2     I take that into account.

3          Anything you need to know before we call the jury

4     pool in?

5          MR. BOHM:  Only that as to opening statements versus

6     housekeeping today, I was hoping to address some of the

7     housekeeping before opening.  But obviously I follow the

8     court's mandates as to how it organizes and runs its

9     proceedings.  I just -- with everything I've been doing, I

10    was sort of counting that we would do opening statements

11    tomorrow, but I can pull it together and do it this afternoon

12    if we're there.

13         We have housekeeping to go over as well, Your Honor.

14    That's all.

15         THE COURT:  What's changed that you really need

16    before opening?

17         Will you be prejudiced if we go to opening today?

18         MR. BOHM:  The only thing that's changed, actually

19    last opening we had a technical glitch, and I didn't want to

20    interrupt proceedings to hook up correctly.

21         This time I figured, since we have done this exact

22    case, we knew how long voir dire would take approximately, I

23    had one of my staffers sent back.  I can call them in to try

24    to get down here in time.

25         It's really -- I'm ready to go.  There's nothing more

4

1    important to me than trying this case.  If it means opening

2    today, I'll open today.  I just -- I don't know how counsel

3    feels about it.  I'm a little bit surprised, but that's all

4    right.

5         THE COURT:  We'll take a short break before we bring

6    the jury back in for opening so that will allow you to get

7    set up.  And if someone needs to call your technical support

8    now, the jury should be up by 1:45.

9         Miss Martin, Mr. Ditora?

10        MS. MARTIN:  Your Honor, thank you.

11        I did receive plaintiff's new estimates to put on her

12   case, and I am concerned that it leaves two days for the

13   defense to put on its case, and for good reason.

14        I feel that we will be prejudiced with having to put

15   this case on in the time we have allotted if plaintiff's case

16   takes the time as listed.

17        THE COURT:  All right.

18        But you're ready to proceed with opening today?

19        MS. MARTIN:  Absolutely, Your Honor.

20        THE COURT:  All right.

21        Any response to the scheduling concern?  Has your

22   time grown, Mr. Bohm?

23        MR. BOHM:  Actually, Your Honor, I think with the

24   benefit of the transcript and the learning from, you know,

25   objections at the first trial, I'm hopeful of moving faster.

5

1          Not in terms of speed speaking, but in terms of time

2     of testimony it should be even more streamlined.

3          THE COURT:  I haven't had time to tally up the time.

4     Is there more or less time than you were showing earlier?

5          MR. BOHM:  What I had done, and I can't personally

6     testify to it, but what I have done is directed my paralegal,

7     Mr. Torres, to look at his notes for time because he kept

8     very meticulous notes throughout trial.  And I believe that's

9     what is reflected there.

10          In some of those instances, I did further edit it

11     down because I knew, for instance, there was a little bit of

12     lost time with one witness so from a half hour to 20 minutes.

13          It is our absolute best approximation of how we

14     expect the case to go in terms of time.  And I note if we're

15     doing openings this afternoon, clearly we're already ahead of

16     schedule.

17          THE COURT:  We'll address the schedule today and make

18     certain there's sufficient time for both sides to try their

19     cases.

20          Did you want to file a motion at this point,

21     Mr. Bohm, on the 412 issue?

22          MR. BOHM:  Yes.  We're prepared to do that.

23          MS. GASPAR:  Yes, Your Honor.  We have that here.

24          THE COURT:  You've provided a copy to defense?

25          MS. GASPAR:  I will do that now, Your Honor.

6

1        THE COURT:  All right.

2        At this point in time, because this addresses the

3   Rule 412 issue, I am granting a request to file that briefing

4   under seal.

5        MS. GASPAR:  Thank you.

6        THE COURT:  You can hand that to Miss Schultz.

7        (Document handed to court.)

8        THE COURT:  I'll review that before tomorrow morning

9   now.

10        You wanted to say something further, Miss Martin?

11        MS. MARTIN:  Thank you, Your Honor.

12        I note that the jury form we have is missing Juror

13   Number 8.  And so Juror Number 9 starts out Juanita Zeller.

14   I wasn't sure if it was an oversight or intentional.

15        THE COURT:  I have not seen the sheet yet.

16        Here it is.

17        THE CLERK:  It was an error, Your Honor.

18        THE COURT:  All right.

19        Do you want to generate a corrected sheet?

20        THE CLERK:  Yes, Your Honor.

21        THE COURT:  All right.  Thank you.

22        I have the statement of the case we used last week.

23        MR. BOHM:  That's fine, Your Honor.  I assumed it

24   would be the same instructions that the court fixed last week

25   in terms of preliminary jury instructions.

7

1          THE COURT:  All right.  Well, I'm going to take a

2    five-minute recess while you get the new seating chart.  And

3    then as soon as the jury pool is here, we'll begin.

4          MR. BOHM:  Thank you, Your Honor.

5          MS. MARTIN:  Thank you.

6          (Off the record at 1:40 p.m.)

7          (Back on the record at 1:49 p.m.)

8          THE CLERK:  Come to order.  Court is back in session.

9          THE COURT:  All right.  There's a corrected seating

10   chart.  You both have that -- you all have that?

11         MR. BOHM:  Yes, Your Honor.

12         MS. MARTIN:  Yes, Your Honor.  Thank you.

13         THE COURT:  All right.  Let's bring the jury pool in

14   then.

15         (Jury pool seated.)

16         THE COURT:  You may be seated.

17         Welcome, Ladies and Gentlemen of the Jury pool.  My

18   name is Judge Mueller.  I'm presiding over the trial

19   proceedings that are beginning today in this court.

20         I wanted to explain to you the first stage of trial.

21   This is what we call voir dire, or some folks say voir dire.

22         It's a chance for the court and the attorneys to have

23   a discussion with you, to see, hear and question you about

24   certain matters in an effort to ensure we are seating a jury

25   that can try this case, be the finder of fact in this case,

8

1    fully and fairly without any bias or prejudice and so the

2    process is designed to do that.

3        I'm going to ask Miss Schultz to first swear the

4    entire panel before we get into asking you some of those

5    questions, but welcome again.

6        Miss Schultz.

7        THE CLERK:  Yes, Your Honor.

8        Will all prospective jurors please rise.

9        Please, raise your right hand.

10        (Whereupon, the oath was administered.)

11        THE CLERK:  Thank you.  You may be seated.

12        All right.   Again, during this first phase I'm going

13    to be asking you questions.  Once I complete my questions,

14    then I'm going to acknowledge the attorneys.  One attorney

15    for each side will have a chance to ask you questions for up

16    to ten minutes.

17        Then we go through a process whereby the attorneys

18    may come to the sidebar and make challenges that I'll hear.

19    And ultimately, once we get past that stage, we'll have a

20    series of peremptory challenges where the attorneys exercise

21    their strikes by passing a strike sheet.  So that's generally

22    the order of things for this afternoon.

23        I want to make certain you know that if at any point

24    a question is asked, regardless of the question, if you would

25    prefer to answer that question outside of the earshot of the

9

1   entire courtroom, I can take your answer at a sidebar where

2   we turn on white noise and it is just the attorneys and

3   myself.

4          So please, if at any point -- we don't want to do

5   anything to embarrass or humiliate you or make you

6   uncomfortable -- if you want to take advantage of that offer,

7   let me know.

8          You've already heard my name.  I'm Judge Mueller.

9   I'm joined here in court by court staff.  My courtroom deputy

10  you met, Casey Schultz.  We are being assisted today by

11  someone who is in training.  And I'm going to ask her to

12  state her full name.

13         THE CLERK:  Alexander Waldrop.

14         THE COURT:  Cathie Bodene is my court reporter.  And

15  my staff attorney, Sandra Gillies, is seated to my far left.

16         Do any of you know any of us in a way that you think

17  you could not be a fair juror in this case?

18         At this point I'm directing my questions to the

19  people in the box, but if those of you in the audience can

20  keep careful track, if we need to call one of you into the

21  box, I will then ask you if your answer to any question would

22  have been yes.

23         So it is important that you pay attention.  Thank you

24  for that.

25         So do any of you know any of us in a way that would

1    create a problem for you in this case?

2         All right.  I would like to ask counsel next to

3    identify themselves.  We'll start with plaintiff's counsel

4    and plaintiff.

5         MR. BOHM:  Thank you very much, Your Honor.

6         My name is Lawrance Bohm.  I am the attorney who has

7    the privilege and honor of representing this woman -- would

8    you please stand up -- Ani Chopourian, the plaintiff in this

9    matter.

10        Miss Chopourian, will you please turn around and face

11   our other prospective jurors.

12        Also with me is attorney Gregory Davenport.  Please,

13   stand up.

14        MR. DAVENPORT:  Good afternoon.

15        MR. BOHM:  Also with me is Erika Gaspar.

16        MS. GASPAR:  Good afternoon.

17        MR. BOHM:  This is Brad Nelson, a paralegal with my

18   office.

19        THE COURT:  So focusing in the box for now, do any of

20   you know any of these persons?

21        All right.  I see no raised hands.

22        You can raise your hand and then we'll pass the mic

23   to you.  There should be a mic there or possibly two.  So we

24   will deliver a microphone so when anyone does have an answer

25   to a question.  And ultimately we'll get to the questions you

11

1    have on the sheet in front of you.

2         So now for the defense?

3         MS. MARTIN:  Good afternoon.  My name is Julie Clark

4    Martin, also known as Judith Clark Martin.  I represent the

5    defendant in this matter, Dignity Health, formerly known as

6    Catholic Healthcare West.

7         With me I have Erin Abbott, Trevor Newhouse, who is

8    awaiting his bar.

9         Dave Ditora, who will be assisting me in the trial of

10   this matter.  And Sister Cathleen -- I'm displaced.  Your

11   last name.

12        SISTER HORGAN:  Horgan.

13        MS. MARTIN:  Sister Cathleen Horgan who will be the

14   representative from the hospital for this matter.

15        THE COURT:  All right.  Do any of you know any of

16   those persons?

17        (Hand raised.)

18        THE COURT:  All right.  Miss Cowan?

19        PROSPECTIVE JUROR COWAN:  Yes.

20        THE COURT:  If we could, pass the mic to Ms. Cowan.

21        PROSPECTIVE JUROR COWAN:  I know the sister because I

22   work for Sisters of Mercy, and I've seen her up at our

23   convent up in Auburn a number of times.  I cook for them.

24        THE COURT:  All right.  Based on what you know of

25   the Sister at this point in time, recognizing that I'm going

1   to ask you quite a few more questions, is there anything that

2   makes you think you could not be a fair juror in this case?

3           PROSPECTIVE JUROR COWAN:  No.

4           THE COURT:  All right.  We'll keep that in mind as we

5   go forward.  If anything else occurs, you let me know.

6           PROSPECTIVE JUROR COWAN:  Okay.

7           THE COURT:  All right.  Thank you.

8           I'm now going to read you a statement of the case

9   which I've discussed with the parties just to give you a

10  sense of what the case is about so please listen carefully to

11  this.  It goes on for a little while.

12          (Reading:)

13          Plaintiff, Ani Chopourian, worked as a surgical

14  physician assistant for two years in the Cardiac Surgery

15  Department of Mercy General Hospital until her termination on

16  August 7th, 2008.

17          Mercy General is owned and operated by defendant,

18  Catholic Healthcare West, now identified as Dignity Health.

19          Plaintiff claims that during her employment she was

20  subjected to demeaning and derogatory comments and action

21  because of her gender and witnessed derogatory and sex-based

22  behavior toward women generally, all of which interfered with

23  her work performance.

24          She also claims she was not provided with meal and

25  rest breaks as provided for by law.

13

1          In addition, she claims she was wrongfully terminated

2    from her employment for illegal reasons, which include her

3    complaints about sexual harassment and discrimination and

4    complaints about patient safety, as well as her refusal to

5    violate the law concerning meal and rest breaks or the laws

6    concerning patient safety.

7          Plaintiff also claims defendant has actively

8    prevented plaintiff from obtaining and holding replacement

9    employment by publication of defamatory remarks.

10         Plaintiff seeks compensation for all harm caused by

11   defendant, including lost wages, benefits, emotional distress

12   and punitive damages.

13         Defendant denies that plaintiff was discriminated

14   against because of her gender or subjected to a hostile

15   working environment.

16         Defendant also claims it took appropriate steps to

17   stop any demeaning behavior when it learned of any.

18         Defendant further claims that plaintiff's termination

19   was proper and not the result of any of plaintiff's

20   complaints.

21         Finally, defendant denies making defamatory comments

22   about plaintiff or interfering with her attempts to seek new

23   employment.

24         (Reading concluded.)

25         Based on that statement of the case, do any of you

14

1   feel that you could not be a fair juror in this case?

2           Have any of you heard anything about this case?

3           If so, if you could raise your hand.

4           All right.  I'm seeing no positive responses.

5           I would now like to ask each attorney, starting with

6   plaintiff's counsel, to read a list of possible witnesses in

7   the case and then I'll ask you if you know any persons by

8   those names.

9           Mr. Bohm.

10          MR. BOHM:  Your Honor, I'll proceed off the list

11  filed today with the court.

12          THE COURT:  All right.

13          MR. BOHM:  Nurse Betty Devitt Riveria.

14          Jose Gomes.

15          Ed Losada.

16          Oreste Rijo Vasquez.

17          Dave/David Shaw.

18          Frances Earle.

19          Doris Frazier.

20          Anil Prasad.

21          Terese Merlo.

22          John/Jonhny Jerome.

23          Cynthia/Cindy Kirch.

24          Joseph Hale.

25          Richard Press.

15

1   Ani Chopourian.

2   Charles R. Mahla, PhD.

3   Those are our witnesses, Your Honor.

4   THE COURT:  All right.  Do any of you know persons by

5 those names, any one of them?

6   If so, if you could raise your hand.

7   All right.  Not seeing any raised hands.

8   Now for defense, Miss Martin.

9   MS. MARTIN:  Thank you, Your Honor.

10   Dr. Mark Taylor.

11   Dr. Richard Kaplon.

12   Dr. Jack Wood.

13   Patti or Patricia Dipinto.

14   Peggy Coppin.

15   Keri Hunter.

16   Ani Chopourian.

17   Dr. Henry Zhu.

18   Barbara Moore.

19   Jean Scrafton.

20   Edith, who goes by Edie Cometo.

21   Ygnacio Marquez, who goes by Joe and Nacho.

22   Priscilla Titus.

23   Renee Dodge.

24   Jim Anderson.

25   Scott Harper.

16

1          Linda Bristow.

2          Michelle McDaniel.

3          And David Moore.

4          THE COURT:  Do any of you know any of those persons

5     or persons by those names?

6          I see no raised hands.

7          Is any one of you currently employed by Catholic

8     Healthcare West or any of its facilities?

9          I'm informed those facilities include Mercy San Juan

10    Medical Center, Mercy Hospital of Folsom, Methodist Hospital,

11    Woodland Memorial, Mercy General Hospital and Saint Joseph's

12    Medical Center.

13         Are any of you employed by any of those facilities?

14         Have any of you previously been employed by Catholic

15    Healthcare West or any one of those facilities?

16         Again, no raised -- Ma'am?  Miss Cowan?

17         PROSPECTIVE JUROR COWAN:  Well, Sisters of Mercy in

18    Auburn used to be through Catholic Healthcare West.

19         THE COURT:  We need to get you a microphone.

20         THE CLERK:  She should have it.

21         THE COURT:  All right.

22         If you could, start over.

23         PROSPECTIVE JUROR COWAN:  I said the convent up in

24    Auburn used to be through Catholic Healthcare West, but it no

25    longer is.

17

1      THE COURT:  Were you employed at the time when it was

2  owned by Catholic Healthcare West?

3      PROSPECTIVE JUROR COWAN:  Yes, I was.

4      THE COURT:  So at this point, based on what you've

5  heard about the case, the description of the case on both

6  sides, is there anything making you think you could not be a

7  fair juror in this case?

8      PROSPECTIVE JUROR COWAN:  No.

9      THE COURT:  All right.  Thank you.  We'll get to some

10  more details on your employment in just a bit.

11      What about family members?  Do any of you have family

12  members who either now or previously worked for Catholic

13  Healthcare West or any of those facilities?

14      If so, raise your hand.

15      Miss Cowan?

16      THE COURT:  That's all right.  Better to raise your

17  hands than question whether you should be.

18      PROSPECTIVE JUROR COWAN:  I have a sister-in-law that

19  works for Mercy Folsom which is through Catholic Healthcare

20  West.

21      THE COURT:  All right.  And how long has she worked

22  there?

23      PROSPECTIVE JUROR COWAN:  Oh, I'm going to say over

24  ten years.

25      THE COURT:  And what is her position?

18

1            PROSPECTIVE JUROR COWAN:  She's a phlebotomist.

2            THE COURT:  All right.

3            Based on that relationship, do you think there is

4    anything that would create an issue for you in terms of being

5    a fair juror?

6            PROSPECTIVE JUROR COWAN:  No.

7            THE COURT:  All right.  Thank you.

8            Now, a different question, but still about Catholic

9    Healthcare West or any one of those facilities.

10           Have any of you been treated at a facility run by

11   Catholic Healthcare West?

12           Have any of you had family members treated at such a

13   facility?  If so, raise your hand.

14           Miss Cowan, you're joined at least by Miss Barge.

15   Let's start with Miss Cowan.

16           PROSPECTIVE JUROR COWAN:  Okay.  I had a colonoscopy

17   done at Mercy San Juan.

18           THE COURT:  All right.

19           PROSPECTIVE JUROR COWAN:  About five years ago.

20           THE COURT:  Is there anything about that procedure

21   that makes you think you could not be a fair juror in this

22   case?

23           PROSPECTIVE JUROR COWAN:  No.

24           THE COURT:  All right.  Thank you.

25           And Miss Barge -- is it Barge?

19

1          PROSPECTIVE JUROR BARGE:  Yes.

2          THE COURT:  All right.

3          PROSPECTIVE JUROR BARGE:  I've had -- I visited a

4    grandmother years ago at Mercy General.

5          THE COURT:  All right.   How many years ago

6    approximately?

7          PROSPECTIVE JUROR BARGE:  Got to be at least ten.

8          THE COURT:  All right.  Is there anything about that

9    visit or your grandmother's experience with Mercy General

10   that makes you think you could not be fair in this case based

11   on what you know so far?

12         PROSPECTIVE JUROR BARGE:  No.

13         THE COURT:  All right.  Thank you.

14         Did anyone else raise their hands?

15         Let me ask you about the schedule of this case.  At

16   this point the estimate is it will take eight days to try the

17   case.  That's the best estimate based on what we now know.

18         The schedule is as follows:

19         We'll go until 4:30 today.  Tomorrow afternoon --

20   tomorrow morning we will go from 9:00 a.m. to 2:00 p.m.  I

21   need to do some housekeeping with the attorneys in the

22   morning.  And after tomorrow, then on Tuesday, Wednesday and

23   Thursday, we would begin at 8:30 and go until 2:00 p.m. with

24   two short breaks.

25         Next Monday we would also run from 1:30 to 4:30, then

20

1 deliberations would proceed after that either on this

2 schedule or whatever the seated jury decides it wants its

3 schedule to be within the normal working hours.

4 Given that schedule, are there any of you in the box

5 that would find it difficult or impossible to sit as a juror

6 for that time period?

7 If so, raise your hand.

8 I see no raised hands.

9 I'm going to now turn to those of you in the audience

10 and ask you this question:  Are there any of you that would

11 find that schedule difficult or impossible to meet if you

12 were seated as a juror?

13 All right.  Sir, let's bring you a microphone.  If

14 you could, identify yourself and just let us know why you

15 believe that would be the case?

16 PROSPECTIVE JUROR MANLEY:  I'm Warren Manley.  I'm

17 asking if this will run through the 14th because I have a

18 memorial which is very important that I attend on the 14th of

19 February.

20 THE COURT:  We do anticipate running through that

21 date at least.  What's the time of the memorial?

22 PROSPECTIVE JUROR MANLEY:  Eleven o'clock.

23 THE COURT:  All right.  That's a family member or

24 close friend?

25 PROSPECTIVE JUROR MANLEY:  Beg your pardon?

21

1              THE COURT:  This is a family member or close friend?

2              PROSPECTIVE JUROR MANLEY:  Yes, it is.

3              THE COURT:  All right.

4              Let me ask either attorney if they want to ask

5    Mr. Manley any follow-up questions about that issue.

6              MR. BOHM:  I would stipulate, Your Honor, on that

7    issue.

8              THE COURT:  Miss Martin?

9              MS. MARTIN:  As would I, Your Honor.

10             THE COURT:  Mr. Manley, thank you for sharing that.

11   Given the nature of that prior obligation, and given that we

12   do plan to be in trial on that day, I will excuse you.

13             PROSPECTIVE JUROR MANLEY:  Thank you.

14             THE COURT:  Just so you know, you should call back

15   now Friday after 5:00 p.m.

16             PROSPECTIVE JUROR MANLEY:  Thank you very much, Your

17   Honor.

18             THE COURT:  All right.  Thank you.

19             Let me ask if anyone else in the audience has

20   concerns about being available for that schedule?

21             Not seeing any raised hands.  All right.

22             Let me ask some more general questions.  Again, I'm

23   turning back to those in the box, but if those of you in the

24   audience keep careful track, I appreciate that.

25             Has any member of your family worked in the medical

22

1     profession?  If so, raise your hand.

2              All right.  I see several.  Why don't we start here

3     with Miss Stokes.

4              There is another mic, Miss Stokes.

5              PROSPECTIVE JUROR STOKES:  Yes.

6              THE COURT:  What position does that family member

7     have?

8              PROSPECTIVE JUROR STOKES:  My grandmother was a

9     nurse.

10             THE COURT:  All right.  And where did she work as a

11    nurse?

12             PROSPECTIVE JUROR STOKES:  In the Bay Area in

13    Oakland -- between Oakland and Hayward.

14             THE COURT:  Did she have a specialty of any kind?

15             PROSPECTIVE JUROR STOKES:  I believe she did

16    business, like occupational health.

17             THE COURT:  And did she work in a facility, a

18    hospital?

19             PROSPECTIVE JUROR STOKES:  In a facility.  For the

20    Hunts factory.  She did their occupational nursing there.

21             THE COURT:  Okay.  Is there anything about her job or

22    your relationship with her that makes you think you could not

23    be fair in this case based on what you know so far?

24             PROSPECTIVE JUROR STOKES:  No, ma'am.

25             THE COURT:  All right.  Thank you.

23

1               Several other hands were raised.

2               Pass the mic down the first row.

3               PROSPECTIVE JUROR FARNAM:  I have two nieces.  One is

4     an ER nurse.  One is a nurse practitioner.

5               THE COURT:  All right.  Where do they work?

6               PROSPECTIVE JUROR FARNAM:  Klamath Falls and Bend.

7               THE COURT:  Do they work in hospital settings?

8               PROSPECTIVE JUROR FARNAM:  One does.

9               THE COURT:  Is there anything about what they do or

10    your relationship with them that makes you think you cannot

11    be fair here?

12              PROSPECTIVE JUROR FARNAM:  No.

13              THE COURT:  All right.  Thank you, Miss Farnam.

14              PROSPECTIVE JUROR HERRON:  Yes.

15              THE COURT:  All right.  Mr. Herron?

16              PROSPECTIVE JUROR HERRON:  When I was younger, my dad

17    used to ride with the ambulance for -- by county ambulance in

18    Marysville.

19              THE COURT:  Was he an EMT?

20              PROSPECTIVE JUROR HERRON:  Yes, he was.

21              THE COURT:  And for how many years did he do that?

22              PROSPECTIVE JUROR HERRON:  I'm not quite sure.  I

23    would say maybe at least five, six years.

24              THE COURT:  So he would end up making transports to

25    the hospitals?

24

1          PROSPECTIVE JUROR HERRON:  Yes.

2          THE COURT:  All right.  Is there anything about his

3     job, your relationship with him, that makes you think you

4     cannot be fair here?

5          PROSPECTIVE JUROR HERRON:  No.

6          THE COURT:  Did he go on to work in the medical

7     field?

8          PROSPECTIVE JUROR HERRON:  Not that I believe so, no.

9          THE COURT:  All right.

10          Thank you for sharing that.

11          Were there other raised hands in the back row?

12          All right.

13          Have any of you been in a supervisory position at

14     work where you have supervised other people?

15          All right.  Let's take the mic and go down each row.

16          First row.  Miss Stokes, if you can, describe the

17     nature of your supervisory position.

18          PROSPECTIVE JUROR STOKES:  I was the sous chef at the

19     Commons at Union Ranch in Madera where I was employed.

20          THE COURT:  How many people did you supervise there?

21          PROSPECTIVE JUROR STOKES:  Four.

22          THE COURT:  And what kind of decisions were you given

23     to make with respect to them?

24          Did you do all hiring and firing, or what was the

25     nature?

1          PROSPECTIVE JUROR STOKES:  Basically training and

2     supervising, you know, work.  Making sure things we're done

3     properly.

4          THE COURT:  Did you ever have to discipline or fire

5     an employee?

6          PROSPECTIVE JUROR STOKES:  No, ma'am.

7          THE COURT:  Anything about that job that makes you

8     think you cannot be fair here?

9          PROSPECTIVE JUROR STOKES:  No, ma'am.

10          THE COURT:  Pass the mic down to the next person in

11     that row.  Someone else in that row?

12          Mr. McLean?

13          PROSPECTIVE JUROR MCLEAN:  Yes, ma'am.  I was in the

14     Air Force for ten years.  And during that ten-year period,

15     four of those years were spent in a supervisory position over

16     anywhere between six and 15 people.

17          THE COURT:  What was the nature of your supervisory

18     work?

19          PROSPECTIVE JUROR MCLEAN:  I was the assistant NCOIC

20     to the medical unit in the hospital.  I worked as a medical

21     technician.

22          THE COURT:  What were those initials?

23          You ran off a title or acronym?

24          PROSPECTIVE JUROR MCLEAN:  Assistant NCOIC.

25          THE COURT:  All right.  Non-commissioned officer in

26

1  charge.

2        PROSPECTIVE JUROR MCLEAN:  Yes, ma'am.

3        THE COURT:  As an assistant medical tech, what do the

4  other people do that you supervised?

5        PROSPECTIVE JUROR MCLEAN:  They worked in the

6  emergency department or they worked on a medical floor as

7  bedside assistants.

8        THE COURT:  Did you discipline or fire?

9        PROSPECTIVE JUROR MCLEAN:  We had a disciplinary

10  process, but I never went through a firing process or

11  anything like that.

12        THE COURT:  All right.  Is there anything about that

13  job, the work you did there that makes you think you could

14  not be fair here?

15        PROSPECTIVE JUROR MCLEAN:  No, ma'am.

16        THE COURT:  All right.  Let's go to the second row.

17        Where's the mic there?

18        THE COURT:  All right.  We will start with you, sir,

19  Mr. Henry?

20        PROSPECTIVE JUROR HENRY:  Yes.  I was an installation

21  supervisor for AT&T Cable.

22        THE COURT:  How many people did you supervise?

23        PROSPECTIVE JUROR HENRY:  Twenty in-house people and

24  probably 250 contractors.

25        THE COURT:  And what was the nature of your

27

1    supervisory position?

2            PROSPECTIVE JUROR HENRY:  To make sure all the

3    installations were done to code.

4            THE COURT:  Did you discipline or hire and fire?

5            PROSPECTIVE JUROR HENRY:  Yes.

6            THE COURT:  All right.  Is there anything about that

7    job that makes you think you could not be fair here?

8            PROSPECTIVE JUROR HENRY:  No.

9            THE COURT:  All right.  Thank you.

10           Next in that row?  We can go either direction as long

11   as we cover all of you.  Miss Plummer?

12           PROSPECTIVE JUROR PLUMMER:  Yes.  I supervised eight

13   beauty salon stores with hairdressers.  There was about 20

14   hairdressers.  I did the hiring, firing, payroll.

15           THE COURT:  Discipline?

16           PROSPECTIVE JUROR PLUMMER:  Yes.

17           THE COURT:  All right.  Is there anything about that

18   position that makes you think you cannot be fair here?

19           PROSPECTIVE JUROR PLUMMER:  No.

20           THE COURT:  All right.  Next.  How do you pronounce

21   your last name?

22           PROSPECTIVE JUROR DINUBILO:  Dinubilo.

23           I've supervised for the last ten years.  Currently

24   I'm the Assistant Director of Unclaimed Property for the

25   State Controller's Office.

28

1          I have 200 people directly or indirectly that report

2     to me.  This is a new position.  I've been there for two

3     months.  Prior to that I have been an audit supervisor for

4     ten years.

5          THE COURT:  Did you supervise people there?

6          PROSPECTIVE JUROR DINUBILO:  Correct.

7          THE COURT:  How many?

8          PROSPECTIVE JUROR DINUBILO:  Then I had anywhere

9     between ten, 15 staff at one time.

10         THE COURT:  All right.  And so you discipline, you

11    hire and fire?

12         PROSPECTIVE JUROR DINUBILO:  Correct.

13         THE COURT:  Is there anything about the nature of

14    either position that makes you think you cannot be fair here?

15         PROSPECTIVE JUROR DINUBILO:  No.

16         THE COURT:  All right.  Next Miss Churchill, I

17    believe?

18         PROSPECTIVE JUROR CHURCHILL:  Yes.  I'm currently in

19    charge of operations for a corporate compliance company.  I

20    oversee five people and do all the disciplinary actions.

21    I've done one termination.

22         THE COURT:  Is there anything about that experience

23    that makes you think you could not be fair here?

24         PROSPECTIVE JUROR CHURCHILL:  No.

25         THE COURT:  All right.  Thank you.

29

1          Miss McGregor?

2          PROSPECTIVE JUROR MCGREGOR:  I worked for 35 years

3    for Placer County Health and Human Services.  I supervised

4    between eight and 12 people, and I was involved in hiring and

5    discipline and the firing and running of the office.

6          THE COURT:  Is there anything about that experience

7    that makes you think you could not be fair here?

8          PROSPECTIVE JUROR MCGREGOR:  No.  Uh-huh.

9          THE COURT:  All right.  Do we have others in that

10   row?

11         No.  All right.

12         Thank you for those answers.

13         Now, apart from what we've heard, if any of you have

14   not responded so far, have any of you worked in a human

15   resources or personnel position where you were specifically

16   responsible for HR or personnel?

17         I see no raised hands.

18         Have any of you that we've heard from already, have

19   you worked separately from what you described in HR or

20   personnel?

21         All right.  Have any of you ever complained to a

22   supervisor or to HR, human relations, and felt you were

23   ignored?  If so, raise your hand.

24         PROSPECTIVE JUROR PLUMMER:  What do you mean?

25         THE COURT:  Have you registered a complaint with an

1    employer's human relations division and been dissatisfied?

2          Can you take the microphone?

3          PROSPECTIVE JUROR PLUMMER:  I didn't register a

4    complaint.  When my grandson was a year old, he had

5    open-heart surgery in Kaiser, San Francisco.  And the way he

6    was treated, we complained to his heart surgeon, who was not

7    a Kaiser doctor.  He was subcontracted out.

8          THE COURT:  Who did you complain -- You complained to

9    the surgeon?

10          PROSPECTIVE JUROR PLUMMER:  Yeah.  My grandson's

11   heart surgeon.

12          THE COURT:  Were you complaining about that surgeon's

13   work?

14          PROSPECTIVE JUROR PLUMMER:  No.  No.  About the

15   nurses.

16          THE COURT:  And did that surgeon take your complaint

17   to any other --

18          PROSPECTIVE JUROR PLUMMER:  He corrected it, yes.

19          THE COURT:  All right.  So were you satisfied with

20   the outcome ultimately?

21          PROSPECTIVE JUROR PLUMMER:  Yes.

22          THE COURT:  All right.  How long ago was that?

23          PROSPECTIVE JUROR PLUMMER:  Seventeen years ago.

24          THE COURT:  All right.

25          Based on what you've heard so far, do you think that

31

1   would affect your ability to be fair here?

2          PROSPECTIVE JUROR PLUMMER:  No.

3          THE COURT:  Have any of you ever been disciplined at

4   work or fired from a job?  If so, raise your hand.

5          I see no raised hands.

6          Have any of you ever had the feeling you were treated

7   differently at work because of your gender, race, religion or

8   membership in some other, what lawyers call, protected class?

9   If so, raise your hand.

10         Have any of you ever felt subjected to unfair or

11  inappropriate remarks from a coworker or supervisor?

12         If so, raise your hand.

13         Have any of you ever been harassed at work or accused

14  of harassment?

15         If so, raise your hand.

16         Please recall that if you prefer to answer at

17  sidebar, I can take answers there.

18         Not seeing any raised hands.

19         Have any of you ever been made to feel uncomfortable

20  at work because of the behavior of coworkers or supervisors

21  or both?

22         Again, no raised hands.

23         Would any of you say that you have ever had to work

24  with a quote, unquote, difficult employee?

25         If so, raise your hand.

32

1          All right.  Pass the mic down.

2          Let's start with you, Miss Dinubilo.  Describe very

3     generally why would you raise your hand in response to that

4     question?

5          PROSPECTIVE JUROR DINUBILO:  You know, over the ten

6     years that I was a supervisor there were many difficult

7     employees so...  I worked with many people that had

8     attendance problems, people that had, you know, work-product

9     issues, various things like that.  Nothing serious enough for

10    them to be fired.

11         THE COURT:  All right.  Did the court reporter get

12    that and the attorneys hear that response?

13         MS. MARTIN:  Yes, Your Honor.

14         THE COURT:  We need to switch out the mic.  It

15    appeared the mic stopped working.

16         All right.  Thank you for that answer.

17         Miss McGregor?

18         PROSPECTIVE JUROR MCGREGOR:  I think like she said,

19    that in the many years of supervision you have many people

20    that come through your unit on probation and learning.  And

21    you have all kind of situations before you, and sometimes

22    people are not always happy with, you know, what you're

23    asking them to do or what they need to do or how they react

24    to it.  And I've had to be involved in discipline and

25    termination in some instances.

33

1          THE COURT:  All right.

2          PROSPECTIVE JUROR MCGREGOR:  It's not a fun place to

3     be.

4          THE COURT:  Does anyone else have a positive response

5     to that question?

6          Mr. McLean?  Let's pass the mic down.

7          PROSPECTIVE JUROR MCLEAN:  Just simply to do with

8     disciplinary processes that we had to go through in the

9     Air Force.  You know, nobody wanted to be in that situation

10    so that's difficult for anybody to handle.

11         THE COURT:  All right.

12         Now, let me ask a different kind of question.  As we

13    proceed through trial there will be presentation of evidence.

14    We'll have witnesses come to this stand here.  We will do our

15    best to make certain they're talking into the microphone and

16    that we are not talking over each other.  But is there

17    anything about the courtroom setup that would make it

18    difficult or impossible for you to see clearly, hear clearly,

19    or otherwise follow the presentation of evidence and listen

20    to the attorneys' arguments for the period of time we've

21    talked about?

22         We'll be sitting from 9:00 to 2:00 with two breaks

23    along the way.

24         Any of you concerned about seeing, hearing, being

25    able to follow the evidence for that period of time with this

34

1    kind of setup?

2         I don't see any raised hands.

3         Let me ask one more question before we turn to you

4    and ask you to run through the questions on the sheet.

5         Have any of you, or any close family members, ever

6    been involved in civil litigation?  This is a civil case, not

7    a criminal case.

8         Have you ever been a plaintiff or defendant, or has

9    anyone close to you ever been a plaintiff or defendant in a

10   civil case?

11        All right.  Sir, Mr. Todd?

12        PROSPECTIVE JUROR TODD:  Yes.  Just custody when my

13   parents got divorced.

14        THE COURT:  All right.  And how long ago was that?

15        PROSPECTIVE JUROR TODD:  Thirty-two years.

16        THE COURT:  Is there anything about your interaction

17   with the court system in that case, a different kind of case,

18   but a civil case, that makes you think you could not be fair

19   here?

20        PROSPECTIVE JUROR TODD:  No.

21        THE COURT:  All right.  Let's go to the questions on

22   the sheet.  If you could, starting with Miss McGregor, just

23   answer the questions in order.

24        I realize some of you have volunteered some of the

25   information that's responsive.  If you want to repeat that

35

1    information, that's fine.  But if you can go through that

2    list, Miss McGregor.

3              PROSPECTIVE JUROR MCGREGOR:  My name is Victoria

4    McGregor, and I live in Cameron Park, which is El Dorado

5    County.

6              I'm retired from Health and Human Services.  I've

7    been retired, I think, seven or eight years.  I have a

8    college education.

9              Never served in the military.

10             I've been married for 42 years.  My husband is a real

11   estate broker and has his own company.  No children.  And I

12   have served on a jury twice in El Dorado County.

13             THE COURT:  All right.  You said you had attended

14   college.  What degree did you obtain, if any?

15             PROSPECTIVE JUROR MCGREGOR:  I have an AA and units

16   for my bachelor's but never finished it.

17             THE COURT:  What was your AA degree in?

18             Was there a certain subject matter?

19             PROSPECTIVE JUROR MCGREGOR:  I think history.

20             THE COURT:  Then your BA, you had a course of study

21   there?

22             PROSPECTIVE JUROR MCGREGOR:  It would have been

23   social work.

24             THE COURT:  All right.  And you've been on a jury

25   twice in El Dorado County.  What kind of cases were those?

36

1          PROSPECTIVE JUROR MCGREGOR:  They were both criminal.

2    One was possession and sale of marijuana.  The other one was

3    indecent exposure.

4          THE COURT:  All right.  And a criminal case you

5    understand has a different burden of proof?

6          PROSPECTIVE JUROR MCGREGOR:  Yes.

7          THE COURT:  All right.  And did the jury reach

8    verdicts in those cases?

9          PROSPECTIVE JUROR MCGREGOR:  In the first one we

10   didn't, in the indecent exposure one.

11         THE COURT:  All right.   Thank you for that.

12         Miss Churchill?

13         PROSPECTIVE JUROR CHURCHILL:  My name is Jennifer

14   Churchill.  I live in West Sacramento.

15         I am a corporate operations manager for a public

16   records research and corporate compliance company.

17         Previous to that I was in the military.  I've

18   attended some college but did not obtain a degree.

19         I'm married.  My husband is a mortgage broker.  We

20   own our own mortgage company.  We don't have any children.

21         And I have served on one jury, been selected to serve

22   on another which reached resolution before the trial began.

23         THE COURT:  What's the name of the company you

24   currently work for?

25         PROSPECTIVE JUROR CHURCHILL:  CT Corporation.

37

1          THE COURT:  And you said you attended some college.

2   Were you pursuing a certain course of study?

3          PROSPECTIVE JUROR CHURCHILL:  Spanish and

4   psychology.

5          THE COURT:  And you were in the military.

6          How many years were you in the military?

7          PROSPECTIVE JUROR CHURCHILL:  Two years as a

8   reservist.  And before I attended my specialized training, I

9   was honorably discharged for a medical injury.

10          THE COURT:  And what branch?

11          PROSPECTIVE JUROR CHURCHILL:  Army.

12          THE COURT:  All right.  You said you were on one

13   jury?

14          PROSPECTIVE JUROR CHURCHILL:  Yes.  It was a criminal

15   case.  Also a drug case.

16          THE COURT:  But settled once the jury was --

17          PROSPECTIVE JUROR CHURCHILL:  The first case that I

18   was on we reached a verdict, and the second one settled

19   before the trial began.

20          THE COURT:  All right.  Did you say -- I'm sorry.

21   Did you say where that jury sat?

22          PROSPECTIVE JUROR CHURCHILL:  Both in Yolo County.

23          THE COURT:  Got it.  Thank you very much.

24          Miss Dinubilo?

25          PROSPECTIVE JUROR DINUBILO:  My name is Cathleen

1   Dinubilo.  I live in Carmichael.

2           I work for the State Controller's Office, Unclaimed

3   Property Division.  I'm the Assistant Chief.  Previously I've

4   been an audit manager for the state for 25 years.

5           I have a bachelor's in business administration.  I

6   have no military service.

7           I'm married.  My husband is a district sales

8   representative for the California Lottery.  My ex-husband is

9   a CFO who lives out-of-state.

10          I have two children.  One works for the state as an

11  auditor, and the other one is still in school.

12          And prior jury experience, I served on one jury.  It

13  was a criminal case.  It was a child murder/homicide.

14          THE COURT:  Where was that?

15          PROSPECTIVE JUROR DINUBILO:  Here.  Sacramento.

16          THE COURT:  In the Sacramento Superior Court?

17          PROSPECTIVE JUROR DINUBILO:  Yes.

18          THE COURT:  Did the jury reach a verdict?

19          PROSPECTIVE JUROR DINUBILO:  Yes.

20          THE COURT:  Let me ask you a few follow-up questions.

21          Did you previously work for other state departments

22  or agencies?

23          PROSPECTIVE JUROR DINUBILO:  Yes.  California State

24  Lottery for 20 years.

25          THE COURT:  All right.  And you said your ex-husband

39

1     is a CFO.  For what company?

2           PROSPECTIVE JUROR DINUBILO:  I don't know the name of

3     it.

4           THE COURT:  Do you know the type of company?

5           PROSPECTIVE JUROR DINUBILO:  It was a manufacturing

6     company.

7           THE COURT:  All right.  You have one child who is a

8     student.  What course of study is that student pursuing?

9           PROSPECTIVE JUROR DINUBILO:  She's in high school.

10          THE COURT:  Didn't you say you had one in college?

11          PROSPECTIVE JUROR DINUBILO:  One already graduated

12    from college.

13          THE COURT:  All right.  Who's the auditor?

14          PROSPECTIVE JUROR DINUBILO:  Correct.

15          THE COURT:  For what agency or department is that

16    one?

17          PROSPECTIVE JUROR DINUBILO:  State Controller's

18    Office.

19          THE COURT:  All right.  Thank you very much.

20          Miss Plummer?

21          PROSPECTIVE JUROR PLUMMER:  Beverly Plummer.  I live

22    in Red Bluff, California, Tehama County.

23          I'm currently not working.  I feel dumb because I

24    don't have a high school education.  I had children.  Just

25    graduated high school.  I have no military background.

1        I've been married 31 years.  My husband is retired

2    CHP.  And he worked six years for the Tehama County Sheriff's

3    Office.

4        I have three children.  One works for a big –– one is

5    a general superintendent for a construction company in

6    San Francisco.  The other one works for the same company in

7    payroll.  And then I have a daughter that is a pharmacy

8    technician.

9        THE COURT:  Where does that daughter work?

10       PROSPECTIVE JUROR PLUMMER:  The youngest?  The

11   pharmacy?

12       THE COURT:  Yes.

13       PROSPECTIVE JUROR PLUMMER:  In Cottonwood.

14       THE COURT:  And for what kind of business or ––

15       PROSPECTIVE JUROR PLUMMER:  She works for Rite Aid.

16       THE COURT:  All right.  Where did she go to school?

17       PROSPECTIVE JUROR PLUMMER:  My kids went to school in

18   Antioch, California.

19       THE COURT:  Then she pursued some higher education to

20   get her pharmacy certification?

21       PROSPECTIVE JUROR PLUMMER:  Actually, she worked for

22   Rite Aid for a number of years.  Then they started having her

23   work in the pharmacy department, and she got her tech license

24   through that.

25       THE COURT:  All right.  Have you served on a jury

41

1  before?

2          PROSPECTIVE JUROR PLUMMER:  No.  I've been called,

3  but not far enough to that process.

4          THE COURT:  All right.  Thank you.

5          Mr. Henry?

6          PROSPECTIVE JUROR HENRY:  Yes.  I'm Jim Henry.  I

7  live in Courts Valley, California.

8          I'm currently retired.  I used to be installation

9  supervisor for AT&T.  I have an AA degree just in general

10  education.  I served four years in the military, in the Navy.

11          I'm married.  My wife is a human resources for Courts

12  Valley Indian Reservation.  And I've never served on a jury

13  before.

14          THE COURT:  And in the Navy, what was your position?

15          PROSPECTIVE JUROR HENRY:  I was an electronics

16  technician.

17          THE COURT:  All right.  Thank you.

18          Miss Cowan?

19          PROSPECTIVE JUROR COWAN:  Okay.  Barbara Cowan.  I

20  live in New Castle in Placer County.

21          I'm a cook for the Sisters of Mercy up in Auburn.

22  Before that I was a registered dental assistant.

23          My education is I went to Sacramento City for my

24  license to become a registered dental assistant.  I was never

25  in the military.

42

1          I'm married.  My husband is a carpenter.  My kids are

2     grown.  My son works as a mechanic at a trucking company, and

3     my daughter works for Placer County in the Environmental

4     Health Department.  And I never served on a jury.

5          THE COURT:  What's your daughter's position with

6     Environmental Health?

7          PROSPECTIVE JUROR COWAN:  She's the assistant to the

8     head person for Environmental Health.

9          THE COURT:  Does she have a specialized degree?

10         PROSPECTIVE JUROR COWAN:  I know she has her AA

11    degree.

12         THE COURT:  Do you know what that's in?

13         PROSPECTIVE JUROR COWAN:  I'm not real sure.

14         THE COURT:  All right.

15         PROSPECTIVE JUROR COWAN:  Okay.

16         THE COURT:  Thanks.  Miss Stryker?

17         PROSPECTIVE JUROR STRYKER:  I'm Barbara Stryker.  I

18    live in Auburn.

19         I'm retired three years ago as a high school English

20    teacher.  Prior to that, when I didn't have my degree yet, I

21    worked for ten years for a surgeon.  I managed his office.

22         I have a BA in English from Sacramento State, then a

23    teaching credential.  I haven't served in the military.

24         I've been married to my husband for 22 years.  He's a

25    retired high school science teacher.  Prior spouse was a

43

1    teacher.

2          My children are grown.  My daughter is a -- has her

3    MFT license, which is a marriage and family therapist.  She

4    works for Novato Oaks High School in Novato and has a private

5    practice also.  My son works for American Audio Visual in the

6    Bay Area.

7          I served on a jury.  It was near Auburn -- in Colfax.

8    The trial was held there in that courtroom.  It was a

9    wrongful termination.  I listened to the entire case, but it

10   went longer than they anticipated.  And I had paid several

11   hundred dollars to attend a conference, and the judge

12   dismissed me so I didn't see it to the end.

13         THE COURT:  All right.  Did you ever follow up to

14   find out what happened in that case?

15         PROSPECTIVE JUROR STRYKER:  Yes, I did follow up.

16         THE COURT:  All right.  How long ago was that?

17         PROSPECTIVE JUROR STRYKER:  Approximately, five

18   years.

19         THE COURT:  All right.  You said your ex-husband

20   also was a teacher.  What did he teach?

21         PROSPECTIVE JUROR STRYKER:  Art and PE.

22         THE COURT:  And you managed a surgeon's office.  Who

23   was that surgeon?

24         PROSPECTIVE JUROR STRYKER:  Doctor Robert Weiss in

25   Auburn.  That was from approximately 1980 to 1990.

44

1          THE COURT:  Was that in a hospital setting or an

2    office outside of the hospital?

3          PROSPECTIVE JUROR STRYKER:  Office.  Outside.

4          THE COURT:  Did he specialize in a type of surgery?

5          PROSPECTIVE JUROR STRYKER:  He was a general surgeon

6    so he did appendix, some cancers, gallbladders.

7          THE COURT:  All right.

8          PROSPECTIVE JUROR STRYKER:  Hernias.

9          THE COURT:  How long did you do that?

10          PROSPECTIVE JUROR STRYKER:  Ten years.

11          THE COURT:  All right.  Thank you.

12          Miss Zeller?

13          PROSPECTIVE JUROR ZELLER:  My name is Juanita Zeller.

14    I live in Stockton, San Joaquin County.

15          I am presently retired, but prior to that was in real

16    estate.  And prior to that I was a paralegal for a bankruptcy

17    law firm for 24 years.

18          I have a business background.  I have not served in

19    the military.  I am divorced.  My previous husband is an

20    instructor at San Joaquin Delta College.

21          I have a grown son who just recently was laid off

22    working for Agilent.  I have served on jury trials, two

23    different criminal actions.  One was a murder trial, and one

24    was a burglary.  And we did find -- we did find them guilty

25    in both cases.  I guess you didn't ask that.

45

1              THE COURT:  So you reached a verdict?

2              PROSPECTIVE JUROR ZELLER:  We reached a verdict.

3              THE COURT:  What's does your ex-husband teach?

4              PROSPECTIVE JUROR ZELLER:  German languages and

5     religion.

6              THE COURT:  You said something about a business

7     background?

8              PROSPECTIVE JUROR ZELLER:  Yes.  I went to business

9     college.

10              THE COURT:  All right.  And for how long were you a

11     paralegal in bankruptcy?

12              PROSPECTIVE JUROR ZELLER:  Twenty-four years.

13              THE COURT:  All right.  What kind of real estate?

14     You said you did real estate?

15              PROSPECTIVE JUROR ZELLER:  Residential real estate.

16              THE COURT:  All right.  Thank you.

17              Let's skip down now to -- We can go to Mr. McLean.

18     Just pass the mic back.

19              You have the mic?  There you go.

20              PROSPECTIVE JUROR MCLEAN:  My name is Jesse McLean.

21     I live in Vacaville, California, Solano County.

22              I currently work for North Bay Healthcare System in

23     the emergency department at Vacaville VacaValley Hospital.  I

24     have been there for ten years.  Prior to that I was in the

25     military for ten years working in the medical field in

46

1    emergency departments and on medical units.

2            All my education and background comes from just

3    general college credits and my military time.  I was in the

4    Air Force for ten years.  Discharged honorably.

5            And I'm married with two children of school age.  My

6    wife is a jack-of-all -- she does a little bit of everything.

7    My prior experience is being called, but never actually

8    serving on a jury.

9            THE COURT:  All right.  For the additional years in

10   Air Force -- You described your four years.  For the

11   additional time in the Air Force, what were your positions?

12           PROSPECTIVE JUROR MCLEAN:  I started off my -- after

13   basic training, I went into the medical services.  And I was

14   there for the entire time I was in the Air Force.

15           I served on -- My first two years I served on a

16   medical floor, and then after that it was all emergency

17   department or combat.

18           THE COURT:  What exactly is your role now?

19           You said you're at North Bay --

20           PROSPECTIVE JUROR MCLEAN:  My role now?

21           I'm an emergency department technician.  It is along

22   the same lines.  I'm unlicensed.  It's the equivalent of an

23   emergency medical technician.

24           THE COURT:  All right.  You said you have college

25   credits.  Was that working towards a certain type of degree?

47

1          PROSPECTIVE JUROR MCLEAN:  Nursing.

2          THE COURT:  But you haven't completed that?

3          PROSPECTIVE JUROR MCLEAN:  No, ma'am.

4          THE COURT:  All right.  Thank you.

5          Mr. Herron?

6          PROSPECTIVE JUROR HERRON:  My name is Arthur Herron.

7  I live here in Sacramento.

8          I am currently disabled so I'm not currently working.

9  Before that I used to work at a Pride Industries in Roseville

10  for a little over six years.

11          I graduated high school.  I have a diploma.  No

12  college.  I haven't served in the military.

13          I have been married for a little over four years.  My

14  wife is working seasonally at See's Candy.  I have no

15  children.  And I have never had to serve on a jury.

16          THE COURT:  And you said you worked at Pride?

17          What was your position there?

18          PROSPECTIVE JUROR HERRON:  Technician -- Production

19  technician.

20          THE COURT:  All right.

21          PROSPECTIVE JUROR HERRON:  It's a company who helps

22  hire people with disabilities.

23          THE COURT:  Right.  So what does a production

24  technician do?

25          PROSPECTIVE JUROR HERRON:  Work on lines.  Help see

48

1    individuals do certain tasks, like an assembly-line-type

2    thing.

3         THE COURT:  In a certain type of facility?

4         PROSPECTIVE JUROR HERRON:  They had different

5    locations throughout.  I worked at the headquarters in

6    Roseville in the electronics department.

7         THE COURT:  All right.  Thank you.

8         Miss Farnam?

9         PROSPECTIVE JUROR FARNAM:  I'm Kathy Farnam.  I live

10   in MacDoel, California, Siskiyou County.

11        I am currently a housewife and a volunteer on the

12   ambulance, EMT.  I was a dental assistant up until last June

13   when I retired.

14        I have an associate of arts degree in general ed.  I

15   was not in the military.

16        I have been married for 45 years.  My spouse is a

17   retired rancher.

18        I have four children.  One is an office manager at a

19   car dealership in Medford, Oregon.  One is a cosmetologist

20   instructor and has her own shop in Klamath Falls, Oregon.

21   One works for the Veterans Administration in Baltimore,

22   Maryland.  One is an electrical lineman in Los Angeles

23   County.  And I have no previous jury experience.

24        THE COURT:  All right.  Your child who works for VA,

25   what does that --

49

1          PROSPECTIVE JUROR FARNAM:  He's insurance.  He looks

2     into if people qualify for the disabilities.

3          THE COURT:  All right.   And you said you're

4     currently volunteering with the ambulance company?

5          PROSPECTIVE JUROR FARNAM:  Yes.

6          THE COURT:  All right.  Is that a public ambulance

7     service?

8          PROSPECTIVE JUROR FARNAM:  It's a volunteer ambulance

9     service.

10          THE COURT:  You're an EMT?

11          PROSPECTIVE JUROR FARNAM:  Yes.

12          THE COURT:  How long have you been doing that?

13          PROSPECTIVE JUROR FARNAM:  About 30 years.

14          THE COURT:  Does that mean you assist with transports

15     to the hospital?

16          PROSPECTIVE JUROR FARNAM:  Yes.

17          THE COURT:  All right.  Do you have a particular role

18     as an EMT or you just do whatever the EMT is called to do?

19          PROSPECTIVE JUROR FARNAM:  That's right.  Yes.

20          THE COURT:  All right.

21          Miss Barge?

22          PROSPECTIVE JUROR BARGE:  My name is Lyndsy Barge.  I

23     live in Sacramento.

24          I'm currently a business tax specialist with the

25     State of California Board of Equalization.  Prior to working

50

1   for the board, I was a pharmacy clerk at Kaiser.

2        I have a bachelor's degree in economics.  I have no

3   military service.

4        I'm married.  My husband is a special agent with

5   Homeland Security Investigations.  I have one child, and

6   she's in preschool.  And I have never served on a jury.

7        THE COURT:  All right.  You said you worked for

8   Kaiser as a pharmacy clerk?

9        PROSPECTIVE JUROR BARGE:  Correct.

10       THE COURT:  What was the time frame for that?

11       PROSPECTIVE JUROR BARGE:  '99 to '05.

12       THE COURT:  All right.

13       PROSPECTIVE JUROR BARGE:  It was through college.

14       THE COURT:  And did you have specialized training to

15   do that job?

16       PROSPECTIVE JUROR BARGE:  No.  It was like

17   cashiering.

18       THE COURT:  All right.   Which Kaiser?

19       PROSPECTIVE JUROR BARGE:  Sacramento, Morris Avenue.

20   Sacramento, Fair Oaks.  Pleasonton.  Then also in Anaheim.

21       THE COURT:  So you worked at more than one facility?

22       PROSPECTIVE JUROR BARGE:  I did.  I transferred

23   around.

24       THE COURT:  All right.  Thank you.

25       Miss Stokes?

51

1            PROSPECTIVE JUROR STOKES:  My name is Wendy Stokes.

2    I live in Manteca, California.

3            I am currently an Avon representative.  I have an

4    associate's degree in the culinary arts.  I have no military

5    service.

6            My spouse drives truck for Frito-Lay.  And I have

7    four children.  One is currently at college, Simpson

8    University in Redding and pursuing her nursing degree.  I

9    have no prior jury experience.

10           THE COURT:  All right.  What does your daughter

11   pursuing nursing hope to do?

12           PROSPECTIVE JUROR STOKES:  Get her nursing degree.

13           THE COURT:  Work in what setting?  Do you know?

14           PROSPECTIVE JUROR STOKES:  I believe emergency is

15   what she wants.

16           THE COURT:  All right.  And you said you have other

17   children.  Are they all high school or younger?

18           PROSPECTIVE JUROR STOKES:  They're in elementary

19   school.

20           THE COURT:  All right.  Thank you.

21           Mr. Todd?

22           PROSPECTIVE JUROR TODD:  My name is Eric Todd.  I

23   live in West Sacramento.

24           I'm currently a software developer.  I've always been

25   a software developer.  I have a bachelor's degree in computer

52

1    science.  I have no military background.

2         I'm currently married.  My wife is a corporate

3    investigator.  I have two children in preschool.  And I have

4    never been selected for jury.

5         THE COURT:  Who does your wife work for?

6         PROSPECTIVE JUROR TODD:  Verizon Wireless.

7         THE COURT:  When you say she's a corporate

8    investigator, what does that mean?

9         PROSPECTIVE JUROR TODD:  On one hand she is liaison

10   between law enforcement when doing criminal investigations.

11   When there is joint investigations, she conducts some of the

12   investigations, some of the interviewing, reports and decides

13   which ones to hand over to law enforcement and whatnot.

14        THE COURT:  All right.  Thank you very much.

15        Let me ask you before I turn this over to the

16   attorneys, do you need some water, ma'am?

17        PROSPECTIVE JUROR PLUMMER:  That would be great.

18        THE COURT:  Miss Schultz, could you get some water?

19        We'll get you some water.

20        Have any of you thought of anything while we've been

21   sitting here listening to other people's answers?

22        Is there anything at this point that makes any of you

23   think you could not be a fair juror in this case?

24        If so, raise your hand.

25        All right.  I see no raised hands.

53

1         I'm going to acknowledge Mr. Bohm for up to ten

2    minutes.

3         MR. BOHM:  Thank you, Your Honor.

4         You want me to go now?

5         THE COURT:  Yes.

6         MR. BOHM:  Thank you.  Good afternoon, Ladies and

7    Gentlemen.  Voir dire.  It means to see speaking.  This isn't

8    about me talking.  This is about trying to encourage you all

9    to talk about your life experience as you try to weigh in and

10   decide what happened in this case.  You don't know anything

11   about what's happened in the case.

12        But by show of hands, can I find out if any of you in

13   your work experience have ever heard a sexually inappropriate

14   remark?

15        Any of you here ever hear a sexually inappropriate

16   remark?

17        Miss Stryker?  Who's got the microphone right now,

18   and I'll see if I can't get near there.

19        All right.

20        Miss Stryker, you raised your hand.  Why don't we get

21   that from you?

22        Tell us what you are referring to.

23        PROSPECTIVE JUROR STRYKER:  I worked in -- when I

24   first started teaching, I worked in a department with about

25   four -- there were four men in the department, and they were

54

1    in the habit of making many inappropriate remarks.

2            MR. BOHM:  Let me pause right there.  Let's also find

3    out, by show of hands, how many of you feel that a little bit

4    of sex talk in the workplace is okay?

5            Raise your hand if you think just a little bit of sex

6    talk is okay in the workplace?

7            Is there anybody who feels that just a little bit is

8    okay?

9            All right.

10           Is there anybody who has had work experience where

11   they feel like given the kind of job I do -- Mr. McLean, you

12   were in the military as a medical person, correct?

13           PROSPECTIVE JUROR MCLEAN:  Yes.

14           MR. BOHM:  Okay.  Given that kind of environment, did

15   you have an opinion that just a little sex talk is okay,

16   we're all together working long hours?

17           PROSPECTIVE JUROR MCLEAN:  No.

18           MR. BOHM:  Was that at all tolerated?

19           PROSPECTIVE JUROR MCLEAN:  No.

20           MR. BOHM:  How many of you, by show of hands, ever

21   experienced a workplace that tolerated even just a little bit

22   of sex talk?

23           Did anybody work in a place like that?

24           Miss Stryker.

25           How about you, Miss McGregor?

55

1          Can you tell me about -- we've heard from

2    Miss Stryker -- can you tell me about your experience?

3          I only get ten minutes so thank you.

4          PROSPECTIVE JUROR MCGREGOR:  As I said, I worked for

5    Placer County Health and Human Services over 35 years.  And a

6    lot changed with the idea of what is sexual harassment, what

7    is harassment of any kind over those 35 years.

8          And I think, you know, when you've been there and

9    you've seen things happen, and as the laws were passed,

10   things were changed, that the workplace did have to make

11   changes in it.

12         But over those years I've seen things that I was

13   uncomfortable with.  I heard things I didn't appreciate.  But

14   we worked at changing them as we went along.

15         MR. BOHM:  So you are talking about the change in the

16   climate from non-political correctness to a heightened

17   awareness?

18         PROSPECTIVE JUROR MCGREGOR:  Yes.  To a very

19   heightened awareness.

20         MR. BOHM:  I don't want to make your former employer

21   nervous in terms of -- You were describing that entire 35

22   years?

23         PROSPECTIVE JUROR MCGREGOR:  Yes.  Describing a

24   period of time where things changed.

25         MR. BOHM:  Okay.  Different topic all together.  I

1  understand some of you didn't get to speak on the last topic,
2  but I want to talk about punitive damages.
3       In this case, if the plaintiff is successful in
4  getting over all the legal hurdles that are there, there will
5  be a request from court and counsel concerning punitive
6  damages.
7       By a show of hands, who among you has even the
8  smallest problem or concern about punitive damages and what
9  they're doing to this country?
10      Anybody have a concern about that, even a little bit
11  of a concern?
12      Miss Stryker, you have a concern.
13      Anybody other than Miss Stryker have a concern about
14  punitive damages?
15      Mr. Todd, what is your concern about punitive
16  damages?
17      PROSPECTIVE JUROR TODD:  How do you quantify what's
18  necessary.
19      MR. BOHM:  Understood.  There will be jury
20  instructions that come later.  I'm just talking about, you
21  know, coffee shop talk.  Sometimes people say:  Oh, my
22  goodness.  Look at this punitive damages award in this case.
23  That's just ridiculous.  That's a problem with our country.
24      Does anybody ever feel that way or had that kind of a
25  discussion?

57

1    Nope?

2    Okay.

3    A few of you had some experience in compliance.

4  Miss Churchill, you work for a compliance company, correct?

5    PROSPECTIVE JUROR CHURCHILL:  Yes.

6    MR. BOHM:  Now, your company, CG Corporation, also

7  accepts service of complaints and such for corporate

8  departments?

9    PROSPECTIVE JUROR CHURCHILL:  Correct.  The majority

10  are served in Los Angeles in California.  However, a very

11  small portion do come through Sacramento.

12    MR. BOHM:  Given that's the kind of work that you do,

13  do you feel uncomfortable sitting on a jury and passing

14  judgment about one of the companies that's in this collective

15  of companies that you service?

16    PROSPECTIVE JUROR TODD:  No.  I see so many that I

17  don't pick one particular type of case or company out of any

18  of them.

19    MR. BOHM:  All right.  Miss Cowan, you've got some

20  experience with Catholic Healthcare West, and that would be

21  before they became Dignity Health and split from the church?

22  Is that what you are saying?

23    PROSPECTIVE JUROR COWAN:  Well, the convent, they

24  split from Catholic Healthcare West and became West, Midwest,

25  so they're not even associated with Catholic Healthcare West

58

1    anymore.

2           MR. BOHM:  Now, at some point, if you're seated for

3    this jury, there will come a point where you have to pass

4    judgment on the conduct of the Sisters of Mercy and Catholic

5    Healthcare West in this case.

6           Do you feel comfortable passing that kind of judgment

7    in this case?

8           PROSPECTIVE JUROR COWAN:  I think I can.

9           MR. BOHM:  Another thing that is going to happen, you

10   are going to be instructed that you have to leave your

11   personal experiences with this employer out of the jury

12   room.

13          PROSPECTIVE JUROR COWAN:  Right.

14          MR. BOHM:  Given your experience with the Sisters of

15   Mercy and Catholic Healthcare West, will you be able to

16   ignore your own personal experience and focus just on the

17   evidence?

18          PROSPECTIVE JUROR COWAN:  Yeah.  I think I can do

19   that.

20          MR. BOHM:  Can you assure Miss Chopourian and the

21   hospital who wants a fair trial here that none of your past

22   experience with Catholic Healthcare West, that you won't be

23   talking about that in the jury room; is that fair to say?

24          PROSPECTIVE JUROR COWAN:  Yes.

25          MR. BOHM:  By show of hands how many of you have ever

59

1  been bullied?  Just felt like you've been bullied, whether at

2  school or work in your life?  How many of you have ever felt

3  bullied?

4          All right.

5          Mr. McLean, can you tell me about that.

6          PROSPECTIVE JUROR MCLEAN:  Just all through high

7  school, since I was a little kid.

8          THE COURT:  You need the microphone.

9          PROSPECTIVE JUROR MCLEAN:  Just through high school

10  and junior high.  I was a very small kid so...  I didn't get

11  to be as big as I am until later on in life so...

12          MR. BOHM:  How many of you, by show of hands, feel

13  that a doctor -- a medical doctor, who is a surgeon, should

14  have the right to bully and use profanity because of the

15  procedure that he's involved in?

16          Anybody feel that way, that because somebody is a

17  surgeon you have to give them room to express themselves when

18  things get tough?

19          Anybody feel that way even a little bit?

20          All right.

21          Different question.

22          This case, as you hear, involves a surgery unit.  How

23  many of you, by show of hands, have ever had invasive

24  procedure where you've been put under general anesthesia?

25          And with regards to everybody who raised your hands,

60

1    of that group, how many of you had feelings one way or the

2    other in terms of whether it was -- Withdrawn.

3            For those who raised your hands, how many of you felt

4    the experience was negative?

5            For those of you who raised your hands, how many of

6    you felt the experience was positive?

7            For those of you who raised your hands, how many of

8    you were told what actually happened in the operating room

9    when you were under anesthesia?

10           PROSPECTIVE JUROR STOKES:  Meaning what was --

11           MR. BOHM:  What was going on during the procedure?

12           Any of you have that discussion of what was going on

13   during the operative procedure?

14           No?

15           In terms of whistle blowing, how many of you have

16   been in a position, by show of hands, where you had to report

17   something up the chain of command or outside the work

18   environment which you felt to be a violation of a rule or a

19   law?

20           Anybody ever in that position?

21           Okay.  And Miss Farnam, we've not heard from you.  If

22   you wouldn't mind, tell me what was your situation?

23           PROSPECTIVE JUROR FARNAM:  It was with our volunteer

24   ambulance.  And they were -- It was people going to do what I

25   didn't approve of.  And I didn't.  So I went before the board

61

1    and talked to them about it.

2              MR. BOHM:  You reported it?

3              PROSPECTIVE JUROR FARNAM:  Yes.

4              MR. BOHM:  Were you satisfied with the response?

5              PROSPECTIVE JUROR FARNAM:  Yes.

6              MR. BOHM:  Who else raised their hands in answer to

7    that question?

8              Let's pass it to Miss Stokes, then Miss McGregor.

9              PROSPECTIVE JUROR STOKES:  My experience was while I

10   was employed at the Commons, I had another employee that was

11   drinking and doing drugs while he was on break.  And I

12   reported that to the supervisor, but I wasn't involved after

13   that.

14             MR. BOHM:  Okay.  And you, Miss McGregor?

15             PROSPECTIVE JUROR MCGREGOR:  As a supervisor I

16   several times had to go to my superiors and even to the

17   director to discuss, you know, actions or situations that had

18   happened.  And sometimes it involved how clients had been

19   treated or not treated.

20             MR. BOHM:  My final area of inquiry.

21             THE COURT:  You're at ten minutes.  I'll give you two

22   more.  So 12 minutes for defense now.

23             MR. BOHM:  Meals and rest breaks.  In California some

24   of you may have heard there is a lot of talk about meals and

25   rest breaks.

62

1          How many of you, by a show of hands, feel that

2     Californias are making too big a deal out of getting a meal

3     or rest break during the working hours?

4          Anybody feel that way?

5          Miss Farnam, what to you have to say about that?

6          PROSPECTIVE JUROR FARNAM:  I just feel that your work

7     should be done, then take a break.  You shouldn't be looking

8     for a break all the time.

9          MR. BOHM:  Do you feel that they should have a legal

10    right to this break?  That they should get it, or that

11    doesn't matter as much to you?

12         PROSPECTIVE JUROR FARNAM:  That doesn't matter to me.

13    As a dental assistant we took breaks whenever we had a

14    chance, not at a certain time.

15         MR. BOHM:  Anybody, by show of hands, who feels

16    similar to Miss Farnam in that regard?

17         MR. BOHM:  Okay.  Thank you, Your Honor.

18         THE COURT:  All right.

19         Miss Martin?

20         MS. MARTIN:  Thank you, Your Honor.

21         Hello.  How many of you got your jury summons and

22    said:  Yeah.  I get to do jury duty.  That's fantastic.

23         Well, I think you're the first one I have ever seen.

24         You know, this jury summons thing that we all get,

25    the jury summons, you know, "Oh, I got jury duty," boy, you

63

1   have no idea how important this work is and how much we

2   appreciate your service.

3          This idea of having a jury trial, I think I can speak

4   for counsel to say this, this is just a fundamental

5   constitutional right that we all have when we're involved in

6   the judicial process, a jury of our peers so thank you very

7   much for coming.

8          And along those lines, what we do in this voir dire

9   process, is we pick a jury that truly is impartial.  And

10  that's a tough, tough order because we all have bias from our

11  experience as human beings on this planet.  We all have

12  preferences and our life experiences.

13         Sometimes it doesn't makes us prefer one thing or

14  another, but we have little tiny prejudices and biases that

15  we're not proud of in today's PC world, but by golly they are

16  there.

17         My job, our job, is to find out if our potential

18  jurors have any potential biases.  We want to do that because

19  what we want is everybody to come out of the gate completely

20  equal.  Nobody is coming out behind.

21         Make sense?

22         So what I want to know is if there is anybody here

23  who might be thinking as we go through the process and Your

24  Honor is asking questions, thinking I've got this experience,

25  can I put it aside?

64

1           Is there anything that -- Let me ask you this way:

2    Would you want to be on my jury?  Would you want to be --

3    Would I want you on my jury, as the defendant, for Catholic

4    Healthcare West representing a hospital?

5           Does anybody not want -- think I would not want you

6    on my jury?

7           No hands.  Fantastic.

8           As you know, this is an employment case.  And so we

9    all luckily have experience with employment hopefully.  I

10   want to ask you a few questions, to the group first, and then

11   I'll ask some specific questions for a few individuals.

12          I'm not trying to make you feel awkward, but I do

13   want to get your best responses.

14          Has anybody ever worked with somebody who didn't pull

15   their own weight?

16          Okay.  Miss Stryker?

17          PROSPECTIVE JUROR STRYKER:  Yes.

18          MS. MARTIN:  Can you tell me about that experience,

19   please?

20          PROSPECTIVE JUROR STRYKER:  Well, as a former

21   teacher, there were teachers that I worked with that did not

22   do what they were supposed to do.

23          MS. MARTIN:  Did that affect your work at all?

24          PROSPECTIVE JUROR STRYKER:  Well, I was, for nine

25   years, the senior project coordinator at the high school.  I

                                                                    65

1    had six English teachers that I –– I didn't answer the

2    supervision question earlier because I wasn't hiring and

3    firing.  You know, I just was in charge of making sure they

4    had materials and making sure they gave their classes the

5    correct information and followed up on what they were

6    supposed to do.  And there were several of them that did not

7    do what they were supposed to do and it caused me more work.

8         THE COURT:  Miss Martin, can you please stay at the

9    microphone.

10        MS. MARTIN:  Sorry, Your Honor.

11        How did that make you feel?  Was it frustrating for

12   you?

13        PROSPECTIVE JUROR STRYKER:  It was extremely

14   frustrating.

15        MS. MARTIN:  Were they corrected so that they

16   participated more and pulled their own weight at some point?

17        PROSPECTIVE JUROR STRYKER:  Not really.  It's a

18   little different in the school system.  It doesn't always

19   work the way that it should.

20        MS. MARTIN:  Okay.  Thank you.

21        Who else raised their hands.

22        It was fleeting.  Mr. Henry?

23        Can you tell me about your experience, please?

24        PROSPECTIVE JUROR HENRY:  Well, as a supervisor on

25   installation of cables, stuff like that, there would be guys

66

1    they would be assigned so many jobs a day and they wouldn't

2    get them done.  Then I would have to send people out that did

3    get their work done and go help them before the time was

4    up -- the work day was up.

5         MS. MARTIN:  Okay.  Did you find those folks who

6    didn't do the work, did you find that they were incapable of

7    doing the work or really didn't want to do the work?

8         PROSPECTIVE JUROR HENRY:  Both.  Both.  Working with

9    that many people you run across just about every kind of

10   attitude towards working.

11        MS. MARTIN:  How did that make you feel as a

12   supervisor when you had folks who weren't pulling their

13   weight?

14        PROSPECTIVE JUROR HENRY:  It didn't make me feel good

15   because I would have to go get guys I knew that would pull

16   their weight and do extra.  And I would have to go send them

17   to help the other guys out.

18        MS. MARTIN:  Thank you.

19        Mr. Todd, did you answer that question?

20        I think I saw your hand raised.  Why don't you tell

21   me about your experience.

22        PROSPECTIVE JUROR TODD:  Just as a software

23   developer, sometimes in my personal experience I worked with

24   some off-site workers who weren't pulling their own weight.

25   Generally, you know, would hide that they weren't getting the

67

1    work done.  Make excuses why.  It was someone else's fault

2    why they weren't getting the work done and so forth.

3           MS. MARTIN:  Did that affect your work?

4           PROSPECTIVE JUROR TODD:  I had to do their work too.

5           MS. MARTIN:  How did that make you feel?

6           PROSPECTIVE JUROR TODD:  Unhappy.

7           MS. MARTIN:  Understandably.

8           There are several of you, I think almost all of you,

9    who answered counsel's question about your experience

10   undergoing general anesthesia for surgical procedures.

11          How many of you wanted the best team operating on you

12   when you were under general anesthesia?

13          How many of you felt that having the A team operating

14   on you, people who cared, was important to your well-being?

15          There were some questions asked by counsel -- Let me

16   ask you this:  The department at Mercy General Hospital was

17   the CVOR cardiovascular operating room.  Has anybody had any

18   experience with open-heart surgery?

19          Okay.  Mr. McLean, what is your experience -- if you

20   feel comfortable telling me, what is your experience?

21          PROSPECTIVE JUROR MCLEAN:  I've had -- When I used to

22   work in the military, that was part of my duties we would

23   recover --

24          THE COURT:  Where's the microphone?

25          I'm sorry.  Let's make certain you have the mic.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

68

1          PROSPECTIVE JUROR MCLEAN:  I would recover

2     patients -- help recover patients in the military during the

3     full ten years that I was in there.

4          MS. MARTIN:  In your work recovering patients, did

5     you put your patient first?

6          PROSPECTIVE JUROR MCLEAN:  Yes, ma'am.

7          MS. MARTIN:  Above all things, right?

8          PROSPECTIVE JUROR MCLEAN:  Yes.

9          MS. MARTIN:  Who else raised their hand.

10          Miss Plummer, your experience with open-heart

11     surgery?

12          PROSPECTIVE JUROR PLUMMER:  Just the same situation I

13     said earlier about my grandson.

14          MS. MARTIN:  That's right.  Of course.  All right.

15     And that you were frustrated with the staff that was working

16     with your grandson as I understood it?

17          PROSPECTIVE JUROR PLUMMER:  The nurses, yeah.  He had

18     just had open-heart surgery, one year old.  And another

19     little boy who was six had just had open-heart surgery.

20          They put the two of them -- Rather they put a little

21     girl in the same room with them that was throwing up,

22     coughing and sneezing, which to me was --

23          MS. MARTIN:  Didn't sound right.

24          PROSPECTIVE JUROR PLUMMER:  Absolutely not.  So we

25     just -- the other mother and I called our doctor, which they

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

69

1   had the same surgeon.

2        MS. MARTIN:  Okay.  Fair enough.

3        Did you feel the nurses were tending -- besides that

4   instance, did you feel the nurses were tending to your son's

5   needs to best of their ability -- grandson's needs?

6        PROSPECTIVE JUROR PLUMMER:  After we called the

7   doctor on them they did, yes.  But his wife was also a nurse

8   and she did the best care.

9        MS. MARTIN:  Okay.  Thank you.

10        Miss McGregor, did you raise your hand?

11        PROSPECTIVE JUROR MCGREGOR:  My father had open-heart

12   surgery several times.  The first time we weren't even sure

13   he was going to make it through the surgery.  But we were

14   fortunate.  We had an excellent hospital and excellent

15   doctors, and we were very appreciative.

16        MS. MARTIN:  And was that Mercy Hospital or --

17        PROSPECTIVE JUROR MCGREGOR:  No.  It was Cottage

18   Hospital in Santa Barbara.

19        MS. MARTIN:  Again, it was important that every

20   member on the team who worked with your father during his

21   open-heart surgery, it was important to you those people care

22   about him, true?

23        PROSPECTIVE JUROR MCGREGOR:  Oh, yes.

24        MS. MARTIN:  Changing subjects briefly, we've talked

25   a little bit about this is a lawsuit -- a civil lawsuit.  Is

70

1   there anybody who feels just because a civil lawsuit has been

2   filed, it has come this far, that it automatically has merit?

3          No hands.

4          Is there anybody who feels there are too many

5   lawsuits filed these days?

6          Mr. Todd, tell me about that please.

7          PROSPECTIVE JUROR TODD:  My wife works as a corporate

8   investigator, and she actually deals with wrongful

9   termination claims and whatnot.

10          Luckily in her case it is easier because a lot of the

11   employees she works with, pretty much all their actions are

12   either recorded by video or what they are doing on the

13   computer.  So it is fairly easy to see when they're not being

14   as honest as they should be.  But most of the claims tend not

15   to pan out.

16          MS. MARTIN:  Okay.  So honesty is something your wife

17   looks for, true?

18          PROSPECTIVE JUROR TODD:  Yeah.

19          MS. MARTIN:  As a juror, I think -- I don't think I

20   talked to you, Miss Cowan.

21          As a juror, if you personally disagreed with the

22   letter of the law, would you -- would it be difficult for you

23   to follow that law as Her Honor instructs if you are a juror

24   on this case?

25          PROSPECTIVE JUROR COWAN:  Would you repeat that?

1          MS. MARTIN:  I just want to know, Her Honor will read

2     the law to the jury that is seated here.  And you, the

3     jurors, are the fact finders.  You are the finders of fact.

4          And then you apply the law as Her Honor gives it to

5     you to the facts you get in this case.

6          My question is just, if you disagree with the law as

7     Her Honor gives it, would you have any difficulty following

8     it?

9          PROSPECTIVE JUROR COWAN:  No.

10         MS. MARTIN:  Okay.  There are some folks here who

11    work for the state, and I understand that are -- Is there

12    anybody here who works with unionized folks?

13         Okay.  Yes.

14         THE COURT:  You have one more minute.

15         MS. MARTIN:  Okay.  Thank you, Your Honor.

16         Miss Barge?

17         PROSPECTIVE JUROR BARGE:  I am a unionized

18    employee.

19         MS. MARTIN:  Okay.  Do you recognize that there are

20    other employees who aren't unionized and play by a different

21    set of rules?

22         PROSPECTIVE JUROR BARGE:  I don't notice that in

23    state service.  Supervisors are exempt.  I don't see that

24    they play by different rules, if that's what you're asking.

25         MS. MARTIN:  Does everybody understand that employers

72

1   employ employees at will who are nonunion, and that they can

2   terminate for any reason as long as it is not illegal?

3          MR. BOHM:  Your Honor, conditioning.

4          THE COURT:  Sustained.  One more question.

5          MS. MARTIN:  Thank you, Your Honor.

6          MS. MARTIN:  I'm going to say thank you all for your

7   service very much.  It is very much appreciated.

8          Is there anything that anybody feels I need to know

9   before I sit down?

10          No hands.

11          Thank you, Your Honor.

12          THE COURT:  All right.  Let me just ask a few

13  follow-up questions, and then I'm going to ask you all a

14  general question.

15          Miss Farnam, you mentioned a personal opinion

16  regarding breaks.  If I ultimately end up giving you

17  instructions about the law as it applies to breaks, and that

18  law is different from what you personally believe, would you

19  have any problem applying the law as I give it to you?

20          PROSPECTIVE JUROR FARNAM:  I would like to say no, I

21  wouldn't, but yes, I think I would.

22          THE COURT:  All right.  And Miss Plummer, you

23  mentioned -- You made a distinction.  You talked about

24  certain nurses.  And you mentioned that someone was a very

25  good nurse.

73

1          I just wanted to clarify, do you have any

2    preconceptions about nurses as a group?

3          PROSPECTIVE JUROR PLUMMER:  No.  No.  Not at all.

4          THE COURT:  All right.

5          Then Miss Cowan, you mentioned having seen the Sister

6    who is here representing Catholic Healthcare West.  Was that

7    seeing her just across the campus at the convent or did you

8    have any interactions with her?

9          PROSPECTIVE JUROR COWAN:  I say hi to her.  You know,

10   she comes down to the kitchen and I'll say hi to her and talk

11   to her for a minute.

12         THE COURT:  All right.  And that's just general

13   chitchat or talking about your job?

14         PROSPECTIVE JUROR COWAN:  No.

15         THE COURT:  Ever talk about Catholic Healthcare West

16   and the changes going on?

17         PROSPECTIVE JUROR COWAN:  No.

18         THE COURT:  All right.

19         Then let me ask all of you again, based on everything

20   you've heard sitting here, is there anything that makes you

21   think you could not apply the law fairly and find the facts

22   fairly in this case?

23         All right.  We're going to discuss at sidebar with

24   white noise whether or not there are any challenges for

25   cause.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

74

1        During this break please don't begin talking with

2    each other, but if any of you want to stretch, feel free to

3    do that.  I know we've been sitting for a while.  We'll be

4    back in just a few minutes.

5                (Whereupon, the following discussion was held at

6                sidebar.)

7        THE COURT:  Can you hear?

8        Are there challenges for cause?

9        MR. BOHM:  We have a for cause challenge for Kathy

10   Farnam.  I think Your Honor brought it out very well that

11   while she said she would like to think she would follow the

12   law, but then she said she wouldn't.  I think that's an

13   adequate basis.

14       THE COURT:  Miss Martin?

15       MS. MARTIN:  I thought -- I would oppose that.  I

16   think she -- I think that -- I didn't hear her say that so...

17       THE COURT:  Are there any others?

18       MR. BOHM:  Yes, Your Honor.  I didn't want to

19   question Miss Cowan more vigorously and embarrass her,

20   however if this case goes as plaintiff -- according to

21   plaintiff's evidence, there is going to be discussion at the

22   end of the case involving millions of dollars.  And if

23   Miss Cowan has lunch with this Sister every day perhaps --

24       THE COURT:  She does interact with her in a social

25   work setting.

75

1          MR. BOHM:  I need to make sure.  Perhaps we can

2     question her further about whether her relationship with the

3     Sister would not make her feel awkward or inhibited in the

4     jury room.  I would suggest a for cause basis.  Maybe there

5     is another case that Miss Cowan can sit on that doesn't

6     involve -- I also didn't publish that there is a lot of

7     discussion of the Sister of Mercy's policy and procedures.

8     There will be a time --

9          THE COURT:  I understand the objection.

10          THE COURT:  Miss Martin?

11          MS. MARTIN:  You know, probably not the best -- she's

12     probably not the best juror for this case.

13          THE COURT:  All right.  Well, I'm prepared to

14     release Miss Cowan based on her regular interaction she

15     continues to have with the Sister.

16          Miss Farnam also given that she did say, even though

17     she would like to think she could apply the law, she didn't

18     really think she could.  On those grounds I am going to

19     release her.  So I'll call two new people into the box.

20          MR. BOHM:  Thank you, Your Honor.

21             (Sidebar discussion concluded.)

22          THE COURT:  The court, having heard from counsel, I

23     am going to excuse a couple of you, but that's with great

24     thanks for your appearing here this afternoon and

25     participating in the process.

76

1          You will remain on jury duty so the court is

2     confident there will be a jury you can serve on.  Given the

3     particular issues in this case, given what we've heard from

4     you, we need to err on the side of caution and make certain

5     we're seating a juror without any potential question in their

6     mind.

7          So Miss Farnam, given what you articulated, we're

8     going to release you.  Thank you so much for being frank with

9     us and sharing your responses to questions.

10         You should, as you heard earlier, call back Friday

11    after 5:00 p.m.

12         All right.  Thank you again.

13         And Miss Cowan, we are also going to release you.  We

14    think there is another case out there for you, but probably

15    not this one.  So thank you so much for being frank with us

16    and sharing your answers.

17         You also should call back on Friday after 5:00 p.m.

18         We need to call two people into the box.

19         THE CLERK:  Janet Whitmore.

20         That will be position 12.

21         Miss Hinshaw.  Laurie Hinshaw.

22         THE COURT:  All right.  Welcome to the jury box,

23    Miss Whitmore and Miss Hinshaw.

24         Let me ask first, based on all the questions you've

25    heard, I understand you've heard quite a few questions, is

77

1  there any question that you would have answered yes to?

2        We'll start with Miss Whitmore.  There is a mic right

3  here.

4        PROSPECTIVE JUROR WHITMORE:  Thank you.

5        I had to laugh when the attorney asked if she

6  wouldn't want me on her jury duty or up here, and I would

7  have probably thought she wouldn't want me.

8        THE COURT:  Why would you say that?

9        PROSPECTIVE JUROR WHITMORE:  I have been -- My

10  husband was -- His job has sued for breaks and lunch times

11  and won.  I'm pretty pro union.

12        If anything is like that, I would understand the laws

13  and go by them, I have to say that, but it has to be done.  I

14  don't know what all is concerned here, but if it is breaks

15  and lunch, I definitely would back that.

16        THE COURT:  As the statement of the case made clear,

17  that's at least a part of it.

18        You understand as a juror you would sit and see and

19  hear the evidence.  You would ultimately be deciding the

20  facts.  And I would give you the law to apply to the facts.

21        PROSPECTIVE JUROR WHITMORE:  I would definitely do

22  that.

23        THE COURT:  Would you be able to do that given

24  your --

25        PROSPECTIVE JUROR WHITMORE:  Yes.  It was just her

78

1    question.  How she asked it.

2             THE COURT:  The way she phrased it?

3             PROSPECTIVE JUROR WHITMORE:  The way she phrased it I

4    was shaking my head.

5             THE COURT:  Thanks for sharing that.

6             Is there anything else you would have answered yes to

7    before we run through the questions on the sheet on the

8    chair?

9             PROSPECTIVE JUROR WHITMORE:  No.

10            THE COURT:  All right.  What about the answers to

11   the questions there?

12            PROSPECTIVE JUROR WHITMORE:  My name is Janet

13   Whitmore.  I reside in Davis.  That's Yolo County.

14            I am a fifth grade aide at Saint Jame's School.  It

15   is a Catholic school.  I worked for 15 years for Longs as a

16   photo supervisor.  I did not have hiring and firing.  I was

17   mostly ordering, making sure we were covered.

18            Educational background.  I have a bachelor's in

19   international relations.  I don't have military service.

20            I'm married for 22 years.  My husband works for a

21   pipeline, Kinder Morgan Energy Partners.

22            I have two children.  One is using his college fund

23   to go around Europe, and my other is in college.  And I have

24   not gotten to this point in jury duty.

25            THE COURT:  And the child who is in college, what is

79

1    that child studying?

2         PROSPECTIVE JUROR WHITMORE:  This is his first year,

3    and he doesn't know.

4         THE COURT:  All right.  Does the other child have

5    plans besides traveling around Europe?

6         PROSPECTIVE JUROR WHITMORE:  I don't think so.

7         THE COURT:  All right.  Thank you very much.

8         Then Miss Hinshaw, would your answers to any of my

9    questions have been yes?

10        PROSPECTIVE JUROR HINSHAW:  I have been a supervisor.

11   For about a year and a half I worked for Sacramento County.

12   I have dismissed somebody from probation, and I have written

13   people up.

14        THE COURT:  All right.  And in what department were

15   you working?

16        PROSPECTIVE JUROR HINSHAW:  Health and Human

17   Services.

18        THE COURT:  All right.  And any other answers that

19   would have been yes, either to my questions or the attorneys'

20   questions?

21        PROSPECTIVE JUROR HINSHAW:  I have gone to Mercy

22   San Juan, my husband and I both, years ago, but it has been

23   about 12 years ago.  I don't even remember what it was for.

24   It was an emergency room visit, that's all I know, for both

25   of us.

80

1          THE COURT:  All right.  Is there anything about that

2    experience or your interaction with the staff?

3          PROSPECTIVE JUROR HINSHAW:  Average doctor

4    experience.

5          THE COURT:  All right.

6          Nothing makes you think you could not be fair here?

7          PROSPECTIVE JUROR HINSHAW:  No.

8          THE COURT:  Are you still a patient with Mercy or any

9    of the facilities mentioned?

10         PROSPECTIVE JUROR HINSHAW:  No.

11         THE COURT:  All right.  If you could run through the

12   questions on your sheet.

13         PROSPECTIVE JUROR HINSHAW:  My name is Laurie

14   Hinshaw.  I leave in Lincoln, California.

15         I currently am a human services social worker for

16   Sacramento County.  My previous occupations have been

17   hairdresser, and I was a purchasing agent for a mechanical

18   contractor.

19         I have a master's degree in social work.  I have no

20   military service.

21         My husband was in the military but was honorably

22   discharged after four years before we even met.

23         We've been married about close to 20 years.  He's

24   currently unemployed.  I have no children.  And I did serve

25   on a jury for Sacramento County about 12 years ago, and we

81

1   did reach a verdict.

2          THE COURT:  What kind of case was that, civil or

3   criminal?

4          PROSPECTIVE JUROR HINSHAW:  It was a criminal.

5          THE COURT:  All right.  I would give the attorneys

6   each up to three or four minutes if they have any questions

7   for these two jurors -- potential jurors in particular.

8          MR. BOHM:  Thank you, Your Honor.  I'll be brief.

9          To our new jurors in the box, first I'll start with

10  Miss Whitmore.

11         You answered the question in terms of Miss Martin

12  asking if you would want to be there.

13         Here's the question back to you:  Can you promise and

14  assure this court that you will be fair in hearing the

15  evidence in this case?

16         PROSPECTIVE JUROR WHITMORE:  Fair, yes.

17         MR. BOHM:  And you understand that both sides -- you

18  have heard nothing about this case.  They're both on equal

19  footing, correct?

20         PROSPECTIVE JUROR WHITMORE:  Correct.

21         MR. BOHM:  And do you have any feeling different in

22  terms of:  Well, because of what your husband went through,

23  somehow Miss Chopourian should be in the lead because she's

24  here?

25         PROSPECTIVE JUROR WHITMORE:  No.

82

1          MR. BOHM:  Like the judge said, she's going to give

2     you the laws, and the laws are what you have to follow.

3          You saw the juror whose seat you took.  She said

4     maybe I can't.  I'll ask you, can you follow the law as it is

5     given to you by the court in this case?

6          PROSPECTIVE JUROR WHITMORE:  Yes.

7          MR. BOHM:  Miss Hinshaw, I asked a question about

8     sexual comments in the workplace, if anybody had ever worked

9     somewhere where there was sexual comments.

10         Have you ever worked somewhere where there was sexual

11    remarks made?

12         PROSPECTIVE JUROR HINSHAW:  Yes.

13         MR. BOHM:  And how did you feel about that?

14         PROSPECTIVE JUROR HINSHAW:  It was uncomfortable.

15         MR. BOHM:  Do you feel that every workplace should be

16    committed to the elimination of unwelcomed sexual remarks?

17         PROSPECTIVE JUROR HINSHAW:  Yes.

18         MR. BOHM:  Do you feel that surgeons could ever

19    somehow have an exception to the rule about sexual remarks

20    because they're doing important surgeries?

21         MS. MARTIN:  Your Honor, conditioning.

22         THE COURT:  Sustained.

23         MR. BOHM:  I have no further questions, Your Honor.

24         THE COURT:  All right.

25         Miss Martin?

83

1          MS. MARTIN:  Thank you, Your Honor.

2          Miss Whitmore, thank you so much for your honesty.  I

3   really appreciate that, but I'm concerned.  You indicated

4   that your husband had a wage and hour lawsuit and prevailed,

5   right?

6          PROSPECTIVE JUROR WHITMORE:  It wasn't him.  He

7   didn't bring it on.  Yes, he was a part of it because of

8   being an employee.

9          MS. MARTIN:  Gotcha.  Again, I know you've given lots

10  of reassurances to Her Honor and counsel, but in this world

11  we live in, as much as we want to be fair, sometimes it's

12  just too hard and that our biases make it difficult.

13          In other words, that because of your experience my

14  concern is that my client would be starting out behind

15  plaintiff on this issue of the wage and hour.  And that

16  doesn't -- that's not what we're looking for here.

17          So I want to make sure.  Would it be true that really

18  my client would be starting out at a deficit or behind on the

19  issue of wage and hour stuff?

20          PROSPECTIVE JUROR WHITMORE:  Not if they followed the

21  law.  I am for the law.  I am for everybody obeying the law.

22  In this instance of wages and breaks, I am for both employers

23  and employees to follow the law.

24          MS. MARTIN:  That sounds wonderful so I would want

25  you on my jury.

84

1          PROSPECTIVE JUROR WHITMORE:  The way you phrased it,

2     to me, was in the -- maybe I didn't hear you right, but I

3     thought it was not me.  But I am -- I do believe in workplace

4     guarantees, and that's both sides, from the employer and the

5     employee.

6          MS. MARTIN:  Okay.  So in this case you're going to

7     hear Miss Chopourian was a physician's assistant working in

8     open-heart surgeries assisting the heart surgeons.  And that

9     sometimes she was impossible --

10         MR. BOHM:  Objection, Your Honor.  This is

11    conditioning --

12         THE COURT:  Sustained.

13         MR. BOHM:  -- and inappropriate.

14         MS. MARTIN:  Do you feel that -- Let me withdraw

15    that.

16         THE COURT:  This will be the last question.

17         MS. MARTIN:  Thank you, Your Honor.

18         Actually, I think those are all my questions.

19         Thank you, Your Honor.

20         THE COURT:  All right.

21         Let me just follow up with you, Miss Whitmore.

22         Where was the lawsuit filed?  Do you know?  Was that

23    in a court of law?

24         You said your husband was affected by it?

25         PROSPECTIVE JUROR WHITMORE:  Yes.  It went to --

85

1   There was a judgment.  All the employees were back-paid

2   whatever they deserved.

3            THE COURT:  He wasn't a named party?

4            PROSPECTIVE JUROR WHITMORE:  No.

5            THE COURT:  But was it in state court or federal

6   court, do you know?  Or was it an administrative agency?  Do

7   you know that?

8            PROSPECTIVE JUROR WHITMORE:  No, I don't know that.

9            THE COURT:  All right.  But are you saying you could

10  find the facts fairly and apply the law fairly as I give it

11  to you?

12           PROSPECTIVE JUROR WHITMORE:  Yes.

13           THE COURT:  All right.

14           We're going to convene again at sidebar.  Please be

15  patient with us for a few more minutes.

16           If you want to stand and stretch, please feel free.

17  Do not discuss the case at all yet.

18                (Whereupon, the following discussion was held at

19                 sidebar.)

20           THE COURT:  All right.  Miss Martin is challenging

21  Miss Whitmore.

22           MS. MARTIN:  I mean, Your Honor, even though she said

23  she would try to be impartial, if you listen to the text of

24  her responses, it is pretty clear she comes with a pretty

25  hard bias.

86

1          THE COURT:  Mr. Bohm?

2          MR. BOHM:  Miss Whitmore affirmatively, over and over

3     again, said she could be fair, she can follow the law.

4          Counsel has kept challenges that I'm sure she can

5     use.  There is just no indicated reason why she would have to

6     be dismissed for cause.

7          THE COURT:  I'm not doing this just to speed things

8     along.  I think she did clarify in her own words what she saw

9     her task being.  And given the way she described her job as

10    treating everyone equally, I'm not prepared to grant for

11    cause.  So that request is denied.  So we will pass the

12    strike sheet.

13         MR. BOHM:  Yes, Your Honor.

14         MS. MARTIN:  Thank you.

15              (Sidebar discussion concluded.)

16         THE COURT:  Ladies and Gentlemen of the Jury Panel,

17    counsel is now going to exercise their peremptory strikes so

18    I'll ask Miss Schultz to provide them with the strike sheet

19    for that purpose.

20         While they do that, I am prepared to give you a short

21    break.  If you would like to go into the hall, Miss Schultz

22    could lead you there, and then we'll call you back once

23    they're ready.

24         So all of you can be excused.  Please do not discuss

25    the case.  You may talk amongst yourselves, but don't talk

87

1    about anything that might possibly relate to the case.

2            Please be ready to be called back in, I would say,

3    within five to ten minutes.  So we'll see you then.  Have a

4    good break.

5            That would apply to those of you -- if you can

6    continue to wait, we need you to wait until we're done with

7    the process.  I will let you know as soon as we have seated a

8    jury.

9            (Potential jurors excused at 3:28 p.m.)

10           (Back on the record at 3:45 p.m.)

11           THE CLERK:  Come to order.  Court is back in session.

12           THE COURT:  All right.  Counsel has the strike sheet.

13           (Handed to court for review.)

14           All right.  We have a jury of eight.  We're going to

15   call the jury panel back into the room, and I will call

16   people up from the audience today.  So then we'll have our

17   seated jury.

18           I'll read the preliminary instructions.  At this

19   point, given that I promised them a 4:30 adjournment, I don't

20   see how we can get through an opening even with my -- even if

21   we had only one opening.  So at this point we will start at

22   9:00 a.m. with opening.

23           MR. BOHM:  Yes, Your Honor.  Thank you.

24           THE COURT:  All right.

25           (Brief pause.  Jury pool brought back in and seated.)

88

1          THE CLERK:  All right.  You may all be seated.

2          Welcome back, Ladies and Gentlemen of the Jury Panel.

3     The parties have exercised their peremptory strikes, and we

4     now know the eight persons who will serve on this jury.

5          I'm going to call you up, and Miss Schultz will

6     direct you to your seat.  So this is the jury that will hear

7     this case.

8          Victoria McGregor.

9          Miss McGregor, if you could come forward please.

10         Cathleen Dinubilo.

11         Beverly Plummer.

12         Laurie Hinshaw.

13         Barbara Stryker.

14         Juanita Zeller.

15         Wendy Stokes.

16         And Jesse McLean.

17         Let's make certain we have those people seated in the

18    box and we can count to eight.

19         (Jury panel seated.)

20         All right.  We'll come to the jury box, Ladies and

21    Gentlemen of the Jury.  Because we now have seated a jury,

22    I'm going to excuse all of you now seated in the audience

23    portion of the courtroom with my greatest thanks for your

24    participation in this very important part of the trial, the

25    jury selection process.

89

1       The court appreciates your appearing and

2  participating today even if we did not hear from you.

3       To all of you who have not been selected for this

4  jury, please realize you should call back on Friday after

5  5:00 p.m. for further direction at that time.

6       Have a good rest of the day.  You are excused.

7       MR. BOHM:  Your Honor, one of the jurors says he has

8  an item in the box.

9       THE COURT:  You can come forward and help us locate

10  that or Miss Schultz can help you.

11       (Item retrieved.)

12       All right.

13       Now that you have been selected, Ladies and Gentlemen

14  of the Jury, Miss Schultz is going to administer the oath

15  that is administered to people who are actually selected to

16  serve on juries.

17       THE CLERK:  Please, stand and raise your right hand.

18       (Whereupon, the oath was administered.)

19       THE CLERK:  Thank you.  You may be seated.

20       THE COURT:  And now Ladies and Gentlemen of the Jury,

21  it is my job to read you some preliminary jury instructions

22  which may take ten minutes or so, just to help you get

23  oriented, and then I'm going to excuse you a little bit early

24  this evening.

25       We don't have time yet for opening statements, but

90

1    when we come back at 9:00 you'll hear the opening

2    statements.

3            So these are my preliminary instructions, and it is

4    my duty to instruct you on the law as we begin this trial.

5            It is your duty to find the facts from all the

6    evidence in the case.  You, and you alone, are the judges of

7    the facts.  You will hear the evidence, decide what the facts

8    are, and then apply those facts to the law which I will give

9    to you.

10           This is how you will reach your verdict ultimately.

11           You must follow the law as I give it to you whether

12   you agree with it or not.  And you must not be influenced by

13   any personal likes or dislikes, opinions, prejudices or

14   sympathy.

15           That means that you must decide the case solely on

16   the evidence before you.  The evidence will consist of the

17   testimony of witnesses, documents and other things received

18   into evidence as exhibits, and any facts on which the lawyers

19   agree or which I may instruct you to accept.

20           You must not infer from these instructions or from

21   anything I may say or do as indicating that I have an opinion

22   regarding the evidence or what your verdict should be.

23           In following my instructions, you must follow all of

24   them and not single out some and ignore others.  They are all

25   important.

91

1        During the trial you may hear me use a few terms you
2   may not have heard before.  I will briefly explain some of
3   the most common to you.
4        A party who has brought suit claiming the person sued
5   violated federal state law is called the plaintiff.
6        In this action, as you heard already today, the
7   plaintiff is Ani Chopourian.
8        The party being sued is called the defendant.  The
9   defendant in this case is Catholic Healthcare West, formerly
10  known as Dignity Health.
11       I mean currently known as Dignity Health.
12       Plaintiff is represented by Lawrance Bohm, Erika
13  Gaspar and Gregory Davenport.
14       Defendant is represented by David Ditora and Judith
15  Martin.
16       The attorneys representing the parties in this case
17  are not allowed to speak with you.  When you see the
18  attorneys, if you do at a recess or pass them in the halls
19  and they do not speak to you, they are not being rude or
20  unfriendly.  They are simply following the law.
21       You will sometimes hear me refer to "counsel."
22  "Counsel" is just another way of saying lawyers or attorneys.
23  I will sometimes refer to myself as "the court."
24       To help you follow the evidence, I will review again
25  that brief summary of the positions of the parties.

92

1          (Reading:)

2          Plaintiff, Ani Chopourian, worked as a surgical

3   physician's assistant for two years in the cardiac surgery

4   department of Mercy General Hospital until her termination on

5   August 7th, 2008.

6          Mercy General Hospital is owned and operated by

7   defendant Catholic Healthcare West, now identified as Dignity

8   Health.

9          Plaintiff claims that during her employment she was

10  subjected to demeaning and derogatory comments and action

11  because of her gender and witnessed derogatory and sex-based

12  behavior toward women generally, all of which interfered with

13  her work performance.

14         She also claims she was not provided with meal and

15  rest breaks as provided for by law.

16         In addition, she claims she was wrongfully terminated

17  from her employment for illegal reasons which include her

18  complaints about sexual harassment and discrimination and

19  complaints about patient safety, as well as her refusal to

20  violate the law concerning meal and rest breaks or the laws

21  concerning patient safety.

22         Plaintiff also claims defendant has actively

23  prevented plaintiff from obtaining and holding replacement

24  employment by publication of defamatory remarks.

25         Plaintiff seeks compensation for all harm caused by

93

1   defendant, including lost wages, benefits, emotional distress

2   and punitive damages.

3          Defendant denies that plaintiff was discriminated

4   against because of her gender or subjected to a hostile

5   working environment.

6          Defendant also claims that it took appropriate steps

7   to stop any demeaning behavior when it learned of any.

8          Defendant further claims that plaintiff's termination

9   was proper and not the result of any of plaintiff's

10  complaints.

11         Finally, defendant denies making defamatory comments

12  about plaintiff or interfering with her attempts to seek new

13  employment.

14         (Reading concluded.)

15         Plaintiff has the burden of proving her claims.  She

16  must prove her claims by a preponderance of the evidence.

17         Defendant has the burden of proof on affirmative

18  defenses and must prove them by a preponderance of the

19  evidence.

20         When a party has the burden of proof on any claim by

21  a preponderance of the evidence, it means you must be

22  persuaded by the evidence that the claim is more probably

23  true than not true.

24         You should base your decision on all of the evidence

25  regardless of which party presents it.

94

1       The evidence you are to consider in deciding what the

2   facts are consists of the following.

3       Number one, the sworn testimony of any witness;

4   number two, exhibits received into evidence; and number

5   three, any facts to which the parties have agreed.

6       There are Rules of Evidence that control what can be

7   received into evidence.  From time to time during the trial I

8   may make rulings on objections or motions made by the

9   lawyers.

10      When I sustain an objection, I am excluding that

11  evidence from this trial.  If I sustain or uphold an

12  objection to a question that goes unanswered by the witness,

13  you should not draw any inferences or conclusions from the

14  question.  You must ignore the question and must not guess

15  what the answer might have been.

16      When I overrule an objection, I am permitting that

17  evidence to be admitted.

18      Sometimes I may order that evidence be stricken from

19  the record and that you disregard or ignore the evidence.

20  That means that when you are deciding the case, you must not

21  consider the evidence that I tell you to disregard.

22      It is counsel's duty to object when the other side

23  offers testimony or other evidence that they believe is not

24  admissible.  You should not be unfair or prejudiced against

25  either party because they make objections.

95

1          You should not infer or conclude from any ruling or

2     other comment I may make that I have any opinion on the

3     merits of the case favoring one side or the other.  I do not

4     favor one side or the other.

5          In reaching your verdict you may consider only the

6     testimony and exhibits again received into evidence.  Certain

7     things are not evidence, and you may not consider them in

8     deciding what the facts are.

9          I will list them for you.

10         Number one, arguments and non-testimonial statements

11    by counsel for either party are not evidence.  Counsel for

12    the parties are not witnesses.  What they say in their

13    opening statements, will say in their closing arguments, at

14    other times, is intended to help you interpret the evidence

15    but is not evidence.

16         If the facts as you remember them differ from the way

17    counsel states them, your memory of the facts controls.

18         Two, questions and objections by counsel for either

19    party are not evidence.

20         Number three, testimony that has been excluded or

21    stricken or that you have been instructed to disregard is not

22    evidence and must not be considered.

23         In addition, sometimes testimony and exhibits are

24    received only for a limited purpose.  When I instruct you

25    that an item of evidence will be or has been admitted for

96

1    limited purpose, you must consider it only for that limit

2    purpose and for no other.

3          And fourth, anything that you may have seen or heard

4    or you see or hear when court is not in session is not

5    evidence.  You are to decide the case solely on the evidence

6    to be received here at trial.

7          Now, evidence may be direct or circumstantial.

8    Direct evidence is direct proof of a fact such as testimony

9    by a witness about what that witness personally saw or heard

10   or did.

11         Circumstantial evidence is proof of one or more facts

12   from which you can find another fact.  You should consider

13   both kinds of evidence.

14         The law makes no distinction between the weight to be

15   given to either direct or circumstantial evidence.  It is for

16   you to decide how much weight to give to any evidence.

17         By way of example, if you wake up in the morning and

18   see the sidewalk is wet, you may find from that fact that it

19   rained during the night.

20         However, other evidence, such as a turned-on garden

21   hose, may provide a different explanation for the presence of

22   water on the sidewalk.

23         Therefore, before you decide that a fact has been

24   proved by circumstantial evidence, you must consider all the

25   evidence in the light of reason, experience and common sense.

97

1          In deciding the facts in this case you may have to
2    decide which testimony to believe and which testimony not to
3    believe.  You may believe everything a witness says or part
4    of it or none of it.

5          Proof of a fact does not necessarily depend on the
6    number of witnesses who testify about it.  In considering the
7    testimony of any witness you may take into account the
8    following.

9          Number 1.  The opportunity and ability of the witness
10   to see or hear or know the things testified to;

11         Number 2.  The witness' memory;

12         Number 3.  The witness's manner while testifying;

13         Number 4.  The witness's interest in the outcome of
14   the case and any bias or prejudice;

15         Number 5.  Whether other evidence contradicted the
16   witness's testimony;

17         Number 6.  The reasonableness of the witness's
18   testimony in light of all of the evidence;

19         Number 7.  Any other factors that bear on
20   believability.

21         The weight of the evidence as to a fact does not
22   necessarily depend on the number of witnesses who testify
23   about it.  The test, again, is not which side brings the
24   greater number of witnesses or takes the most time to present
25   its evidence, but which witnesses and which evidence appeal

98

1  to your minds as being most accurate and otherwise

2  trustworthy.

3        A witness may be discredited or impeached by evidence

4  that is contradictory or that shows at some other time the

5  witness has said or done something or failed to say or do

6  something which is inconsistent with the witness's present

7  testimony.

8        As I have already instructed you, it is up to you to

9  decide which testimony to believe and which testimony not to

10 believe.  You may believe everything a witness says or part

11 of it or none of it.

12       From time to time during the trial it may become

13 necessary for me to talk with the attorneys out of the

14 hearing of the jury either by having a conference at the

15 bench when the jury is present, when you're sitting here, or

16 by calling a recess.

17       Please understand that while you are waiting, we are

18 working.  The purpose of any conference is not to keep

19 relevant information from you, but to decide how certain

20 evidence is to be treated under the Rules of Evidence and to

21 avoid confusion and error.

22       Of course we will do what we can to keep the number

23 and length of any conferences to a minimum.  I may not always

24 grant a request for a conference.  Do not consider my

25 granting or denying a request for a conference as any

99

1    indication of my opinion of the case or what your verdict

2    should be.

3           At the end of the trial, you will have to make your

4    decision based on what you recall of the evidence.  You will

5    not have a transcript of the trial.  Therefore, I urge you to

6    pay close attention to the testimony as it comes in.

7           Are you okay, Miss Plummer?

8           JUROR PLUMMER:  Yes.

9           THE COURT:  Do you want water?

10          JUROR PLUMMER:  No.

11          THE COURT:  If at any time you cannot hear the

12   testimony, see or hear the evidence, hear questions or

13   arguments, see any of the witnesses or evidence, let me know

14   so that I can correct the problem.  And let me know

15   immediately.  Raise a hand or speak out if that is

16   happening.

17          If you wish, you will be able to take notes to help

18   you remember the evidence.  If you do take notes, please keep

19   them to yourself until you and your fellow jurors go to the

20   jury room to decide the case.  Do not let note taking

21   distract you.

22          When you leave the room, your notes should be left

23   here on your chairs.  And we'll provide notebooks for you to

24   use for notes starting in the morning.  No one will read your

25   notes.  They will be destroyed at the conclusion of the

100

1    case.

2          Whether or not you take notes, you should rely on

3    your memory of the evidence.  Notes are only to assist your

4    memory.  You should not be overly influenced by your notes or

5    those of your fellow jurors.

6          Now, just a few words about your conduct as jurors.

7    First, of course, keep an open mind throughout the trial and

8    do not decide what the verdict should be until you and your

9    fellow jurors have completed your deliberations at the end of

10    the case.

11          Second, because you must decide this case based only

12    on the evidence received in the case and on my instructions

13    as to the law that applies, you must not be exposed to any

14    other information about the case or to the issues it involves

15    during the course of your jury duty.

16          Therefore, until the end of the case, or unless I

17    tell you otherwise, these are fundamental ground rules.  I'll

18    refer to them as we proceed throughout trial.

19          Do not communicate with anyone in any way and do not

20    let anyone else communicate with you in any way about the

21    merits of the case or anything to do with it.

22          This includes discussing the case in person, in

23    writing, by phone or electronic means, via email, text

24    messaging or any Internet chat room, blog, website other

25    feature.

1      This applies to communicating with your fellow jurors

2  until I give you the case for deliberations, and it also

3  applies to communicating with everyone else, including your

4  family members, your friends, your employers, the media or

5  press and people involved in the trial.

6      You may, however, notify your family and your

7  employer, if you have one, that you have been seated as a

8  juror in this case.

9      But if you are asked or approached in any way about

10  your jury service or anything about this case, you must

11  respond that you have been ordered not to discuss the matter

12  and to report that contact to me.  You can do that by giving

13  a note to Miss Schultz.

14      Again, because you will receive all of the evidence

15  and legal instruction you properly may consider under the law

16  to return a verdict, do not read, watch or listen to any news

17  or media accounts or commentary about the case or anything to

18  do with it.

19      Do not do any research such as consulting

20  dictionaries, searching the Internet, or using other

21  reference materials.  Do not make any investigation or in any

22  other way try to learn about the case on your own.

23      Third, as I said, if you need to communicate with me,

24  simply give a signed note to the clerk to give to me.

25      Fourth, do not make up your mind about what the

102

1   verdict should be until after you have gone to the jury room

2   to decide the case and you and your fellow jurors have

3   discussed the evidence.  Keep an open mind until then.

4        The law requires these restrictions to ensure that

5   the parties have a fair trial based on the same evidence that

6   each party has an opportunity to address.

7        A juror who violates these restrictions would

8   jeopardize the fairness of the proceedings and that could

9   result in a mistrial, meaning there would have to be a new

10   trial.

11        If any juror is exposed to any outside information,

12   yourself, or you become aware of another juror being so

13   exposed, please notify me immediately.

14        Now the next phase of trial will begin first thing

15   tomorrow morning.  Each side may make an opening statement.

16   An opening statement is not evidence.  It is simply an

17   outline to help you understand what that party expects the

18   evidence will show.  A party is not required to make an

19   opening statement.

20        Plaintiff's counsel then will present evidence, and

21   counsel for the defendant may cross-examine.  Then

22   defendant's counsel may present evidence, and counsel for

23   plaintiff may cross-examine.

24        After the evidence has been presented, I will

25   instruct you on the law that applies to the case and the

103

1   attorneys will make closing arguments.  After that, then, and

2   only then, will you go to the jury room to deliberate on your

3   verdict.

4          Now, as we come to close of today we're about to take

5   our first break.  I just read for you the instructions on not

6   doing any research, not talking to anyone about the case,

7   please keep those in mind that you should not begin to think

8   about the conclusion of the case, you may tell your family

9   and employer that you have been selected to sit as a juror,

10  but say nothing else about the case.

11         Don't begin talking about it amongst yourselves

12  either, although you may, of course, talk about other things.

13         And if anyone approaches you, you become aware of any

14  juror being approached over the break this evening or first

15  thing tomorrow morning, please let me know immediately.

16         With that Ladies and Gentlemen of the Jury,

17  Miss Schultz will escort you to the jury room and let you

18  know how you can check in tomorrow morning.

19         If you can, be here in time to start promptly at 9:00

20  a.m.  That is the court's request.

21         Thank you for your service today.  Thank you in

22  advance for your service on this jury.  We'll see you

23  tomorrow morning.

24         THE CLERK:  Please follow me into the courtroom.

25         (Jury excused at 4:20 p.m.)

104

```
 1           THE COURT:  You may be seated.
 2           All right.  Just a few minor issues.  I'm not going
 3    to go into depth on any of the still pending motions.
 4           Is the agreed-upon stipulated exhibit list still
 5    good?
 6           MR. BOHM:  The joint trial exhibit list should still
 7    be good, Your Honor.
 8           MR. DITORA:  Did you have a chance to modify it?
 9           MR. BOHM:  After we talked?
10           MR. DITORA:  Yes.
11           THE COURT:  So give to Miss Schultz by tomorrow
12    morning the final -- the current version of the stipulated
13    trial list so I have that in front of me.
14           On the motion to preclude reference to the first
15    trial or mistrial, just for now my instruction is to not
16    reference the fact there has been a prior mistrial.
17           I think some of the testimony could be used, but we
18    can cross that bridge when we come to it.
19           On defendant's motion to quash, plaintiff indicates
20    it's still awaiting for a stipulation as to how the
21    information produced at Miss Chopourian's deposition got to
22    the MEC.  Defense was going to propose stipulation?
23           MS. MARTIN:  Your Honor, I have not done that yet.  I
24    will work on that this evening.
25           THE COURT:  All right.
```

105

1          Anything else?

2          MR. BOHM:  Yes, Your Honor.  I want to touch on the

3   complicated legal issue that came about last trial just so we

4   can get ahead of this, in terms of whether or not Catholic

5   Healthcare West waived its attorney-client privilege during

6   the colloquy that occurred with Miss Earle, et cetera.

7          I have had a chance, at least as to that narrow legal

8   issue, of whether or not a lawyer can waive the privilege for

9   its client.  I have found legal authority that addresses that

10  that confirms, yes, a lawyer can waive the privilege for a

11  client.

12         I've been a little busy for briefing, but I have

13  citations directly on point for the court.

14         Drimmer versus Appleton, 628 F.Supp. 1249.  That is a

15  1986 case.  And then Hollins versus Powell.  That's 773 F.2d

16  191.  That's a 1985 case.

17         And I do intend, depending on where we go -- I wanted

18  to start with this because this seemed the easiest way to

19  deal with the issue, rather than focusing on even whether or

20  not the statement was privileged, just focusing on the fact

21  that it was waived.

22         THE COURT:  This is focusing on the limited testimony

23  that came in after Miss Martin said during trial she

24  absolutely waived the objection.

25         MR. BOHM:  Yes.  Then I'm also not clear, Your Honor,

1   and I'll do even more research, but cases are clear in terms

2   of the waiver of a privilege carrying from one proceeding to

3   the next proceeding.

4        And I intend to probably very late tonight get a

5   supplemental brief in terms of the authorities, including

6   these and any others I'm able to dig up, on this particular

7   topic, Your Honor.

8        But I will make it known to the court, although it

9   won't be discussed in any form or fashion during opening or

10  until the court approves otherwise, it is very much the

11  plaintiff's position in this case that several times over the

12  attorney-client privilege as to that communication was

13  waived.

14       THE COURT:  As to "that communication"?  What

15  communication are you referring to?

16       MR. BOHM:  The colloquy -- All the discussion with

17  Frances Earle about what she spoke to Miss Martin about.

18       THE COURT:  In June of 2011?  What's the year?

19       MR. BOHM:  It was after the EEOC was filed, the

20  complaint was filed as Miss Martin testified to.  That's the

21  timing of the discussion.

22       THE COURT:  Do you have additional information --

23  evidence for the court to consider in that regard or you're

24  saying the case law clarifies?

25       MR. BOHM:  The court's analysis, as I understood it

1    at the time, was based on the lack of clarity as to whether

2    or not Miss Martin even had the authority to waive the

3    attorney-client communication.  That was a sticking point for

4    the court, and understandably so.  We do not want somebody

5    waiving a privilege who didn't intend it or hadn't had it

6    implied by conduct.

7         THE COURT:  Again, for clarification, you are talking

8    about not what happened in court last week?  You are talking

9    about the interview of Miss Earle?

10        MR. BOHM:  Well --

11        THE COURT:  Are you talking about both?

12        MR. BOHM:  The interview with Miss Earle in some

13   sense happened last week in court in terms of her discussing

14   what she spoke to Miss Martin about and how the discussion

15   went, so yes.

16        THE COURT:  You're talking about the waiver

17   currently.  Which waiver are you're talking about?

18        MR. BOHM:  I'm talking about when initially

19   Miss Martin objected to that line of questioning as

20   attorney-client privilege, and then corrected herself to say

21   no, she does not object, and then explored the question and

22   answer more thoroughly even in her cross-examination.

23        And then I just want to add to this that the initial

24   mistrial basis was because allegedly Miss Earle engaged in

25   some kind of witness misconduct.

1       THE COURT:  But the court did not grant a motion -- a

2   finding that Miss Earle engaged in any kind of misconduct so

3   that's clear.

4       MR. BOHM:  Yes.

5       THE COURT:  Based on her testimony and Miss Martin's

6   testimony, the court could only conclude that Miss Martin was

7   serving as advice counsel at the time looking at Upjohn and

8   Admiral.  That's the sole basis for the court's decision.

9       MR. BOHM:  I have not -- In presenting these cases,

10  I'm not even addressing that.  I'm trying to keep it simpler

11  because we all saw the waiver in court.  And the --

12      THE COURT:  So you're talking only about the waiver

13  and what occurred after that waiver in the trial proceedings

14  last week?

15      MR. BOHM:  I think a ruling on whether or not

16  Miss Martin had the authority and did actually waive

17  attorney-client privilege will certainly help streamline the

18  issue because there are exceptions to the waiver which may or

19  may not apply in this case.

20      THE COURT:  I'll address that in the morning then.

21      MR. BOHM:  Thank you, Your Honor.

22      THE COURT:  Mr. Ditora.

23      MR. DITORA:  Sorry, Your Honor.

24      We did file a short brief.  I wanted to add one

25  concept to that on this issue, that these issues were decided

109

1   by the court.  And under the law of the case, as I understand

2   it, the court's generally precluded from reconsidering an

3   issue that's already been decided absent some type of

4   intervening change in the law or unless the first decision

5   was clearly erroneous or some other changed circumstance

6   which does not exist here.

7           I've got some citations on that if court is

8   interested?

9           THE COURT:  How many citations?

10          MR. DITORA:  Two.  U.S. v. Alexander 106 F.3d, 874,

11  876.  And Thomas v. Bible, 983 F.2d, 152, 154.

12          It's our position that the issue of the existence of

13  the privilege and the issue of waiver was -- were among the

14  issues in dispute on the motion for mistrial and that the law

15  of the case would prevent reconsideration of those issues.

16          THE COURT:  Well, the court's recollection is that I

17  made a decision based on a finding that Miss Martin was

18  acting as advice counsel when she interviewed Miss Earle

19  prior to trial.  And that for that reason the client had a

20  privilege, that it was not Miss Earle's privilege to decide

21  whether or not to waive so the client privilege applied to

22  that interview.  Again, given the record supporting the

23  conclusion that Miss Martin was acting as advice counsel.

24          That is the court's recollection of the basis for its

25  decision, and that's the decision it made.  If I need to,

110

1    I'll check the transcript again.

2         MR. BOHM:  Which, Your Honor, in researching this I

3    have given deference to that opinion of the court.  I'm

4    dealing with that as though it was a fact, and I'm dealing

5    instead with the waiver of the privilege as found by the

6    court.  That's the authority I provided.

7         THE COURT:  I'm clear on that now, and I'm going

8    to -- I'll let you know in the morning.

9         Anything else?

10        MR. DITORA:  I do have one matter.  On Friday

11   plaintiff served a subpoena on a witness who's on the

12   schedule for tomorrow morning, Oreste Rijo Vasquez.

13        It's my understanding that Mr. Vasquez was not listed

14   in their Rule 26 disclosure.  I know he was not listed in

15   their witness list or any supplemental witness list or even

16   in the trial schedule that plaintiffs provided last week.

17        THE COURT:  Is he on the defense witness list?

18        MR. DITORA:  No.

19        He is a current employee and was just subpoenaed, and

20   it is highly improper.

21        Plaintiffs have known about the existence of this

22   witness for quite some time, and it's highly prejudicial.  We

23   have no time whatsoever to prepare for this.

24        THE COURT:  I recall hearing that name last week.

25        MR. DITORA:  I'll tell you, the plaintiff has been

111

1    aware of it.  It's not our witness.

2         THE COURT:  Well, what's your response to that,

3    Mr. Bohm?

4         MR. BOHM:  Your Honor, in discussion with Miss Merlo,

5    in response to the defendant's contention that Miss Merlo was

6    not an appropriate witness, I thoroughly interviewed

7    Miss Merlo about the testimony that came out.

8         I will also notice that this individual is on the

9    defendant's witness list, which is actually -- the pretrial

10   witness list, which is Document Number 77, lists Oreste Rijo

11   Vasquez on page 3 of that.  So it is absolutely disingenuous

12   for defense to -- there is no --

13        THE COURT:  Let's not make any ad hominem remarks.

14        What's the page of the Pretrial Order?

15        MR. BOHM:  Of the Pretrial Order?

16        Sorry, Your Honor.  I'm going off document number --

17   Let me confirm.

18        I will confirm more definitively, Your Honor, but I

19   know for a fact looking at this document that on a document

20   entitled Defendant's Updated Witness List and Estimated Times

21   for Direct Examination filed on January 26th, 2012, after the

22   start of the -- or right before the start of the last trial,

23   Mr. Vasquez was indicated on that document on page 3 of 4.

24        THE COURT:  What's the docket number for that?

25        MR. BOHM:  The document number is 77, your Honor.

112

1          THE COURT:  Filed in January of 2012?

2          MR. BOHM:  Yes.  I'm sorry.  I'm sorry.  It is

3     October 5th, 2011.  That's the one that shows Mr. Vasquez on

4     it.

5          I also would note --

6          THE COURT:  The Pretrial Order says plaintiff intends

7     to call the witnesses listed on Docket Number 77.  You're

8     saying that's the defendant's witness list?

9          MR. BOHM:  I'm looking at the defendant's witness

10    list.  I identified it as Docket Number 77, Your Honor.

11         THE COURT:  All right.  I'll check.

12         MR. BOHM:  Ours was 76.

13         THE COURT:  All right.  I'll check.

14         MR. DITORA:  I do believe there have been subsequent

15    witness lists filed.  I don't have them in front of me.

16         I found out about this this morning.  This was served

17    on Friday.  Again, plaintiff has known about this witness,

18    and in fact mentions this witness in one of her journal pages

19    and accuses him of harassing her.

20         I think we were entitled to rely on the fact that

21    plaintiff was not -- That's Exhibit 180 at page 854.  And I

22    think we were entitled to rely on the fact that they were not

23    intending to call this witness.

24         It is highly prejudicial, especially if this witness

25    is going to be one of the first to testify tomorrow morning.

113

1          MR. BOHM:  I will still be ordering, Your Honor.  We

2     would be willing to take him the day after tomorrow if that

3     gives them additional time.

4          We intend to be with this witness 15 minutes or less.

5     And we're confirming it, but will arrive with an indication,

6     although I believe he was on the defendant's initial

7     disclosures in this case, in addition to being on the witness

8     list, Your Honor.

9          MR. DITORA:  One more, Your Honor.  Document Number

10    197, I believe, is our witness list which does not contain

11    his name.

12          THE COURT:  All right.

13          See you at 8:30 in the morning.

14          MS. MARTIN:  Thank you, Your Honor.

15          MR. BOHM:  Thank you.

16          (Off the record at 4:35 p.m.)

17                         ---o0o---

18

19

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2                             ---o0o---

3
    STATE OF CALIFORNIA  )
4   COUNTY OF SACRAMENTO )

5

6
            I certify that the foregoing is a correct transcript
7
    from the record of proceedings in the above-entitled matter.
8

9

10               IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, California.
11

12

13   /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
14        Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25