

RAYMOND A. CARDOZO, STATE BAR NO. 173263
rcardozo@reedsmith.com
MARGARET A. GRIGNON, STATE BAR NO. 76621
mgrignon@reedsmith.com
PAUL D. FOGEL, STATE BAR NO. 70859
pfogel@reedsmith.com
**REED SMITH LLP**
101 Second Street, Ste. 1800
San Francisco, CA 94105
Telephone: (415) 543-8700
Facsimile: (415) 391-8269

JUDITH CLARK MARTIN, STATE BAR NO. 173557
MARY E. "MOLLY" GREENE, STATE BAR NO. 186205
**LA FOLLETTE, JOHNSON,**
**DE HAAS, FESLER & AMES**
655 University Avenue, Suite 119
Sacramento, California 95825
Phone: (916) 563-3100
Facsimile: (916) 565-3704
Email: JCMartin@ljdfa.com
Email: RWestfall@ljdfa.com

Attorneys for Defendant,
CATHOLIC HEALTHCARE WEST dba
MERCY GENERAL HOSPITAL (erroneously
sued and served herein as CATHOLIC HEALTHCARE
WEST and MERCY GENERAL HOSPITAL)

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ANI CHOPOURIAN,

Plaintiff,

v.

CATHOLIC HEALTHCARE WEST, MERCY GENERAL HOSPITAL, AND DOES 1 through 20, inclusive,

Defendants.

CASE NO. 2:09-CV-02972-KJM-KJN

**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW**

**[DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES ATTACHED]**

**[FILED CONCURRENTLY WITH DECLARATION OF RAYMOND A. CARDOZO AND APPENDIX]**

**Date: September 28, 2012**
**Time: 11:00 a.m.**
**Courtroom 3**
**The Honorable Kimberly J. Mueller**

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on September 28, 2012, at 11 a.m., or as soon as the matter can be heard by the Honorable Kimberly J. Mueller in Courtroom 3 of the above-entitled Court, located at 501 I Street, Sacramento, CA 95814, Defendant Catholic Healthcare West dba Mercy General Hospital will, and hereby does, move the Court for partial judgment as a matter of law.

This Motion is made pursuant to Federal Rule of Civil Procedure 50(b), and seeks partial judgment as a matter of law on the following claims:

1. JMOL is warranted on the intentional interference claim because plaintiff failed to prove CHW engaged in the wrongful conduct and plaintiff agreed to immunize it from such claims;

2. JMOL is warranted on the defamation claim because CHW made no false statements to prospective employers or medical privileging committees, plaintiff agreed to immunize CHW from such claims, and the challenged statements made internally were nonactionable opinion, did not have a natural tendency to injure, or were not made with the requisite ill will or hatred to defeat the common interest privilege;

3. JMOL is warranted on all the state-based punitive damages claims because plaintiff failed to prove that an officer, director, or managing agent authorized or ratified the conduct at issue;

4. JMOL is warranted on all the state-based punitive damages claims because plaintiff failed to establish CHW's financial condition;

The Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the concurrently filed Declaration of Raymond A. Cardozo and Appendix, all the records and documents on file in this matter and all evidence presented at trial in this action, and any oral or documentary evidence presented at the hearing of this Motion.

Dated: May 29, 2012.

Respectfully submitted,
LA FOLLETTE, JOHNSON,
DE HAAS, FESLER & AMES

REED SMITH LLP

By: /s/ Raymond A. Cardozo
RAYMOND A. CARDOZO
Attorneys for Defendant

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2012, I am electronically filing the **DEFENDANT'S NOTICE OF MOTION AND MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW** with the Clerk of the Court of the United States District Court for the Eastern District of California by using the District's CM/ECF system.

All participants in this case are registered CM/ECF users and will be served by the District's CM/ECF system.

Dated: May 29, 2012

By /s/ Raymond A. Cardozo
Raymond A. Cardozo

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

RAYMOND A. CARDOZO, STATE BAR NO. 173263
rcardozo@reedsmith.com
MARGARET A. GRIGNON, STATE BAR NO. 76621
mgrignon@reedsmith.com
PAUL D. FOGEL, STATE BAR NO. 70859
pfogel@reedsmith.com
**REED SMITH LLP**
101 Second Street, Ste. 1800
San Francisco, CA 94105
Telephone: (415) 543-8700
Facsimile: (415) 391-8269

JUDITH CLARK MARTIN, STATE BAR NO. 173557
MARY E. "MOLLY" GREENE, STATE BAR NO. 186205
**LA FOLLETTE, JOHNSON,**
**DE HAAS, FESLER & AMES**
655 University Avenue, Suite 119
Sacramento, California 95825
Phone: (916) 563-3100
Facsimile: (916) 565-3704
Email: JCMartin@ljdfa.com
Email: RWestfall@ljdfa.com

Attorneys for Defendant,
CATHOLIC HEALTHCARE WEST dba
MERCY GENERAL HOSPITAL (erroneously
sued and served herein as CATHOLIC HEALTHCARE
WEST and MERCY GENERAL HOSPITAL)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ANI CHOPOURIAN,

Plaintiff,

v.

CATHOLIC HEALTHCARE WEST, MERCY GENERAL HOSPITAL, AND DOES 1 through 20, inclusive,

Defendants.

CASE NO. 2:09-CV-02972-KJM-KJN

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW (Fed.R.Civ.P. 50(b))**

**[ATTACHED TO DEFENDANT'S NOTICE OF MOTION AND MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW]**

**[FILED CONCURRENTLY WITH DECLARATION OF RAYMOND A. CARDOZO AND APPENDIX]**

**Date: September 28, 2012**
**Time: 11:00 a.m.**
**Courtroom 3**
**The Honorable Kimberly J. Mueller**

US_ACTIVE-108856105.12

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

# TABLE OF CONTENTS

Page

I. INTRODUCTION ....... 1

II. ARGUMENT ....... 3

A. JMOL Is Warranted On The Intentional Interference and Defamation Claims ....... 3

1. JMOL Is Warranted On The Intentional Interference Claim Because Plaintiff Failed To Prove CHW Engaged In The Requisite Wrongful Conduct ....... 4

a. Background ....... 4

b. The Evidence And Instructions Require JMOL For CHW On The Intentional Interference Claim ....... 8

2. JMOL Is Warranted On The Defamation Claim Because CHW Made No False Statements To Prospective Employers Or Medical Privileging Committees, Plaintiff Agreed To Immunize CHW From Such Claims, And The Challenged Statements Made Internally Were Nonactionable Opinion Or Not Made With The Requisite Ill Will Or Hatred To Defeat The Common Interest Privilege ....... 10

B. JMOL Is Warranted On The State-Based Punitive Damages Awards (Claims 3 Through 6) Because Plaintiff Failed To Prove Two Required Elements ....... 14

1. Plaintiff Failed To Prove That An Officer, Director, Or Managing Agent Authorized Or Ratified The Conduct At Issue ....... 14

2. Plaintiff Failed To Establish CHW's Financial Condition ....... 19

III. CONCLUSION ....... 23

- i -

US_ACTIVE-108856105.12

MEMORANDUM IN SUPPORT OF DFT'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abboud v. International Bus. Mach. Corp.*,
No. C 04-00017 JW, 2006 WL 905319 (N.D.Cal. Apr. 7, 2006) ..... 12

*Ace v. Aetna Life Ins. Co.*,
139 F.3d 1241 (9th Cir. 1998) ..... 3

*Adams v. Murakami*,
54 Cal.3d 105 (1991) ..... 19, 20, 22

*Bangert Bros. Const. Co., Inc. v. Kiewit Western Co.*,
310 F.3d 1278 (10th Cir. 2002) ..... 3

*Baxter v. Peterson*,
150 Cal.App.4th 673 (2007) ..... 21

*Campanelli v. Regents of the Univ. of Cal.*,
44 Cal.App.4th 572 (1996) ..... 12

*Chaney v. City of Orlando, Fla.*,
483 F.3d 1221 (11th Cir. 2007) ..... 3

*Chronicle Pub. Co. v. Legrand*,
1992 WL 420808 (N.D. Cal. Sept. 3, 1992) ..... 21

*City Solutions, Inc. v. Clear Channel Comm.*,
365 F.3d 835 (9th Cir. 2004) ..... 3

*Cruz v. HomeBase*,
83 Cal.App 4th 160 (2000) ..... 15

*Down East Energy Corp. v. Niagara Fire Ins. Co.*,
176 F.3d 7 (1st Cir. 1999) ..... 3

*E.E.O.C. v. Go Daddy Software, Inc.*,
581 F.3d 951 (9th Cir. 2009) ..... 3

*Egan v. Mutual of Omaha Ins. Co.*,
24 Cal.3d 809 (1979) ..... 15

*Freund v. Nycomed Amersham*,
347 F.3d 752 (9th Cir. 2003) ..... 22

*Gelfo v. Lockheed Martin Corp.*,
140 Cal.App.4th 34 (2006) ..... 16

*Gould v. Maryland Sound Indus., Inc.*,
31 Cal.App.4th 1137 (1995) ..... 12

*Guebera v. Allstate Ins. Co.*,
237 F.3d 987 (9th Cir. 2001) ..... 13

*Holtzclaw v. Certainteed Corp.*,
795 F.Supp. 2d 996 (E.D. Cal. 2011) ..... 15, 16, 18, 19

*Jensen v. Hewlett-Packard Co.*,
14 Cal.App.4th 958 (1993) ..... 11, 12

*Johnson v. Paradise Valley Unified School Dist.*,
251 F3d 1222 (9th Cir. 2001) ..... 3

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- ii -
US_ACTIVE-108856105.12
MEMORANDUM IN SUPPORT OF DFT'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

*Kelly v. General Tel. Co.*,
136 Cal.App.3d 278 (1982) .......... 11

*Kelly v. Haag*,
145 Cal.App.4th 910 (2006) .......... 19, 21

*Kelly-Zurian v. Wohl Shoe Co.*,
22 Cal.App.4th 397 (1994) .......... 16, 19

*Lara v. Cadag*,
13 Cal.App.4th 1061 (1993) .......... 21

*McKinney v. Apollo Group, Inc.*,
No. 07cv2373 WQH (CAB), 2009 WL 937142 (S.D. Cal. Apr. 3, 2009) .......... 12

*Reese v. Barton Healthcare Sys.*,
606 F.Supp.2d 1254 (E.D. Cal. 2008) .......... 12

*Roby v. McKesson Corp.*,
47 Cal.4th 686 (2009) .......... passim

*Rudwall v. Blackrock, Inc.*,
No. C 06-2992 MHP, 2006 WL 3462792 (N.D.Cal. Nov. 30, 2006) .......... 12

*Simon v. San Paolo U.S. Holding Co. Inc.*,
35 Cal.4th 1159 (2005) .......... 19

*Smith v. Maldonado*,
72 Cal.App.4th 637 (1999) .......... 12

*Vermillion v. Corr. Corp. of Am.*,
CVF08-1069, 2008 WL 4755329 (E.D. Cal. Oct. 29, 2008) .......... 14-15, 19

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000) .......... 3

*White v. Ford Motor Co.*,
312 F.3d 998 (9th Cir. 2002) .......... 3

*White v. Ultramar, Inc.*,
21 Cal.4th 563 (1999) .......... 2, 14, 16

*Wu v. Doucette*,
2010 WL 1444505 (C.D. Cal. Apr. 8, 2010) .......... 21

**Statutes and Regulations**

45 CFR § 164.502(j) .......... 9, 11

Cal. Civ. Code § 47(c) .......... 10

Cal. Civ. Code § 1559 .......... 10

Cal. Civ. Code § 3294(b) .......... 2, 14

**Rules**

Fed.R.Civ.P. 50 .......... 22

Fed.R.Civ.P. 50(a) .......... 4, 18, 22

Fed.R.Civ.P. 50(c)(1) .......... 3

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- iii -
US_ACTIVE-108856105.12
MEMORANDUM IN SUPPORT OF DFT'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## TABLE OF ABBREVIATIONS

We use the following abbreviations throughout this memorandum:

"JMOL" refers to judgment as a matter of law

"CHW" refers to defendant Dignity Health, formerly named Catholic Healthcare West; since the pleadings have referred to defendant as CHW, this memorandum continues to do so for simplicity sake.

"RAS" refers to Radiological Associates of Sacramento

"Medical Staff" refers to the self-governing entity of physicians that determines who receives privileges to practice medicine at the two Mercy Hospitals

"[date]RT [page #]" refers to the reporter's transcript of the trial proceedings for the date indicated (all dates indicated are in 2012), by page number (e.g., 2/22RT 35). (A single, consecutively-paginated transcript of the trial proceedings does not exist, so we refer to the record by date of transcript and page number; copies of all pages appear in the Appendix attached to the Declaration of Raymond A. Cardozo.)

"Ex" refers to an exhibit, by number (copies of all cited exhibits appear in the Appendix attached to the Declaration of Raymond A. Cardozo.)

"Doc." refers to filed documents, by the docket number assigned to the document

"Instr." refers to a Final Instruction (Doc. No. 284)

Unless otherwise indicated, all statutory references are to the California Civil Code.

- iv -

US_ACTIVE-108856105.12

MEMORANDUM IN SUPPORT OF DFT'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## I. INTRODUCTION

To permit employers and medical privileging committees the latitude to deliberate on an employee's or applicant's fitness, California law restricts the ability of the evaluated party to bring claims against those who supply information to the deliberating body. California law also restricts punitive damages claims against corporations to cases where top policy-making corporate officials have authorized or ratified the misconduct at issue. Here, plaintiff's state law claims for intentional interference with prospective economic advantage, defamation, and punitive damages under state law violated these legal limits and suffered from fatal defects in proof.

Plaintiff's intentional interference claim was based on two allegedly "wrongful acts" by CHW that plaintiff claims interfered with her employment relationship with Radiological Associates of Sacramento (RAS): (1) CHW purportedly falsely advised the Medical Staff, an independent, self-governing entity of physicians that confers clinical privileges, that plaintiff had been terminated from Mercy General Hospital, and (2) CHW purportedly falsely told the Medical Staff that plaintiff had taken confidential patient records in violation of law and/or policy. By the end of trial, however, both theories had collapsed. It was undisputed that plaintiff *was* terminated from Mercy General. The Court thus instructed the jury that it "was established as true" "for purposes of this case" that she had been terminated. Similarly, it was undisputed that plaintiff took confidential patient records from the hospital. And although she claimed she was legally entitled to take them under a "whistleblower exception" to the federal privacy laws, the Court ruled that this exception did not apply. The Court thus instead instructed on the privacy laws in a manner that required the jury to find that plaintiff had taken records *in violation of* law and/or policy. Thus, as a matter of law, it was established that CHW did not "falsely" inform the Medical Staff either that plaintiff had been terminated from Mercy General or that she had taken medical records in violation of law or policy.

Although the Court's instructions dictated a finding for CHW on the intentional interference claim, the jury disregarded those instructions and returned an impermissible verdict on it. The Court should grant judgment as a matter of law (JMOL) to CHW on that claim.

Plaintiff's defamation claim challenged statements made internally within CHW as well as the same external statements that were the basis for her interference claim. For the same reasons that

- 1 -
US_ACTIVE-108856105.12
MEMORANDUM IN SUPPORT OF DFT'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

the interference claim fails, the Court should grant JMOL on plaintiff's external defamation claim. In addition, the internal defamation claim fails because the statements made in connection with plaintiff's performance reviews to HR were either nonactionable opinion or privileged.

The Court also should grant JMOL on the state law punitive damages claims. First, California law requires that someone "who exercise[s] substantial discretionary authority over decisions that ultimately determine corporate policy" must, with advance knowledge, authorize the conduct that justifies punitive damages or must ratify that conduct. § 3294(b); *White v. Ultramar, Inc.*, 21 Cal.4th 563, 577 (1999). Plaintiff could not satisfy this requirement because no one on the witness list (Doc. 259) or at trial qualified as such a policy-making employee. Plaintiff argued that Doris Frazier, the head of *one department* at *one* of CHW's *forty* hospitals, qualified, but that argument ignored settled law holding that a manager at one facility does not qualify as the type of policy-setting official of the *corporation* who must authorize or ratify conduct before the *corporation* may be punished. Because there was no evidence of high-level corporate knowledge, authorization, or ratification, JMOL on all the state law punitive damages claims is warranted.

Second, plaintiff failed to present evidence on CHW's financial condition, another mandatory element of proof. Plaintiff attempted to introduce such evidence during her rebuttal testimony but the Court correctly sustained objections on the ground that she was not competent to testify to CHW's financial information. Plaintiff then asked for judicial notice of financial evidence, but the Court correctly denied the request because plaintiff did not establish the prerequisites for judicial notice. The result was that the case went to the jury without sufficient financial condition evidence. Such evidence, however, is mandatory to recover punitive damages under state law, and the cases invariably reverse where, like here, insufficient financial condition evidence was presented.

When CHW orally moved for JMOL under Rule 50(a), the Court denied the motion with regard to all other claims, but took under submission plaintiff's claims for defamation and state law punitive damages. (2/15RT 234; 2/22RT 236) Although the Court initially denied the motion with regard to intentional interference (2/15RT 234), it later stated it was deferring ruling on that claim as well (2/16RT 2). After the Court instructed the jury, CHW renewed its Rule 50(a) motion as

previously articulated, which the Court denied "without prejudice." (2/24RT 50-51) The Court should now grant JMOL on the interference, defamation, and state law punitive damages claims.[1]

## II. ARGUMENT

JMOL is warranted when "the [admissible] evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment." *Down East Energy Corp. v. Niagara Fire Ins. Co.,* 176 F.3d 7, 15 (1st Cir. 1999); *Weisgram v. Marley Co.,* 528 U.S. 440, 457 (2000); *White v. Ford Motor Co*., 312 F.3d 998, 1010 (9th Cir. 2002); *Johnson v. Paradise Valley Unified School Dist.*, 251 F3d 1222, 1227 (9th Cir. 2001). The Court independently evaluates the evidence; it does not make credibility assessments, weigh the evidence, or rely on the jury's findings. *City Solutions, Inc. v. Clear Channel Comm.*, 365 F.3d 835, 841 (9th Cir. 2004); *see Chaney v. City of Orlando, Fla.*, 483 F.3d 1221, 1228 (11th Cir. 2007). The Court has the power to grant a motion for JMOL on the entire judgment or on certain claims or issues. *Ace v. Aetna Life Ins. Co.,* 139 F.3d 1241, 1247 (9th Cir. 1998) (partial JMOL on punitive damages); *Bangert Bros. Const. Co., Inc. v. Kiewit Western Co.,* 310 F.3d 1278, 1286 (10th Cir. 2002) (partial JMOL on fraudulent misrepresentation).

Finally, subject to various exceptions, a party seeking JMOL under Rule 50(b) generally must have moved for JMOL pre-verdict under Rule 50(a). *E.E.O.C. v. Go Daddy Software, Inc.,* 581 F.3d 951, 961 (9th Cir. 2009). As explained below, CHW moved for JMOL in its oral Rule 50(a) motion on each of the counts or claims challenged here.

### A. JMOL Is Warranted On The Intentional Interference and Defamation Claims

When plaintiff applied for clinical privileges, she expressly agreed to immunize from liability anyone who furnished information to the Medical Staff. Her intentional interference and defamation claims nevertheless sought to impose tort liability based on information CHW furnished to the committee. Her defamation claim also sought to impose liability based upon information furnished internally within CHW as part of an evaluation of plaintiff. If such claims were permitted, and such breaches of agreements to immunize from liability ignored, the ability of such committees or

[1] If the Court grants this motion in whole or in part, Rule 50(c)(1) requires the Court to "conditionally rule" on the portion of CHW's new trial motion that challenges the same claims.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

employers to perform their functions would be crippled because no one would speak to a privileging committee or would furnish a personnel evaluation. For that reason, California law restricts such claims, as the Court's instructions reflected. Those instructions, applied to the evidence, require JMOL for CHW on the intentional interference and defamation claims.[2]

**1. JMOL Is Warranted On The Intentional Interference Claim Because Plaintiff Failed To Prove CHW Engaged In The Requisite Wrongful Conduct**

Plaintiff based her intentional interference claim on two theories that, by the close of evidence, had collapsed to the point that the Court's instructions foreclosed a verdict for her. The jury nevertheless disregarded those instructions and rendered an impermissible verdict on that claim.

**a. Background**

Although CHW employed plaintiff, she was authorized to practice medicine at Mercy General and Mercy San Juan by an independent entity—the Medical Staff, a self-governing entity composed of medical practitioners who were not hospital employees and who had sole discretion, independent of CHW, to determine an applicant's fitness to receive clinical privileges. (2/22RT 168-70) When plaintiff first applied to and received privileges from the Medical Staff, she attested she would inform Mercy San Juan Medical Center within 72 hours if she had been terminated from employment at a healthcare facility. (2/22RT/153)

While employed at CHW, plaintiff received several written reprimands. (Exs. 41, 61) CHW terminated Plaintiff in August 2008 pursuant to a written notice that specified she was terminated. (Ex. 70; 2/23amRT 136) A month later, she resigned her clinical privileges at Mercy General (Ex. 82) and at Mercy San Juan (Ex. 86). In the fall of 2009, plaintiff applied for employment at RAS. In response to an inquiry from RAS regarding plaintiff's fitness for clinical privileges, a Medical Staff office employee wrote that plaintiff had demonstrated competence for the privileges requested. (Ex. 88) The letter listed the date in 2007 that plaintiff had been appointed and a "Resignation Date" in August 2008. (*Id.*) RAS hired plaintiff in fall 2009.

---

[2] In its oral Rule 50(a) motion, CHW sought JMOL on interference, noting "there has not been any wrongful act that has come into play in this case and that plaintiff's release barred the claim (2/15RT 219-20), and on defamation, arguing "there are no defamatory statements in the evidence here" (2/15RT 218).

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

On March 3, 2010, plaintiff applied for clinical privileges at Mercy San Juan and Mercy General. (Ex. Q-117) The Medical Staff evaluated her application. (2/22RT 168-70) As part of her application, plaintiff stated, "[t]o the fullest extent permitted by California and federal law, I hereby release from any liability and extend immunity to any individuals and organizations who provide information" concerning her fitness to receive privileges. (Ex. P 137; 2/15RT 32) Plaintiff also answered "no" to a question ("Question C") that asked whether her "clinical privileges, membership, contractual participation or employment by any medical organization …" had ever "been denied, suspended, restricted, reduced, subject to probationary conditions, revoked or not renewed for possible incompetence, improper professional conduct or breach of contract[.]" (Ex. Q-125) She also answered "no" to whether she had "ever received a disciplinary action in the form of a written letter of reprimand, admonition, warning, or censure regarding your clinical performance as a practitioner or your professional behavior or conduct towards patients, families, staff, colleagues or other participants in the health care treatment environment[.]" (*Id.*) In a page she entitled "Time Gap Explanations," plaintiff wrote "09/08-08/09- I took time off for personal reasons." (Ex-Q 103)

The Medical Staff office advised the Medical Staff that CHW had terminated plaintiff from employment at Mercy General. The Medical Staff wrote plaintiff on May 12, 2010, asking about her "no" answer to Question C. Plaintiff replied on May 17, stating "I knew that the 'expressed reason' for my termination would prompt me to answer 'yes.' However, I do not believe this was the actual reason I was terminated, thus answering no seemed right as I was not incompetent nor did I engage in unprofessional conduct or a breach of contract." (Ex. Q-234-235; 2/22RT 156) She added, "I can understand that it could appear, I was being disingenuous by answering no, but given the circumstances in which I was terminated and what followed after termination, and the advice I got, and of course, the need to work, I answered no." (*Id.*) And, "[p]er your request, I will change the answer to a yes with this clarification." (Ex. Q-235) Plaintiff did not refer to any resignation status.

Then, during her March 15, 2010 deposition, CHW learned plaintiff had taken the private health information ("PHI") of 132 Mercy patients. (2/14RT 85-86) CHW concluded it was required by law to notify those 132 patients of plaintiff's misappropriation of their PHI. CHW's Jim Anderson advised the Medical Staff that CHW had learned of plaintiff's taking of PHI. In a May 18,

- 5 -

US_ACTIVE-108856105.12

MEMORANDUM IN SUPPORT OF DFT'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

2010 letter, the Medical Staff asked plaintiff about this. (Ex. Q-236) The following day, plaintiff responded to the Medical Staff by letter, admitting she took and kept patient records at her home and she "underst[ood] it was improper to create a record with patient information." (Ex. Q-237; 2/22RT 166-68) Plaintiff added that she had kept the records in a locked cabinet at home and never disclosed them to anyone other than her attorney as part of discovery. (*Id.*)

The Medical Staff denied plaintiff's application for privileges via a June 8, 2010 letter from its Medical Executive Committee ("MEC"),[3] explaining that plaintiff "provided false information on your application form…." (Ex. 114) The Medical Staff stated that despite plaintiff's disagreement with Mercy General's termination of her employment, she "should have disclosed" the termination. (*Id.*) The Medical Staff added "[t]he denial of your application is also based upon information that you inappropriately utilized patient health information, requiring Mercy General Hospital to send notifications to 132 patients that a breach of their confidential information had occurred. As you acknowledged in your letter of May 19, 2010, you kept patient notes in your work locker and, upon termination from your employment, removed the patient information from the Hospital and, sometime thereafter, gave them to your attorney. Despite your acknowledgment that it was improper to retain this information and assurances that you will now maintain patient confidentiality, the MEC cannot disregard the fact that you breached the confidentiality rules of Mercy General Hospital and applicable laws." (*Id.*)

The Chair of the Medical Staff's MEC, Dr. Jack Wood, testified that during the MEC's investigation of plaintiff's "no" answer to Question C, the MEC was unable to find documentation that plaintiff had complied with her duty to notify Mercy San Juan of her termination by CHW within 72 hours of that event, which duty was a condition of her original grant of privileges at Mercy San Juan. (2/22RT 152) Dr. Wood also testified that upon review of plaintiff's explanation for her "no" answer to Question C, plaintiff's explanation was "[i]nadequate as it did not appear to be a

[3] The Medical Staff has several committees that handle different layers of review in the privileging decision. The MEC makes the final recommendation.

- 6 -
US_ACTIVE-108856105.12
MEMORANDUM IN SUPPORT OF DFT'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

truthful response to the questions" and thus "points to the ethics of the applicant misinterpreting what the question said and replying in a wrongful manner." (2/22RT 157-58)

Dr. Wood also testified that "it is expected of providers of healthcare to keep confidential, essentially at all costs, the personal health information of patients" and that it was CHW's policy to preclude removal of PHI from the hospital for any reason "other than continued healthcare reasons of the practitioner themselves who [are] following the patient." (2/22RT 165) Thus, he said, plaintiff's removal of PHI from the hospital to document what happened during surgeries "would definitely violate Mercy's policies." (2/22RT 166) After reviewing at trial plaintiff's explanation regarding her keeping the records locked and limiting their disclosure to her attorney as part of discovery, Dr. Wood testified her actions were a "clear violation" of Mercy's policy. (2/22RT 167) This assessment from a physician who was legally independent of CHW (and by all of the independent physicians on the MEC who had also unanimously so concluded) mirrored what the Court later ruled and instructed the jury: it is a violation of law to take PHI unless authorized by the patient, a court order, or a direct need for medical diagnosis. (Instr. 24)

The MEC extensively discussed plaintiff's PHI breach and her explanation, and concluded, "in the opinion of everyone on the Medical Executive Committee," her conduct "was a clear violation of ethical standards" [2/22RT 170], i.e., "a major breach of personal health information by a practitioner" [*id.* 171-72].[4] Dr. Wood confirmed in his testimony that plaintiff's breach along with her Question C answer and her explanations were the grounds for denying her privileges. (2/22RT 156-157, 170-72)

After the Medical Staff denied plaintiff privileges, her employment at RAS ended in June 2010. (2/14/RT 85-86) According to plaintiff, "I lost my job because I couldn't get privileges at Mercy, and 60 percent of his[5] operative cases were at Mercy." (2/14RT 86)

---

4   Under the Health Insurance Portability and Accountability Act ("HIPAA"), healthcare providers have stringent obligations to maintain patient confidentiality and must notify patients when any breach occurs. While the jury, perhaps unfamiliar with HIPAA, may not have appreciated the seriousness of plaintiff's transgression, it was not lost on the medical practitioners who comprise the MEC.

5   The "his" presumably refers to the RAS surgeon for whom plaintiff worked.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Also, on June 18, 2010, Barbara Wheat, an employee in the Mercy General Medical Staff office, sent RAS a letter to clarify that office's earlier October 1, 2009 response to RAS's request for credentialing information about plaintiff. (Ex. 115) Wheat stated that the earlier response had been based on information in Mercy's General's database that plaintiff had resigned her privileges since she was no longer employed by CHW. (*Id.*) Wheat added that in connection with plaintiff's 2010 application for privileges, "we became aware that her previous employment with Mercy General had been terminated and not voluntarily relinquished." (*Id.*)

**b. The Evidence And Instructions Require JMOL For CHW On The Intentional Interference Claim**

The Court instructed the jury that, to prevail on her claim of intentional interference with her relationship to RAS, plaintiff needed to prove seven elements, including that defendant "engaged in wrongful conduct through falsely claiming plaintiff was terminated from Mercy General Hospital and/or that she took private medical information in violation of law or policy[.]" (Doc. 284, Instr. No. 23) The only evidence asserting a causal connection between such alleged CHW conduct and the termination of plaintiff's employment with RAS was plaintiff's testimony that she lost her job at RAS because she had lost her privileges at Mercy. (2/14RT 86) Thus, her interference claim required plaintiff to prove that CHW falsely claimed to the Medical Staff that she had been terminated and/or falsely claimed to the Medical Staff that she took PHI in violation of law or policy. (Doc. 284, Instr. No. 23)

Plaintiff did not prove either point. By the close of evidence, each point had been established adverse to plaintiff, with the Court instructing the jury in a way that foreclosed a finding for her.

First, the evidence was undisputed that plaintiff *was* terminated, and the Court so instructed the jury. (Doc. 284, Instr. 21) She received a written notice of termination in August 2008. (Ex. 70; 2/23amRT 136) Although she later resigned her *clinical privileges* at Mercy General (Ex. 82) and Mercy San Juan (Ex. 86), her *employment* with CHW was terminated. Thus, as noted, when the Medical Staff inquired about her "no" answer on this point in her application for privileges, plaintiff herself told the Medical Staff that she had been terminated. (Ex. Q-234-235; 2/22RT 156)

Accordingly, Instruction No. 21 stated "*[f]or purposes of this case*, you are instructed that the first two elements above are established as true." (Doc. 284, Instr. 21, ital. added) The second of those "elements" was "[t]hat Catholic Healthcare West terminated [plaintiff]." (*Id.*) Because plaintiff *was* terminated, she could not establish that CHW "falsely claim[ed]" that she was.

Second, plaintiff did not prove CHW "*falsely* claim[ed] … that she took private medical information in violation of law or policy" [Doc. 284, Instr. 23, ital. added], and the instructions foreclosed any such finding. The Court instructed the jury that "[m]edical privacy law and policy prevents a health care provider from accessing, using, releasing, transferring or divulging a patient's identifying medical information … without that patient's authorization, a court order, [or] the direct need for medical diagnosis or treatment." (*Id.*, Instr. 24) The parties stipulated in front of the jury that during plaintiff's March 15, 2010 deposition, "it was discovered Ani Chopourian had taken the private health information relating to 132 Mercy patients." (2/14RT 85-86)

Moreover, there was no evidence plaintiff took that information with any patient's authorization, a court order, or the need for medical diagnosis or treatment. Rather, plaintiff's explanation was that she was legally entitled to take the confidential patient records as a "whistleblower" under 45 CFR section 164.502(j). The Court, however, found insufficient evidence "that [plaintiff] was consulting Miss Levi [her first attorney] for purposes of determining [her] legal options" in this regard, so there was "no evidence to have any [such] claim to go to the jury," and no basis to include plaintiff's whistleblower theory in the intentional interference instruction. (2/23amRT 219-20)[6]

The Court instead gave the above-quoted Instruction 24 that, given the evidence, required a finding that plaintiff *did* take "private medical information in violation of law or policy." Again, therefore, she could not and did not establish that defendant "falsely claimed" that she did so.

---

6 The "whistleblower" regulation exempts from HIPAA a covered entity if a "member of [the entity's] workforce or business associate" discloses under certain circumstances protected patient information to an attorney he or she has retained "for the purpose of determining" her "legal options" concerning whether the entity has engaged in unlawful or unprofessional conduct or potentially endangered, patients, workers, or the public. 45 CFR § 164.502(j). Taking PHI to create evidence for a personal lawsuit and furnishing the PHI to an attorney to comply with discovery does not fall within the terms of the regulation.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

In short, because plaintiff did not and could not prove the essential wrongful act element of intentional interference, the Court should grant JMOL as to that claim for this reason alone.

JMOL also is proper for another reason. As noted, plaintiff agreed as a condition of her application for privileges that she would immunize anyone who provided information to the Medical Staff. That promise was essential to the Medical Staff's ability to operate because without it, no one would likely furnish information. The immunity provision was intended to benefit parties, like CHW, who supplied information, and as such, CHW is entitled to enforce plaintiff's agreement to immunize it from liability. *See* § 1559 (where contract is made expressly for the benefit of a third party, third party may enforce the contract). CHW noted in a trial brief that plaintiff's immunity agreement foreclosed liability. (Doc. 186) CHW then confronted plaintiff with that agreement in cross-examination (2/15RT 30-32), and raised it again in its oral Rule 50(a) motion (2/15RT 219).

Although plaintiff has argued that she waived claims against CHW only to the extent CHW gave information in good faith, her agreement contains no such limitation and instead employs the broad and unconditional term "extend immunity to." Plaintiff has confused the statutory conditional privilege that protects persons who supply information to "interested" parties, even in the absence of any immunity agreement (§ 47(c)), with the broader immunity agreement she signed. Her agreement extended immunity to CHW "to the *fullest extent* <u>*permitted*</u> by California or federal law …." (Ex. Q-230 ¶ E(3)[ital. and underline added]) No California or federal law *prohibits* an applicant for privileges from extending immunity to those who furnish information to a Medical Staff. Indeed, if plaintiff had not guaranteed CHW immunity, CHW would have been free to decline to speak to the Medical Staff at all. This is an independent reason to grant JMOL on the interference claim.

**2. JMOL Is Warranted On The Defamation Claim Because CHW Made No False Statements To Prospective Employers Or Medical Privileging Committees, Plaintiff Agreed To Immunize CHW From Such Claims, And The Challenged Statements Made Internally Were Nonactionable Opinion Or Not Made With The Requisite Ill Will Or Hatred To Defeat The Common Interest Privilege**

The Court instructed the jury that plaintiff's defamation claim was based on the assertion that CHW employees, acting with "hatred or ill will" toward plaintiff, made "false negative statements concerning her work performance and professional abilities to its other employees" (so-called "internal" defamation), "prospective employers, and/or medical privileging committees" (so-called

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

"external" defamation). (Doc. 284, Instr. 26 & 27) As a matter of law, the evidence does not support either of plaintiff's defamation theories.

**External Defamation**. There was no evidence CHW made any false statements to any "prospective employers." The other statements plaintiff ever pointed to as purported external defamation were the same communications to the Medical Staff that comprised her intentional interference claim—that CHW "falsely" stated she had been terminated and that she had taken patient records in violation of law or policy. As explained, however, these statements were true: plaintiff *was* terminated—indeed, the jury was so instructed. (Doc. 284, Instr. 21) And she *did* take patient records in violation of law or policy—she stipulated she took them [2/14RT 85-86] and the Court *rejected* the only justification she asserted for doing so, that she was a "whistleblower" under 45 CFR section 164.502(j) [2/23amRT 219-20]. JMOL is therefore required on external defamation.

JMOL is also required on external defamation based on plaintiff's agreement to immunize parties, like CHW, who supplied information to the Medical Staff, as discussed above.

**Internal Defamation.** In support of her internal defamation claim, plaintiff pointed to Exhibit 261, which consisted of emails between Dodge and HR and plaintiff's performance appraisals/evaluations. (For the Court's convenience, we attach as Appendix A excerpts from Exhibit 261 that contained statements about plaintiff's performance.) The Court initially ruled that plaintiff's internal defamation claim was not viable. (2/22RT 10-11) Relying on *Kelly v. General Tel. Co.*, 136 Cal.App.3d 278, 283 (1982), plaintiff ultimately persuaded the Court to reverse itself and rule that "publication of internal comments can satisfy defamation" as long as such statements violated the qualified common interest privilege in section 47(c)—i.e., were made with hatred or ill will. (2/23amRT 2)

Cases after *Kelly*, however, make clear that the internal defamation claim asserted here was not viable. A defamation claim may not rest on internal job performance-related statements unless those statements falsely accuse an employee of "criminal conduct, lack of integrity, dishonesty, incompetence or reprehensible personal characteristics or behavior[.]" *Jensen v. Hewlett-Packard Co.*, 14 Cal.App.4th 958, 965 (1993). That failing, such statements constitute nonactionable opinion rather than actionable defamation. *Id.*

In *Jensen,* a supervisor evaluated the plaintiff's work as "adequate in certain respects" but noted the plaintiff had been "the subject of some third party complaints," "was not carrying his weight," exhibited a "negative attitude in dealing with others," lacked "direction in his project activities" and was "unwilling to take responsibility for the projects he oversaw." *Id.* at 966. The court held the statements would not support a defamation claim because they were opinion, not factual, and did not suggest Jensen lacked honesty, integrity, competence, or that he had reprehensible personal characteristics. *Id.* at 970-71. Other decisions are consistent.[7]

Defamation is the "intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Smith v. Maldonado*, 72 Cal.App.4th 637, 645 (1999). In determining whether a statement is fact or opinion, "[t]he court examines the communication in light of the context in which it was published" [*Jensen,* 14 Cal.App.4th at 970]—i.e., the "nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed" [*Campanelli v. Regents of the Univ. of Cal.*, 44 Cal.App.4th 572, 578 (1996)].

Exhibit 261 consisted of internal emails, a written warning to plaintiff, and plaintiff's performance appraisal, which contained statements similar to those in *Jensen.* All the statements in Ex. 261 were a supervisor's statements to plaintiff herself or to HR about plaintiff's performance.

---

[7] *E.g.*, *Gould v. Maryland Sound Indus., Inc.*, 31 Cal.App.4th 1137, 1153-54 (1995) (rejecting claim that supervisor's statement accusing plaintiff of "poor performance" was actionable defamation since statement did not "suggest any lack of honesty, integrity or competency on Gould's part nor does it impute any reprehensible personal characteristic"); *Abboud v. International Bus. Mach. Corp.,* No. C 04-00017 JW, 2006 WL 905319 (N.D.Cal. Apr. 7, 2006) (granting summary judgment; holding performance ratings statement that plaintiff had "achieved some/most of [his] commitments" and "supporting comments that [Plaintiff's] team interaction could have been stronger" did not constitute defamation); *Rudwall v. Blackrock, Inc.*, No. C 06-2992 MHP, 2006 WL 3462792 at *4 (N.D.Cal. Nov. 30, 2006) (statements conveying employer's "impression that plaintiff exaggerated his roles with respect to certain accounts and did not strictly comply with the company's policies regarding travel" were nonactionable opinion; "the courts are not the proper venue for an employee to challenge his employment evaluation" (citing *Jensen*)); *McKinney v. Apollo Group, Inc.,* No. 07cv2373 WQH (CAB), 2009 WL 937142 at *2, *11 (S.D. Cal. Apr. 3, 2009) (dismissing defamation claim that alleged co-workers "attacked" plaintiff's "personal character" in front of other workers, company "demanded" plaintiff sign documents containing statements relating to his "professional performance and character," company caused its "associates" to violate plaintiff's rights as an employee, finding complaint related to "comments regarding plaintiff's performance" that were insufficient to support "requisite conduct to state a claim for defamation in the employee-employer context"); *compare Reese v. Barton Healthcare Sys.*, 606 F.Supp.2d 1254, 1263-64 (E.D. Cal. 2008) (Damrell, J.) (acknowledging that "[g]enerally, performance evaluations are statements of opinion" (citing *Jensen*), but declining to dismiss a defamation claim at the complaint stage because it was based on a "disciplinary action notice" stating the plaintiff had exhibited "continued behavior that is disrespectful to coworkers" and the complaint did not reveal "who the intended primary recipient of the notice is or the purpose to be served by it.").

- 12 -

US_ACTIVE-108856105.12

MEMORANDUM IN SUPPORT OF DFT'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

As such, most constituted nonactionable opinion—Dodge's "concern" that plaintiff's action were "compromising patient care," her belief that plaintiff's conduct raised a "behavioral issue," her statement that plaintiff's "inability to interact effectively with colleagues" was "negatively affecting" morale; and her performance appraisal that plaintiff's behavior "creates an uncomfortable working environment," and that plaintiff "require[s] more direction than your colleagues[.]" The written warning and performance appraisals constituted opinion because they outlined proposed actions and the reasons for them, the latter of which are by their nature subjectively evaluative. Moreover, because Dodge could not relate her opinions without reciting some facts, most factual statements recited in Exhibit 261 were a component of those non-actionable opinions and thus could not be actionable either. If the rule were otherwise, it would be impossible to submit a personnel evaluation without fear of defamation liability. The protected opinions in the evaluation therefore must always include some supporting facts—otherwise the evaluation would be useless.

To the extent that any of the statements in Exhibit 261 were factual and untethered to a nonactionable opinion, they either did not have a natural tendency to injure or cause special damage or did not involve the malice required to overcome the qualified privilege in section 47(c). The statements consisted of Dodge memorializing conversations she had had with plaintiff or others or actions she had taken, simply to make a record with HR about what had transpired. No reasonable juror could have concluded that these notes had a natural tendency to injure or that the qualified privilege did not apply. [8]

Finally, there is another problem with plaintiff's internal defamation theory—based on an issue the California Supreme Court has never decided, but which is a viable defense to defamation

---

[8] Plaintiff did not address these defects but simply broad-brushed the defamation claim in closing through non-sequiturs that bypassed the required elements and misstated the burden of proof. (2/23(pm)RT 25 ("[Plaintiff] told you about her recurring nightmare over this -- over the termination, the attack on her character, the loss of her defamation [*sic*], all those years in school she worked to be in that position gone."), 72 ("False statements. This is funny. The brief little stuff you saw on the screen with the highlighting from the hospital, compare that to that Exhibit 261 with the highlighting done by Ani Chopourian and it's frightening how everything that she is highlighting matches what they say is true because it is not. And in defamation, they have the burden of proof. They have to prove it is true. How far are they from that?"))

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

here.[9] Dodge was the person whom plaintiff accused of making the allegedly defamatory internal communications. Yet, plaintiff sued *CHW* on the theory it was liable, apparently on a vicarious liability theory, for Dodge's statements. But if one applies vicarious liability principles to such a defamation theory, then CHW was both the maker and the recipient of the allegedly defamatory statements because all involved were CHW employees. As a result, there was no "publication." This is another independent logical flaw in plaintiff's internal defamation theory.

As noted, the Court initially rejected plaintiff's "internal defamation" claim [2/22 RT 10-11] before plaintiff persuaded the court to reconsider and reverse [2/23 RT 3]. The Court was right the first time. Because neither the external nor internal statements constituted actionable defamation, JMOL on the defamation claim is required.

**B. JMOL Is Warranted On The State-Based Punitive Damages Awards (Claims 3 Through 6) Because Plaintiff Failed To Prove Two Required Elements**

**1. Plaintiff Failed To Prove That An Officer, Director, Or Managing Agent Authorized Or Ratified The Conduct At Issue**

In a California tort-based action, a punitive damages award against a corporation does not lie unless "an officer, director, or managing agent" "authorized or ratified the wrongful conduct for which the damages are awarded." § 3294(b). The plaintiff has the burden of proving that the employee who authorized or ratified the conduct "exercised substantial discretionary authority over significant aspects of a corporation's business." *White*, 21 Cal.4th at 563. That employee must have "broad authority" to act with independent discretion concerning "formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership." *Roby v. McKesson Corp.*, 47 Cal.4th 686, 714-15 (2009). "The critical inquiry … is 'the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy.' " *Vermillion v. Corr. Corp. of Am.*, CVF08-1069, 2008 WL 4755329, at *11

---

9 In analyzing a state-law issue that has not been decided by the state's highest court, a federal court's task is to predict how the state's highest court would decide the issue. *See, e.g., Guebera v. Allstate Ins. Co.*, 237 F.3d 987, 993 (9th Cir. 2001) ("Our task is to surmise how [the state's highest] court would decide the issue").

(E.D. Cal. Oct. 29, 2008) (quoting *Egan v. Mutual of Omaha Ins. Co*., 24 Cal.3d 809, 822-823 (1979)). The punitive damages instruction given here reflected these principles.[10]

This focus on authorization by a high-level official stems from notions of fairness and responsibility. California law "requires proof of malice among corporate leaders" because "[t]his is the group whose intentions guide corporate conduct." *Cruz v. HomeBase*, 83 Cal.App 4th 160, 167-68 (2000) (internal quotation marks, citation, and alterations omitted) (security supervisor at retail store not a managing agent because "[t]here was not a hint of evidence that he exercised authority over corporate principles or rules of general application in the corporation"). By doing so, the law "assures that punishment is imposed only if the corporation can fairly be viewed as guilty of the evil intent sought to be punished" and prohibits punishment where the conduct "does not reflect the corporate 'state of mind.' " *Id.*; *see also Roby*, 47 Cal.4th at 714 ("[T]he focus of the punitive damages inquiry must be on the corporation's institutional responsibility, if any"). This is likely one of the reasons why the higher standard of clear and convincing proof is required. *Id.* at 712; *Holtzclaw v. Certainteed Corp.*, 795 F.Supp. 2d 996, 1021 (E.D. Cal. 2011).

In *Roby*, the California Supreme Court held that a jury could not reasonably have found that a supervisor (Schoener) at one of McKesson's local distribution centers qualified as a McKesson "managing agent," permitting punitive damages liability against McKesson based on the supervisor's disability discrimination and harassment. 47 Cal.4th at 714. The Court noted that at the time of the plaintiff's termination, "McKesson had over 20,000 employees [and that] Schoener worked at a local distribution center supervising four of them." *Id.* at 715. The corporate ratification requirement, *Roby* explained, refers to those who have discretionary authority over "formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership. It is this sort of broad authority that justifies punishing an entire company

[10] "You may award punitive damages … only if [Plaintiff] proves … [t]hat one or more officers, directors, or managing agents of [CHW] knew of the conduct … and adopted or approved that conduct …. An employee is a 'managing agent' if he or she exercises substantial independent authority and judgment in his or her corporate decision making such that his or her decisions ultimately determine corporate policy." (Doc. 284, Instr. 49)

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

for an otherwise isolated act of oppression, fraud or malice. The record here does not support the conclusion that Schoener exercised that sort of broad authority…." *Id.* [11]

Other cases similarly require the same level of involvement in corporate policy. *Holtzclaw*, 795 F. Supp.2d at 1022 (granting summary judgment; no evidence that plant manager, who implemented the plant's budget, oversaw production schedules and amounts, and assessed employee performance to determine who should be laid off [*id.* at 1007, 1012], was an officer, director or managing agent—nor did plaintiff present evidence showing that VP of operations, to whom plant manager reported, qualified); *Gelfo v. Lockheed Martin Corp.*, 140 Cal.App.4th 34, 63 (2006) (affirming directed verdict on punitive damages because senior manager of equal opportunity programs, who chaired corporation-wide committee, was not even "potentially" a managing agent; plaintiff pointed to senior manager's supervisor, a VP, but presented "[n]o evidence … regarding [the VP's] duties or authority, let alone substantial evidence, that [he] 'exercise[d] substantial discretionary authority over decisions that ultimately determine corporate policy' "); *Kelly-Zurian v. Wohl Shoe Co.*, 22 Cal.App.4th 397, 421-22 (1994) (upholding judgment; even though "there was no one in a superior position … in Southern California" to the regional administrator and he supervised employees who managed multiple retail stores, administrator was not managing agent because he did not "have authority to change or establish business policy"); *compare White*, 21 Cal. 4th at 577 (upholding $300,000 punitive damages award; "zone manager" was responsible for operating 8 stores and overseeing 65 employees daily and was "delegated most, if not all, of the responsibility for running" the stores and made "significant decisions affecting both store and company policy" and was managing agent because she "exercised substantial discretionary authority over decisions that ultimately determined corporate policy in a most crucial aspect of [the defendant's] business").

Here, plaintiff failed to prove ratification by anyone with the requisite authority at CHW, and instead relied erroneously on a vice-president of one department in one of CHW's many hospitals—Doris Frazier. CHW owns and operates 40 hospitals and employs 55,000 employees. (2/9RT 170)

---

[11] *Roby* ultimately did not decide who at McKesson qualified because McKesson never claimed that other, more senior managers, who were aware of the plaintiff's complaints did *not* qualify, so the Supreme Court "assume[d] for purposes of this appeal" that at least one of them was a managing agent. *Id.* at 715.

- 16 -

US_ACTIVE-108856105.12

MEMORANDUM IN SUPPORT OF DFT'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Frazier, the VP of Mercy's Cardiac Unit, is in charge of one department within one of those hospitals. (2/9RT 161, 170) Frazier was clear that she does not make policy at the corporate level:

> Q: Do you make policy at the corporate level, in other words, Catholic Healthcare West?
> A: No I do not.
> Q: Who does?
> A: The people at corporate. (2/13RT 100)

Frazier's role was "to make sure that if policy – when policies are made, that they are put into place and we follow them. That's what our role is in the hospitals." (*Id.*) She was not even informed of important CHW corporate decisions—like its name change to Dignity Health, which plaintiff 's counsel characterized as "an important change" (2/9RT 163)—until those decisions were "announced to everybody" or became public. (*id.*, 162-64) She does "[n]ot typically" see press releases from CHW's corporate office, is "not involved" in CHW's corporate finances" [*id.*, 164-65] and has never "had the authority to draft policies or procedures of CHW" [2/13RT 100].

Frazier is not even a policy-setting official at Mercy General. Mercy General has a governing board, but Frazier does not attend its meetings. Indeed, as she explained, the only time she attended any board meeting was to do a presentation on a new technology. (2/9RT 162) And within her own department, Frazier's scope of authority is to "make sure that the policies and procedures that we have in place are implemented and followed in a fair consistent manner." (*Id.*) Frazier is responsible to "know and understand" the financials of the cardiac surgery department, and has "knowledge of the cost accounting" [*id.*, 167, 169]—but she never testified she had discretion with regard to the department's or Mercy's budget. In short, because there was *no*—much less clear and convincing—evidence that Frazier had "broad authority" to act with independent discretion concerning "formal policies that affect a substantial portion of" CHW [*Roby*, 47 Cal.4th at 714-15], the jury could not assess punitive damages against CHW based on Frazier's status.[12]

---

[12] Plaintiff suggested that other employees at or below Frazier's level also qualified, pointing to Scrafton, the CVOR clinical coordinator, who reported to Frazier [2/9RT 175], Dodge, the CVOR manager who was "one step" below Frazier [*id.*, 49], Cindy Kirch, Vice President of HR [2/15RT 229], and Jim Anderson, HR manager [2/9RT 116, 2/22RT 19-20]. No evidence showed, however, that any of these individuals exercised the requisite "broad discretion" over CHW policies. (*E.g.*, as HR manager, Anderson "administer[s] policies" and does not make hiring/firing decisions, but merely "supports" and "assists" hospital managers. (2/22RT 19-20)) Plaintiff may also point to Dr. Alan Morris (although she never did previously), but that argument would fail as well. Morris was Mercy's General's Medical

(continued on following page)

- 17 -
US_ACTIVE-108856105.12
MEMORANDUM IN SUPPORT OF DFT'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

At the hearing on its Rule 50(a) motion, CHW emphasized there was no evidence that any CHW managing agent "ratified any of the decisions in this case." (2/15RT 219) In response to the Court's question whether Frazier "count[ed]," CHW replied—consistent with Frazier's testimony—that her "scope of authority does not reach up. She basically carries out the policies that come from CHW which is above her in a separate structure." (2/15RT 220) Plaintiff disagreed, but never explained how Frazier exercised sufficient discretion to set broad policies for CHW. (2/15RT 228-29) Instead, plaintiff erroneously conflated the concept of a "manager" with the definition of "managing agent," with her counsel declaring that "although the stipulation has not yet been worked out in terms of what leadership is, everybody in this case agrees leadership is management. We've been using the phrase 'management' time and time again." (2/15RT 229)[13] The Court, however, correctly ruled later that the "leadership" stipulation was accepted "with the instruction that it is not to be construed as defining 'managing agents.' " (2/22RT 8-9; *see also* 2/21RT 163) Having correctly ruled that "management" did not equate to the corporation-wide policy-making authority required under section 3294(b), the Court should now rule that no evidence satisfied the section 3294(b) standard.

Plaintiff's counsel asserted that Frazier "admitted to being an officer" [2/15RT 228] and that "the vice-president of cardiovascular services … clearly … is a managing agent. I can't even understand how she could possibly not be" [*id.*, 228-29]. But "[t]itles alone" are not determinative. *Holtzclaw*, 795 F. Supp.2d at 1022. Rather, the critical inquiry is the "degree of discretion the

---

(continued from previous page)
Director for cardiovascular services, a role limited to supervising the quality of clinical care in the department. (2/13RT 9) As with Frazier, no evidence showed that he exercised broad discretion over CHW policies. Moreover, Morris testified he was not even consulted on plaintiff's termination and did not support it (*id.*, 20-21), so there was no evidence that he authorized or ratified any of the alleged tortious conduct at issue.

[13] The jury may have erroneously conflated the concepts as well. It was instructed that (a) to establish a claim for sexual harassment, plaintiff must prove "a member of the defendant's management knew or should have known of the harassment and failed to take prompt, effective remedial action" [Doc. 284, Instr. 18], (b) to impose punitive damages on the Title VII claims, "a higher management official of defendant [must have] personally acted with malice" [*id.*, Instr. 48], and (c) to impose punitive damages under the state law counts, "the conduct constituting malice, oppression or fraud [must have been] authorized by one or more officers, directors, or managing agents of Catholic Healthcare West" [*id.*, Instr. 49]. Because there was insufficient evidence to establish (c), the jury may have conflated these requirements, and like plaintiff's counsel, erroneously equated "managing agent" with "manager."

employee[ ] possess[es] in making decisions that will ultimately determine corporate policy." *Kelly-Zurian*, 22 Cal.App.4th at 421-22.

In fact, when the defendant is a large corporation with multiple facilities, even the employee in charge of one of those facilities does not, merely by virtue of his or her managerial capacity or title, act with the requisite authority to expose the corporation to punitive damages. For example, the supervisor at a McKesson distribution center failed to qualify in *Roby*, 47 Cal.4th at 714, as did a plant manager in charge of an insulation manufacturing plant in *Holtzclaw,* 795 F.Supp.2d at 1022. Perhaps an even better example is *Vermillion*, 2008 WL 4755329, at *12. There, Judge O'Neill found insufficient evidence that a warden who exercised "complete control" over a correctional facility operated by a private corrections corporation was a "managing agent" because no "meaningful facts [showed] his discretionary authority over ultimate corporate decisions."

Unlike the warden in *Vermillion*, Frazier was not even the top employee at the facility in question (Mercy General). Nor was there any evidence showing Frazier's "discretionary authority over ultimate corporate decisions." Thus, Frazier was not an officer, director, or managing agent under section 3294. JMOL on the state-law based punitive damages awards is required.

**2. Plaintiff Failed To Establish CHW's Financial Condition**

Because under California law, "the quintessence of punitive damages is to deter future misconduct by the defendant," a "key question" is whether "the amount of damages 'exceeds the level necessary to properly punish and deter.' " *Adams v. Murakami*, 54 Cal.3d 105, 110 (1991). Moreover, because a reviewing court "may consider what level of punishment is necessary to vindicate the state's legitimate interests in deterring conduct harmful to state residents, the defendant's financial condition remains a legitimate consideration in setting punitive damages. [Citation.]" *Simon v. San Paolo U.S. Holding Co. Inc.,* 35 Cal.4th 1159, 1195 (2005).

Punitive damages are intended to "deter wrongful conduct, … not destroy the defendant," which means the plaintiff must present "*meaningful* evidence of a defendant's *financial condition*." *Kelly v. Haag*, 145 Cal.App.4th 910, 916 (2006) (internal quotation marks and citation omitted). Only by comparing the defendant's financial condition with the size of the punitive damages award can the jury assess the proper amount of punitive damages. *Adams*, 54 Cal.3d at 110 ("The nature of

- 19 -

US_ACTIVE-108856105.12

MEMORANDUM IN SUPPORT OF DFT'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

the inquiry is a comparative one."). "[A]bsent financial evidence, a jury will be encouraged (indeed, required) to speculate as to a defendant's net worth in seeking to return a verdict that will appropriately punish the defendant." *Id.* at 114.

A "plaintiff who seeks to recover punitive damages must bear the burden of establishing the defendant's financial condition." *Id.* at 123. After all, because the plaintiff is made whole through compensatory damages, punitive damages are a "windfall" and it is not "too much" to require the plaintiff to "introduce evidence that will allow a jury and a reviewing court to determine whether" that windfall is "excessive in light of the central goal of deterrence." *Id.* at 120 (internal quotation marks and citation omitted). Moreover, "[i]t is inherently prejudicial to require a defendant to introduce evidence of [its own] finances" because "[a] defendant should not be required to justify the amount of the award he or she is seeking to avoid." *Id.* at 123.

Plaintiff attempted to present evidence of CHW's financial status through Doris Frazier. Frazier acknowledged on the stand that what "look[ed] like a press release that would have come … from the corporate office" contained a statement that CHW "made community benefit contributions for 2011 of approximately [$]947 million to the benefit of the community." (2/9RT 164) Plaintiff did not ask, and Frazier did not testify about, what "community benefit contributions" are, so this figure was not explained to the jury. And when plaintiff "propose[d] to move [the supposed press release] into evidence as a statement by a party opponent concerning financial resources for the purposes of punitive damages," the Court sustained CHW's objection. (2/9RT 166) Plaintiff then asked Frazier whether it was "fair to say" that CHW "posts revenue in the billions each year." (*Id.*) Frazier responded that "corporate finances" were not her area of responsibility; rather, the most she was able to testify was that she has "heard that we make money and post billions of dollars of revenue." (2/9RT 166-67)

Aware of evidentiary deficiency in her case-in-chief, plaintiff attempted to patch the hole on rebuttal. First, she moved for the admission of "Catholic Healthcare West and Subordinate Corporations Consolidated Financial Statements" for 2010 and 2011, but the Court declined to take judicial notice and sustained CHW's lack-of-foundation and hearsay objections. (2/23amRT 197-98, 224-25) Next, plaintiff's counsel attempted to elicit from plaintiff—in more than a half dozen

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

ways—testimony about CHW's revenues, net worth, and wealth. (2/23amRT 199-202 ["And what is the net worth of Catholic Healthcare West-Dignity? ... What, if any, information did you hear in the workplace concerning Catholic Healthcare West's and Dignity's financial revenue? … Miss Chopourian, have you ever heard that the company's financial wealth is in the billions?"]) The Court sustained virtually all of CHW's objections, with the result that plaintiff did not testify about CHW's financial status—indeed, she was unqualified to do so. (*Id.*)

As a result, the only evidence on the point is (1) Frazier's acknowledgment of unexplained "community benefit contributions" and (2) her statement that she has "heard that we … post billions of dollars of revenue." (2/9RT 166-67) This was insufficient because vague statements concerning gross revenues in particular do not constitute sufficient evidence of a defendant's financial condition. *See, e.g.*, *Kelly*, 145 Cal.App.4th at 915 ("actual evidence of the defendant's financial condition is essential"); *Lara v. Cadag,* 13 Cal.App.4th 1061, 1063-64 (1993) (evidence of defendant's earnings without evidence of liabilities did not constitute " 'meaningful evidence of the defendant's financial condition' "; "evidence of a defendant's income, standing alone, is wholly inadequate."); *Wu v. Doucette*, 2010 WL 1444505, at *16 (C.D. Cal. Apr. 8, 2010) (" 'net worth' or 'net income' " is required; "the corporate defendant's gross sales receipts or the individual defendant's salary" are insufficient); *Chronicle Pub. Co. v. Legrand*, 1992 WL 420808, at *3 (N.D. Cal. Sept. 3, 1992) (granting JMOL where defendant's salary and amount he spent defending the case was not "meaningful evidence" of financial status). As a result, CHW is entitled to JMOL on the state-based punitive damages awards [14]

This issue is embraced within CHW's oral Rule 50(a) motion to strike the punitive damages claim. Because the Court indicated it wanted to hear the parties' arguments orally, CHW needed only note, which it did, that it was challenging the sufficiency of the evidence to support punitive damages.

[14] California state courts likewise grant judgment notwithstanding the verdict (the state equivalent of JMOL) if a plaintiff had an opportunity to present evidence of the defendant's financial status but failed to do so. *See, e.g.*, *Baxter v. Peterson*, 150 Cal.App.4th 673, 681 (2007); *Kelly*, 145 Cal.App.4th at 919 ("[F]or our justice system to function, it is necessary that litigants assume responsibility for the complete litigation of their cause during the proceedings.").

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Moreover, *Freund v. Nycomed Amersham*, 347 F.3d 752 (9th Cir. 2003), shows that a party may raise an insufficiency in financial condition evidence claim for the first time after a verdict. There, the defendant challenged the punitive damages as excessive on the ground the plaintiff failed to submit "appropriate evidence regarding the defendants' financial condition." *Id.* at 763. Because a party cannot make such a challenge until there is a verdict, *Freund* found the argument not waived. *Id.*, n.11 (excessiveness of jury's award "cannot be known prior to verdict"). Moreover, plaintiff's proposed punitive damages instruction correctly included California's requirement to consider CHW's financial status and ability to pay. *See, e.g.*, *Adams*, 54 Cal.3d at 114 (because requested instruction to award punitive damages that would have deterrent effect "in light of defendant's financial condition," plaintiff's argument that such evidence was not required "r[a]ng[ ] hollow").

One of Rule 50's functions is to "call[ ] to the court's and the parties' attention any alleged deficiencies in the evidence at a time when the opposing party still has an opportunity to correct them." *Freund*, 347 F.3d at 761. Plaintiff's requested instruction proves she was aware of California's financial condition evidence requirement and on notice of the need to introduce the evidence on that issue—indeed, she attempted (unsuccessfully) to do so on rebuttal and at the close of evidence. The lack of a mention of financial condition evidence in CHW's oral Rule 50(a) motion did not deprive plaintiff of notice of the need to correct the deficiency in proof—since plaintiff had notice and attempted to correct the deficiency *after* the motion.[15]

Without meaningful financial condition evidence, this Court and any reviewing court are in the untenable position of determining, based on speculation, the appropriate amount of punitive damages. But "[s]ound judicial policy weighs in favor of fully informed decisions, especially when a public interest is at stake." *Adams*, 54 Cal.3d at 112. Because a punitive damages award "cannot be sustained absent evidence of the defendant's financial condition" [*id.* at 119], this Court should grant JMOL on the state-based punitive damages claims for this reason as well.

---

15 Another purpose of Rule 50 is to alert the district court to the issue so it need not "engage in an impermissible reexamination of facts found by the jury." *Freund*, 347 F.3d at 761. That purpose was served here by plaintiff's requested instruction on the financial condition evidence issue.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

## III. CONCLUSION

If the law permitted liability for intentional interference and defamation claims of the type plaintiff asserted here, privileging committees would be unable to perform the careful evaluations of medical practitioners that those committees need to perform, and employers would be unable to perform essential and candid personnel evaluations. The Court correctly instructed the jury that the challenged statements needed to constitute false statements of fact rather than opinion and needed to be made with ill will or hatred. But the evidence established as a matter of law that the statements did not so qualify. The evidence also did not establish that any CHW director, officer, or managing agent authorized or ratified the conduct at issue nor did plaintiff present the requisite financial condition evidence necessary to support a punitive damages award. As a result, the Court should grant JMOL on those aspects of the judgment.

Dated: May 29, 2012.

Respectfully submitted,
LA FOLLETTE, JOHNSON,
DE HAAS, FESLER & AMES

REED SMITH LLP

By: /s/ Raymond A. Cardozo
RAYMOND A. CARDOZO
Attorneys for Defendant

- 23 -
US_ACTIVE-108856105.12
MEMORANDUM IN SUPPORT OF DFT'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

**APPENDIX A**

**EXCERPTS FROM EXHIBIT 261**

Dodge's 7/3/08 email to Book, Frazier, Anderson, and McCue (HR):

Dodge "totally supported" Scrafton in telling plaintiff that plaintiff could not unilaterally decide she was " 'too tired' " to return to the CVOR for an emergency procedure and that plaintiff could not "call in sick" for the procedure;

After plaintiff did come into work for the procedure and the team was setting up the case, several employees observed she was "not in the room helping the team"; "some of the staff" told Dodge plaintiff was "sleeping in the lounge" and had to be "summoned to" the OR;

When confronted with the "sleeping" allegation, plaintiff said she was "standing outside the room and did not want to go into the room until the last minute since Dr. Kaplon was in there";

Dodge "relayed" to plaintiff "her concern" that "there was an unstable patient," that others were "pitching in to the get the case going," and that Dodge was "concerned that [plaintiff's] actions were compromising patient care in an unstable state [*sic*]"; and

Plaintiff's refusal to "pitch in" was "a behavioral issue."

Dodge's 7/16/08 "Written Warning In Lieu Of Termination Notice" (marked "received" by "MGH Human Resources"):

In their meeting, Dodge and plaintiff discussed the June 30 incident, that Dodge reiterated as described above; with Dodge adding that plaintiff had told one of the nursing assistants to "Wake me up when the patient gets to OR" and that, when she was standing outside the OR while the room was being prepped, plaintiff said there was "nothing for a PA to do during that time";

In her meeting, they also discussed a July 8 incident, when plaintiff was scheduled to assist on a procedure, failed to appear, and when called at home and asked what was going on, she said "F___" and hung up. Dodge wrote that when plaintiff arrived and started assisting in the procedure, she removed a vein from the patient's leg and "did not follow the standard process to provide an opportunity for the MA [medical assistant] to take a break and left the room." Dodge added that during their meeting, plaintiff "acknowledged that [she] did not listen to the call schedule that day" but stated that "it is the MA's call to ask for break relief."

Dodge stated plaintiff's actions violated the hospital's "Rules of Conduct" and that her "inability to interact effectively with colleagues is negatively affecting the moral [*sic*] and harmony of the department," which could lead to termination.

- A1 -

US_ACTIVE-108856105.12

APPENDIX A TO MEMO. IN SUPP. OF DFT'S MOTION FOR PARTIAL JUDG. AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Dodge's 7/22/08 email to Book, Anderson, McCue, and Frazier (HR), recounting an incident Slachman told her about from the previous day:

Plaintiff left the OR after a vein was removed during a procedure and "went to lunch"; she was "summoned" back in; plaintiff complained that she had been "only 10 minutes" into her lunch and was supposed to "get 30 minutes," but Scrafton told her that "her meal waiver pays for her lunch" such that no lunch break is warranted. Dodge also wrote that at one point Asst. MD surgeon Taylor had also left the OR, leaving it "unrepresented by an assistant or PA until Ani got into the room."

Dodge's 7/24/08 email to Frazier, Book Anderson, Kirch, McCue:

Recounts Marife Yu's rearrangement of the PA assignments "to accommodate Ani's request once again," about which "[t]wo PA have approached Yu and "are getting tired of this."

Dodge's 8/12/08 email to Anderson and Book re "documentation log for Ani":

Recounted 8/1/08 incident in which Dodge approached plaintiff to give her Kaplon's and nurses' "positive feedback," to which plaintiff reacted, "this is just a ploy," and "had anger in her voice and a sense of panic";

Recounted 8/4/08 incident about "having an investigatory meeting in HR, to which plaintiff responded she would "never go over to HR without a representative"; additional comments about whether plaintiff wished to respond to recommendation about "corrective action with potential termination";

Recounted 8/5/08 incident where plaintiff accused Scrafton of placing "green" outline on her schedule (meaning "come in early") "on purpose" rather than acknowledging that plaintiff simply "seems not to remember" her early schedule.

Criteria-Based Performance Appraisal (8/8/08 (total overall grade: 1.74, "Does Not Meet Expectations")):

*Perf. Std. I—Relates with Others – Grade: 1.8 (slightly below 2.0, "meets expectation")*: Stated plaintiff "continue to react defensively when confronted or questioned by the surgeons and management, which then escalates and creates an uncomfortable working environment for all." Requires plaintiff to attend "at least one communication [class]" by 10/31/08; "You need to improve in this area to be truly effective in the unit."

*Perf. Std. II—Working Envt – Grade: 1.83:* Stated plaintiff needed to provide education/in-service or participate in a safety/legal/or QI process, which was "not completed"; "Let us know if you need any help with this."

*Pef. Std. III—Efficient Performance – Grade 1.8*: Noted that coworkers had "note[d] trouble with her coworkers at times of scheduling and OR availability"; one surgeon had stated "somewhat lacks enthusiasm at times but there to help me"; underscored "imperative" need to "wear

- A2 -

US_ACTIVE-108856105.12

APPENDIX A TO MEMO. IN SUPP. OF DFT'S MOTION FOR PARTIAL JUDG. AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

your loops during vein harvesting"; "good job learning endoscopic and radial artery harvesting," but "[s]trive for totally endoscopic," and expected plaintiff to learn how to "clock in" "correctly."

*Perf Std. V—Judgment – Grade 1.25*: "… [Y]ou require more direction than your colleagues when it comes to relieving each other for lunches and/or to go home. You frequently have to be summoned back into the room instead of taking the initiative to relieve the assisting surgeon."

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

- A3 -

US_ACTIVE-108856105.12

APPENDIX A TO MEMO. IN SUPP. OF DFT'S MOTION FOR PARTIAL JUDG. AS A MATTER OF LAW
Case No. 2:09-CV-02972-KJM-KJN

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

**CERTIFICATE OF SERVICE**

I hereby certify that on May 29, 2012, I am electronically filing the **MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL JUDGMENT AS A MATTER OF LAW (Fed.R.Civ.P. 50(b))** with the Clerk of the Court of the United States District Court for the Eastern District of California by using the District's CM/ECF system.

All participants in this case are registered CM/ECF users and will be served by the District's CM/ECF system.

Dated: May 29, 2012.

By /s/ Raymond A. Cardozo
Raymond A. Cardozo